IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WALTER STRATTON BAGG, ESQ and
COOPER LAW P.A., individually
and on behalf of all others similarly situated,

vs. Case No.: 6:15-cv-1666 ORL-37-GJK

Plaintiffs,

USHEALTH GROUP, INC.,
A Delaware corporation, and
US HEALTH ADVISORS, LLC,
a Texas limited liability company,

Defendants.
_______________________________________/

**AFFIDAVIT OF JAMES L. JACKSON, JR.**

PERSONALLY APPEARED BEFORE ME, the undersigned, James L. Jackson, Jr., who first being duly sworn, deposes and states

1. My name is James L. Jackson, Jr. and I am over the age of 18, competent to testify, and I have personal knowledge of the matters stated herein.

2. I serve as an Associate General Counsel of USHEALTH Advisors, LLC ("UHA").

3. UHA is a wholly-owned subsidiary of USHEALTH Group, Inc. ("UHG"). UHA sells health insurance policies through independent sales agents.

4. It is not, and has never been, the policy of UHG or UHA to send unsolicited facsimile advertisements.

5. Since its inception, all UHA independent sales agents have been provided with a copy of the company policy tiled "National Do-Not-Call List – Background and Frequently Asked Questions" discussing the Telephone Consumer Protection Act and prohibiting telephone solicitations to individuals on "do-not-call" lists and further prohibiting the sending of



EXHIBIT
tabbies
A

unsolicited facsimiles. *See* Exhibit 1, p 10. This policy expressly states that "Faxes of unsolicited advertisements, solicitations and invitations to inquire are prohibited." *Id.*

6. In 2015, I was made aware of the Plaintiffs' claims that they received an unsolicited facsimile advertisement.

7. Since then, I have been personally involved in the investigation of the Plaintiffs' aforementioned claims and the inquiries into gathering information and documents responsive to Plaintiffs' discovery requests.

8. In the process of this investigation and in responding to the Plaintiff's written discovery requests, I have consulted with Brian Clark (Chief Marketing Office of UHA) and Cynthia Koenig (Chief Financial Officer of UHG); I also communicated with (now former independent sales agent) Birsen Goksu-Savluk who is alleged to have sent the purported facsimile to the Named Plaintiffs. I also communicated with Ms. Goksu-Savluk's division leader, James Hmielewski.

9. Ms. Goksu-Savluk confirmed she did send the facsimile received by the Plaintiffs; that she acted alone; that she prepared the facsimile advertisement herself; and acknowledged that she did not have authority to send the facsimile. *See* Exhibit 2, February 25, 2015 email correspondence from Birsen Goksu-Savluk. She also confirmed during her deposition (which I personally attended) that it was her idea to send the alleged facsimile. *See* Exhibit 3, February 16, 2016 Deposition of Birsen Goksu-Savluk, pp. 31, 63. Ms. Goksu-Savluk's division leader, James Hmielewski, confirmed to me that he did not authorize Ms. Goksu-Savluk to send facsimile advertisements.[1] Additionally, I have also communicated with all eight (8) of UHA's current Regional Sales Leaders, who are over the entirety of UHA's field force nationally, and

[1] Division Leaders are independent contractors and their duties consist of recruiting, training, motivating and leading indepdent sales agents such as Ms. Goksu.

confirmed that they were unaware of any other unsolicited facsimile advertisements sent by any agents within their respective regions.

10. The investigations made by the Companies revealed that, as indicated above, Ms. Goksu-Savluk acted alone and on her own accord in sending facsimiles, and did so without authority from the Companies. In fact, Ms. Goksu-Savluk's transmission of the facsimile was in direct contravention of the written standards of UHA, as well as her contract with UHA. While she did claim during her deposition that her division leader, James Hmielewski, approved of her sending of facsimile advertisements, this testimony directly contradicts her prior email correspondence (which email was sent approximately one year prior to her deposition) wherein she stated she acted alone and without permission. *See* Exhibit 3, p. 32; Exhibit 2 ("I personally created the flyer myself . . . No one approved this flyer from my leaders. They didn't even know I was doing this.").

11. No facsimiles or other facsimiles (as defined in Plaintiffs' discovery requests) were determined to be reasonably within the Companies' custody, possession or control. In fact, the only unsolicited "facsimile" advertisement the Companies have located is the single facsimile the Named Plaintiffs produced to the Companies after making their claim—it was not independently located during the Companies' investigation since the Companies never had been previously provided with this facsimile. Nor were any third party facsimile broadcasting companies identified from my investigation aside from the one Ms. Goksu-Savluk claims to have utilized (Fax87) which apparently sent the facsimile at issue to the Plaintiffs. In the same vein, the Companies' investigation did not reveal the identification of any transmitters, phone numbers of machines which transmitted, nor the identification of any receivers of purported facsimiles or other facsimiles (as defined in Plaintiffs' discovery requests).

12. The Companies even requested that Ms. Goksu-Savluk request all correspondence and documentation exchanged between herself and the apparent third party facsimile

broadcasting company she utilized (Fax87). Ms. Goksu-Savluk indicated to me that Fax87 was no longer in possession of any such documentation. *See* Exhibit 5, Email correspondence exchanged between Birsen Goksu-Savluk and James L. Jackson, Jr.

13. UHA currently has 1,966 independent sales agents in 31 states. For the period of time from September, 2011 to the present, UHA has contracted with 9,128 independently contracted agents, many of whom are no longer with UHA. The status of these agents as independent contractors is set forth in their contract agreements, which, among other things, permit the independent sales agents to exercise their own judgment in the time and manner of performing services, and exercise their own judgment as to the persons the independent sales agent chooses to market to, provided that the independent sales agent at all times follows local, state and federal laws. *See* Exhibit 6, USHealth Advisors Agent Agreement, ¶ 1.

14. The investigations described above did not include searches of all UHG and UHA current and former employee, agent, and contractor email addresses dating back to September 2011 for evidence of any communications with third party facsimile broadcasting companies, nor did the investigation described above include contacting each current and former UHG and UHA employee, agent and contractor since September 2011 by email or phone to ask whether each individual ever engaged in facsimile broadcasting. The Companies have no reason to believe that any other independent agents have ever sent a fax blast.

15. The identification of all independent sales agents since September 2011, inclusive of those that no longer work for the Companies, and the process of identifying (to the extent identification is possible) current contact information and contacting of all current and former UHG and UHA employees, agents and contractor email addresses and, further, to contact them personally, would be incredibly time consuming, costly, and burdensome. Moreover, it would be incredibly burdensome to reconstruct and search email accounts of former agents of UHA to identify whether they had any email contact with any faxing vendor. *See* Affidavit of Terry

Shottenkirk. Additionally, the Companies' information technology department does not have the capability to perform this large-scale recreation of email accounts, and the retention of a third party company may be necessary, which would be very costly and raises potential privacy concerns. *Id.*

16. As indicated above, all of UHA's independent agents are overseen by eight (8) Regional Sales Leaders ("RSL"), who are charged with recruiting, training, motivating, and overseeing the actions of the agents within their respective regions. In an effort to gather some of the information requested by Plaintiffs, I have contacted each of the RSLs, which are comprised of Dan Ashfield, Don Dente, Kevin Ferrell, Stephen Koncurat, Taraina McCants, Michael Laughlin, Marion Still and Matthew Dailey, to confirm that none of them have ever authorized any "fax blasts" since September 2011. Each has confirmed no such authority has been given, and they are not aware of any such "fax blasts" sent by any agent within their respective regions (apart from the fax allegedly sent by Ms. Goksu, which is made the basis of this lawsuit).

**FURTHER AFFIANT SAYETH NAUGHT.**

**JAMES L. JACKSON, JR.**
**ASSOCIATE GENERAL COUNSEL**
**USHEALTH ADVISORS, LLC**

SWORN TO AND SUBSCRIBED before me, the undersigned authority, personally appeared **JAMES L. JACKSON, JR.**, who is personally known to me, and after being duly sworn stated that he has executed the foregoing Affidavit, and that it true and correct.

**WITNESS** my hand and official seal on this, the 30th day of June 2016.

LISA B. SILVIA
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
September 30, 2017

Notary Public

**Freedom Life Insurance Company of America**

# Memo

**To:** All Licensed and Appointed Agents

**From:** Freedom Life Insurance Company of America

**Date:** November 1, 2003

**Re:** National Do-Not-Call List – Background and Frequently Asked Questions

---

**Legislative and Regulatory Background**

As each of you is aware, the so-called National Do-Not-Call List and its enforcement by either the Federal Trade Commission ("FTC") or the Federal Communications Commission ("FCC") have received significant publicity in recent months. Unfortunately, there appears to have been a great deal of misinformation circulating throughout the country as to not only the impact of this new federal law on various segments of our economy, but also the "who, what, when, where and how" questions in connection with compliance issues and this new federal law. Accordingly, the Legal Department of Freedom Life Insurance Company of America ("Company") has prepared this Memorandum in an effort to answer these and other frequently asked questions regarding this new federal law as it relates to insurance sales by an agency force.

However, before addressing these questions, a brief review of what this law is, where it came from, as well as its current status will be helpful in understanding the answers to the following questions. It should be noted that this law is comprised of three different federal statutes, as well as two lengthy sets of regulations promulgated by two different federal agencies under the statutes, both of which have been amended by the applicable agency. The following brief historical summary is provided so that each of you will have a general understanding as to the evolution of this new law and where we find ourselves today.

In 1991, Congress passed and the President signed into law the Telephone Consumer Protection Act ("TCPA") in order to "protect residential telephone subscribers' privacy rights to avoid telephone solicitations to which they object."[1] In

[1] 47 U.S.C. § 227(c)(1).

web form 237

EXHIBIT

tabbies

1

order to accomplish the stated purposes of the TCPA, the statute directed the FCC to promulgate regulations that restricted the use of automatic telephone dialing systems, and authorized the FCC to establish "a single national database...of telephone numbers of residential subscribers who object to receiving telephone solicitations..."[2]

In 1992, the FCC adopted certain rules pursuant to the TCPA, but did not create or otherwise establish a national "do-not-call" list.[3] Instead, the FCC, at that time, required telemarketers to adopt "company specific" do-not-call lists, whereby a consumer who did not wish to receive telephone solicitations from a particular company could request that the telemarketer remove that consumer's telephone number from the telemarketer's list.

Approximately three years after enactment of the TCPA, Congress passed and the President signed into law the Telemarketing and Consumer Fraud and Abuse Prevention Act ("TCFAP").[4] This new federal legislation directed the FTC to "prescribe rules prohibiting deceptive...and other abusive telemarketing acts or practices" and to also "include in such rules...a definition of deceptive telemarketing acts or practices..."[5] In August of 1995, pursuant to the authority granted to it under the TCFAP, the FTC promulgated the Telemarketing Sales Rule ("TSR") in order to implement the stated purpose of this federal statute, namely prohibiting telemarketers from "undertak[ing] a pattern of unsolicited telephone calls which the reasonable consumer would consider coercive, or abusive of such consumer's right of privacy."[6] The regulations promulgated by the FTC in 1995 also attempted to delineate conduct that constituted an abusive telemarketing act or practice under the TCFAP. On January 3, 2003, the FTC adopted new regulations amending the TSR, which, among other things, established a nationwide do-not-call registry and spelled out additional requirements for the future use of predictive dialers and other telemarketing activities.[7]

Also in 2003, Congress passed the Do-Not-Call Implementation Act that authorized the establishment of a national do-not-call registry, and directed the FCC to issue final regulations in connection with the TCPA that maximized consistency with the regulations previously adopted by the FTC.[8]

The FCC adopted a Report and entered an Order on June 26, 2003 that is over 160 pages in length.[9] This Order amended the regulations previously adopted by the

---

[2] *Id.* at § 227(c)(3).
[3] In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (October 16, 1992) at 9, ¶ 14.
[4] 15 U.S.C. § 6101, *et seq.*
[5] *Id.* at § 6102(a)(1) through (a)(2).
[6] *Id.* at § 6102(a)(3)(A).
[7] 68 Fed. Reg. 4580.
[8] Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557 (2003), *to be codified at* 15 U.S.C. § 6101 (*Do-Not-Call Act*).
[9] Report and Order of the Federal Communications Commission, CG Docket No. 02-278, Adopted June 26, 2003 and Released July 3, 2003.

FCC in 1992 under the TCPA in many important respects, including "adoption" of the national do-not-call list established by the FTC with an effective date for the list of October 1, 2003. The regulations promulgated by the FCC contain significant restrictions on both telephone and fax solicitations.

**Litigation Background**

Two separate suits were filed on January 29, 2003 by separate telemarketing companies in different federal courts against the FTC challenging, on different grounds, the national do-not-call registry and its enforcement by the FTC.[10]

On September 23, 2003, the federal judge in the Oklahoma case ruled that the FTC exceeded its statutory authority under the TCFAP, and that it had no authority under the TCPA to either create or enforce the national do-not-call registry. The Court's opinion and Order makes clear that in the opinion of this federal judge, only the FCC had statutory authority to create and enforce a national do-not-call registry. In this regard, Congress, as of the date of this Order, had not provided any funding to the FCC to enforce the national do-not-call registry. However, within days after this Order was handed down in Oklahoma, Congress responded and the President signed into law appropriations for the FCC to timely enforce and otherwise regulate the national do-not-call registry. This subsequent action by Congress arguably rendered moot the Order of the federal judge in Oklahoma.

Shortly after the Oklahoma federal judge handed down his decision, the federal judge in Colorado rendered a decision that the national do-not-call registry created by the FTC and its enforcement by the FTC was unconstitutional. The federal judge in Colorado also entered a permanent injunction against the FTC. Pursuant to this injunction, the FTC was ordered to not enforce the do-not-call list and not disseminate the extensive do-not-call list it had already compiled to others, including the FCC. In response to this injunction, the FTC removed the list from its website, and third parties were not able to obtain the list from the FTC.

The FTC immediately appealed the injunction and ruling of the federal district court in Colorado to the United States Court of Appeals –for the Tenth Circuit. In the appeal, the FTC requested reversal of the district court on the merits, and an emergency stay of the injunction pending a determination by the Tenth Circuit on the merits of the appeal. On October 7, 2003, the Tenth Circuit entered an Order staying the injunction pending a final decision on the merits. It should be noted that in granting the FTC's request for stay, the Tenth Circuit stated that it was satisfied that the FTC had demonstrated that there was a "substantial likelihood of success on the merits" of the appeal by the FTC.[11] It appears, therefore, that the FTC will ultimately prevail on the merits in its appeal. In any event, the October 7, 2003 dissolution of the

---

[10] *Mainstream Marketing Service, Inc. v. FTC*, No. 03-N-0184 (D. Colo.) and *U.S. Security v. FTC*, Civ. No. 03-122-W (W.D. Okla.).

[11] *FTC v. Mainstream Marketing Services, Inc.*, No. 03-1429 (United States Court of Appeals -Tenth Circuit), Order Filed October 7, 2003 (page 23).

permanent injunction cleared the way for immediate enforcement of the do-not-call regulations.

## Interim Enforcement Pending Appeal

Interim enforcement of the do-not-call list by the FTC and/or the FCC followed the stay ruling of the Tenth Circuit pending resolution of the merits of the appeal. Thus, the Company has taken steps to insure its compliance with all federal "Do-Not-Call" rules, regulations and legislation (collectively "DNC"), including purchasing the list from the FTC website. All agents of the Company are required to conduct their business in strict compliance with the DNC, as well as any state do-not-call rules, regulations or statutes in their particular state. The DNC rules are expansive and compliance may require modification of the manner in which certain agents have conducted business in the past. However, compliance with the DNC rules should save an agent time and money by eliminating telephone calls by the agent to individuals who have taken the time to register their residential phone or cell phone number on the national do-not-call list. More likely than not, the placement of such a call could be a waste of time because the call will probably irritate the consumer who will not respond in a positive manner to the agent attempting to set an appointment.

It is sincerely hoped that each agent will review and study the following "Frequently Asked Questions and the Company's Answers" in order to gain a better understanding of the Company's position in this matter, and insure compliance by all of its agents.

## Frequently Asked Questions and the Company's Answers

1. *What is the federal do-not call rule and how does the DNC affect Freedom Life Insurance Company of America?*

   **Answer:** While the FTC stated in the TSR that it did not have jurisdiction to enforce the DNC with respect to insurance companies and insurance marketing, the FCC specifically held and found in its June 26, 2003 Report and Order that the FCC has jurisdiction to enforce the DNC which is "significantly broader than the FTC's," including jurisdiction to enforce the DNC upon insurance companies and their agents. The FCC will enforce the DNC against insurance companies and their agents.[12] Accordingly, each Agent of the Company must comply with the DNC, until and unless there is some future change in the law or an appellate court decision somehow invalidates the DNC, neither of which is anticipated.

2. *What governmental agencies or departments are responsible for the regulation and enforcement of state and federal Do Not Call lists? What are their roles?*

---

[12] *See* Report and Order of the Federal Communications Commission, CG Docket No. 02-278, Adopted June 26, 2003 and Released July 3, 2003, at pages 20-21 and 33-34.

**Answer:** Both the FTC and the FCC share enforcement responsibilities of the federal DNC. In addition, where applicable, each state has responsibility for the enforcement and administration of any state specific do-not-call rules, regulations or statutes that have been adopted in such state.

Once again, the FCC has stated that it will enforce the DNC against insurance companies and their agents. It should be remembered, however, that both the FTC and the FCC have stated in the TSR and the June 26, 2003 Report and Order, respectively, that the federal DNC preempts or "trumps" all do-not-call rules, regulations or legislation adopted by any state or local statute, regulation or rule that is less restrictive than the federal DNC. Thus, the federal DNC constitutes a regulatory "floor", although states are free to pass more restrictive, but not less restrictive, rules and regulations.[13]

The Company complies with all federal and state specific do-not-call rules that might be applicable to it. Each agent of the Company must comply with not only the federal DNC, but also with their particular state do-not-call rules, regulations and statutes.

3. *I have heard that insurance companies and their agents are exempt from or not governed by the requirements of the federal DNC. Is this true?*

   **Answer:** No, this is not true. See "Answer" to question 1.

4. *Isn't it correct that the DNC rules apply only to sales over the telephone and not to phone calls that are made to simply set an appointment to meet in person?*

   **Answer:** No, this statement is not correct. The DNC rules apply to telephone calls to a number registered on the national do-not-call list even if the purpose of the call is only to set an appointment. The FCC specifically refused to create an exception to the DNC for calls made to set face-to-face appointments. In refusing to carve appointment calls out of DNC enforcement, the FCC stated:

> "We conclude that such calls are made for the purpose of encouraging the purchase of goods and services and therefore within the statutory definition of telephone solicitation. We find no reason to conclude that such calls are somehow less intrusive to consumers than other commercial telephone solicitations."[14]

In reviewing this issue, the FTC reached the same conclusion.[15] Therefore, agents should not call a phone number that is registered on the national do-not-call list unless the call falls within one of the three limited exceptions to the DNC discussed below.

---

[13] *Id.* at pages 46-50.
[14] *Id.* at page 32.
[15] *FTC Order*, 68 Fed. Reg. 4655-56.

5. *I know consumer residential phone numbers can be added to the national do-not-call registry, but aren't I safe if I call a cell phone number?*

   **Answer:** No. The FCC specifically ruled that cell phone numbers may be registered in the same fashion, and with the same protection, as residential landline phone numbers.[16] For purposes of enforcement, the FCC considers cell phone numbers to be "residential" numbers within the meaning of the statute. Therefore, you cannot call a cell phone number that has been registered on the national do-not-call list unless the call to such cell phone number falls within one of the three limited exceptions to the DNC that are discussed below.

6. *I understand that a consumer can register his/her residential landline and/or cell phone number on the national do-not-call list, but what about Business phones?*

   **Answer:** The federal statutes, rules and regulations discussed above (DNC) are applicable only to so-called "B to C" or business-to-consumer calls. If an individual or company has listed a telephone number in the public domain as a business listing (e.g. yellow pages, white pages, other advertisements or public communications), then such number is beyond the scope of the federal DNC. So-called "B to B" or business-to-business telephone calls and numbers are not regulated by the federal DNC. Therefore, an agent's telephone call to a business number is not a violation of the DNC.

7. *In connection with insurance sales and setting appointments by an agent, what are the exceptions, if any, to the National DNC rules with respect to people who have registered their residential landline or cell phone numbers on the national do-not-call list?*

   **Answer:** If a person has registered their residential or cell phone number on the national do-not-call list, there are only three very narrow and limited exceptions that would permit an agent to contact an individual who has registered their phone number on the national do-not-call list. These are the so-called "business relationship" exemption, the "prior express permission" exemption, and the "personal relationship" exemption.

8. *What is the "business relationship" exemption to the DNC that would permit a phone call to a residential or cell phone number registered on national do-not-call list?*

   **Answer:** The "business relationship" exemption is very narrow. In the context of an insurance agent, the FCC, in pertinent part, defines "business relationship" as follows:

   > "a prior or existing relationship formed by a voluntary two-way communication between [an agent] and a residential subscriber [to

---

[16] *See* Report and Order of the Federal Communications Commission, CG Docket No. 02-278, Adopted June 26, 2003 and Released July 3, 2003, at page 24.

> the national do-not-call list] with or without an exchange of consideration, [i] on the basis of the [residential] subscriber's [prior] purchase or transaction with the [agent] within eighteen (18) months immediately preceding the date of the telephone call or [ii] on the basis of the [residential] subscriber's inquiry or application regarding the products or services offered by the [agent] within three (3) months immediately preceding the date of the call."[17]

It should be noted that if a residential subscriber to the national do-not-call list has terminated a "business relationship" with an agent prior to the call by the agent, then it is a violation of the DNC for the agent to subsequently place a solicitation call to the subscriber's registered number. In addition, if the residential subscriber makes a do-not-call request to the agent, it is a violation of the DNC for the agent to place a solicitation call to the registered number, even if the residential subscriber continues to do business with the agent.

So-called "bootstrapping" of "business relationships" is not permitted under the DNC. More specifically, a residential subscriber who has registered his phone number on the national do-not-call list who has a prior or existing "business relationship with a particular business entity does not extend to affiliated entities unless the subscriber would reasonably expect them to be included given the nature and type of goods or services offered by the affiliate and the identity of the affiliate."[18]

9. *How does the "business relationship" exemption to the DNC affect an agent calling the phone number listed on a new sales lead produced by PDS in order to set an appointment?*

**Answer:** Calling the phone number listed on a PDS lead for the purposes of setting an appointment generally should not violate the DNC for the following reasons:

First, in generating the lead, PDS removes residential and cell phone numbers that are registered on the national do-not-call list. Therefore, at the time the PDS lead was generated, the phone number called by PDS was not on the national do-not-call list purchased by the Company from the FTC and furnished to PDS.

Secondly, if the potential applicant while speaking to the PDS operator from a non-registered phone number provides PDS with a registered residential or cell phone number for the applicant to be contacted by the agent, then the second part of the "business relationship" test is satisfied, as long as the agent makes the appointment call within three (3) months of the date that the PDS lead was generated. In other words, this situation would be an example of "a prior or existing relationship formed by a voluntary two-way communication between [an agent] and a residential subscriber [to the national do-not-call list] with or without an exchange of consideration.... on the

---

[17] *Id.* at page 134.
[18] *Id.*

basis of the [residential] subscriber's inquiry or application regarding the products or services offered by the [agent] within three (3) months immediately preceding the date of the call" within the definition of "business relationship" discussed above. Accordingly, for any PDS generated lead that is contacted three (3) or more months after the lead card was generated, the agent is required to verify that the potential applicant's number is not registered in the federal do-not-call database.

Thirdly, even if the potential applicant added his residential or cell phone number to the national do-not-call list after providing it to PDS, but before the agent places the appointment call, the second part of the "business relationship" test is satisfied for the same reasons, provided the telephone call occurs within three (3) months of the date the PDS lead card was generated.

Finally, it must be remembered that even if the original call by the agent to a PDS generated lead is within the "business relationship" exception, the consumer has the right to terminate the business relationship over the phone while talking to the agent, and the agent would violate the DNC if the agent refused to honor the consumer's decision, by placing any subsequent call to his registered residential or cell phone number.

10. *Is it possible to satisfy the "business relationship" exemption from a potential applicant's written response to a mail lead sufficient to satisfy the exemption requirements?*

    **Answer:** Yes, it is possible, but only if the mail lead piece is properly worded so that it is clear that by returning the mail lead, the individual is making an "inquiry or application regarding the products or services offered by the [agent]" as set forth in the definition of "business relationship" outlined above.

    Please remember, however, that no agent is authorized to conduct any written advertisement or mail solicitation that mentions the Company's name or otherwise describes any of its policies, features, service or available coverages, without first obtaining the prior written consent of the Company.

11. *What is the "prior express permission" exemption to the DNC that would permit a phone call to a residential or cell phone number registered on national do-not-call list?*

    **Answer:** "[S]ellers may contact consumers registered on a national do-not-call list if they have obtained the prior express permission of those consumers." However, "such express permission must be evidenced only by a signed, written agreement between the consumer [that is registered on the list] and the seller which states that the consumer agrees to be contacted by this seller, including the telephone number to which calls may be placed."[19] Calls may not be placed to any residential or cell phone

[19] *Id.* at page 30.

number registered on the national do-not-call list for the purpose of requesting written permission to later place a "sales" call to the number.

12. *Is it possible to satisfy the "prior express permission" exemption from a potential applicant's written response to a mail lead sufficient to satisfy the exemption requirements?*

**Answer:** Yes, it is possible, but only if the strict requirements of the "prior express permission" exemption are met. In this regard, the potential applicant must have signed the return mail piece, and such return mail piece should either have been signed by the agent in advance of its original mailing, or be promptly signed by the agent upon its return from the individual, and before placing the appointment call to the individual. The return mail piece also must clearly state that the individual consents and agrees to be contacted by the agent at the phone numbers designated on the returned mail piece for the purpose of setting an appointment to discuss the coverage set forth and described in the mail piece.

Once again, please remember, however, that no agent is authorized to conduct any written advertisement or mail solicitation that mentions the Company's name or otherwise describes any of its policies, features, service or available coverages, without first obtaining the prior written consent of the Company.

13. *What is the "personal relationship" exemption to the DNC that would permit a phone call to a residential or cell phone number registered on the national do-not-call list?*

**Answer:** The FCC recognizes a limited exception to the DNC for so-called "personal relationships." However, this exemption is limited to individuals personally known to the caller. The FCC stated that "[w]e believe that calls to family members, friends and acquaintances of the caller will be both expected by the recipient and limited in number." In determining for enforcement purposes whether a caller was a "friend," or "acquaintance" of a consumer, the FCC stated that the test was "whether a reasonable consumer would expect calls from such a person because they have a close, or at least, firsthand relationship."[20]

14. *Is it okay for me to call a residential or cell phone number registered on the national do-not-call list, if the individual was personally referred to me by an existing client, customer, friend or family member?*

**Answer:** No, this would violate the DNC. The FCC has refused to either create a separate exemption or extend the "business relationship" or "personal relationship" exemption to appointment calls made in response to a referral from a source that either knew or had a personal relationship with the consumer.[21] An agent should verify before placing any solicitation call to any individual based upon a referral from

[20] *Id.* at page 31.
[21] *Id.* at page 32.

clients, customers, friends or family members that all residential and cell phone numbers of individuals referred to the agent are not registered on the national do-not-call list.

15. *How can an agent acquire a list of registered numbers for their own purposes? What is the expense?*

**Answer:** The national do-not-call list is maintained by telephone area code. Anyone can obtain the do-not-call listings for up to five (5) area codes at no cost from the FTC website, www.telemarketing.donotcall.gov. If do-not-call lists for more than five (5) area codes are desired, the cost is $25.00 per additional area code.[22]

16. *What should the agent do if he/she receives a Do-Not-Call request from an individual who is **not** registered on either the national do-not-call list or the do-not-call list of any state?*

**Answer:** This request must be honored. If you are asked during a call not to call the number again, pursuant to the DNC you must log the person's name and telephone number and refrain from calling the number again, regardless of whether the person has registered their number on any do-not-call list. This information should then be sent to both the Home Office of the Company, c/o Agency Department, and the principal office of the agency under which the agent is writing. This will enable the Company and the agency to add the person's name and telephone number to a separate do-not-call list. The agent should also maintain his/her own do-not-call list. Although it is anticipated that an individual agent's personally maintained do-not-call list will be relatively small in size, it should nevertheless be checked prior to any residential or cell phone solicitation call initiated by the agent, in addition to the national do-not-call list. If a do-not-call request is received from a new sales lead produced by PDS, it should be also reported through the agency management hierarchy so that the agency management can likewise promptly advise PDS.

17. *What about faxes?*

**Answer:** Faxes of unsolicited advertisements, solicitations and invitations to inquire are prohibited. The FCC Report and Order specifically provides that "[n]o person or entity may...[u]se of a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone fax machine."[23] This prohibition is not limited to the faxes sent to the residential or cell phone numbers registered on the national do-not-call list, but instead prohibits sending an unsolicited fax advertisement, solicitation, or invitation to inquire to any telephone number.

---

[22] *Id.* at page 35.
[23] *Id.* at page 131.

*18. What about automated dialers with pre-recorded messages and no live operators?*

**Answer:** Dialers with pre-recorded messages and no live operators are prohibited unless the caller can establish a "prior express permission" or a "business relationship" exemption. This prohibition applies to all residential telephone numbers, regardless of whether they are registered in the national do-not-call registry. The FCC Report and Order specifically provides that "[n]o person or entity may...[i]nitiate any telephone call to **any** residential line using an artificial or prerecorded voice to deliver a message **without the prior consent of the called party, unless the call** (i) is made for emergency purposes, (ii) is not made for commercial purposes, (iii) is made for commercial purposes but does not include or introduce an unsolicited advertisement or constitute a telephone solicitation, (iv) **is made to any person with whom the caller has an established business relationship at the time the call is made**, or (v) is made by or on behalf of a tax-exempt nonprofit organization." [Emphasis added]. In the context of an agent selling insurance policies, setting appointments for such sales, or prospecting for leads, it is difficult to imagine any possible exception to this prohibition except the "prior express permission" and the "business relationship" exemptions discussed above in the context of the national do-not-call list. However, every agent should understand that the prohibition is not limited to residential phone lines registered on the national do-not-call list, but instead literally prohibits calls to **any** residential phone line unless one of the exceptions set forth above is present.

*19. What are the Penalties for non-compliance with the DNC?*

**Answer:** Penalties include $500 for each violation or actual loss, whichever is greater, an action to enjoin the violation, or both. If found to be willful and knowing, the court may increase the award to three times the preceding amount. Additionally, violation of the federal DNC rules, or any state or local do-not-call rule or regulation, is grounds for immediate termination of the agent's appointment with the Company.

## Conclusion

The Company requires all agents to fully comply with the federal DNC provisions, as well as any state specific do-not-call rules, regulations or statutes that may have been passed or promulgated in their particular state. The Company recognizes that this has been an evolving issue, and may well be subject to future change by the judiciary, legislature or regulators, and we will make every reasonable effort to keep our agents informed of new developments.

**From:** Sliva, Debra
**To:** Silvia, Lisa
**Subject:** FW: BIRSEN, very important... Fwd: FW: CT Service received today - Florida Fax Attorney Demand
**Date:** Wednesday, February 25, 2015 8:47:43 AM
**Attachments:** A2052816-39E6-467D-8544-2876D9137F5A.png

---

**From:** birsen goksu [mailto:birsengoksu@gmail.com]
**Sent:** Wednesday, February 25, 2015 8:46 AM
**To:** James Hmielewski Forwarding contact
**Cc:** BIRSEN GOKSUSAVLUK; BILL SHELTON; MARA BROCKMAN; TARAINA MCCANTS; Sliva, Debra; TRAVIS YODER
**Subject:** Re: BIRSEN, very important... Fwd: FW: CT Service received today - Florida Fax Attorney Demand

1. Where did the agent get the fax number to which this was sent? One possible exception to the TCPA would be if the recipient voluntarily placed their number in a directory

I have found an efax company online where I can send marketing materials via efax. I used Manta.com to find local businesses and looked for ones that had fax numbers on their personal website and efaxed the flyer

2. Did the agent have an established business relationship with the recipient of the fax? This is a possible exception to enforcement of the TCPA.

No, I did not. I randomly fax my flyer to this company which I found on manta.com

3. Who actually sent the fax? Did the agent send it, or did they contract with some form of fax blasting company? If so, what representations and warranties were made by the fax blasting company as to (i) the legality of the fax, and (ii) indemnification against claims like this?

I used fax87 which where I found through google search. I talked to them about my idea of faxing flyers to local businesses and they offered me a product that would be a good fit. I do not know if they have any indemnification against claims like this. I uploaded the flyer and put in the fax number and the efax company (fax87) is the one who faxed it out.

4. Who authorized this agent to do this? We obviously do not authorize any fax blasts, so I am concerned about

EXHIBIT

tabbies

2

whether this is a "lone wolf", or whether the practice is being encouraged in a particular region. Regardless, you need to communicate to the field that fax blasts are not permissible, are in violation of their contract, can lead to termination and potential significant liability, and are not covered under the terms of their E&O coverage.

This is completely my idea. I thought it was another way that I can market myself and reach out to people. I did not know that this was illegal. I had so many prospective clients (leads) that I spoke to over time and they always asked me to fax some information to them and thats how I got the idea of doing the fax blast. I thought it was legal.

5. Where did the form of the ad used come from? Given the content, and misspellings, such as "pe-existing conditions", and things we would not authorize, such as "cross state lines" and "small group plans", this ad needs to be shut down immediately, regardless of the medium of distribution. A reminder to the field that they may only use ads that previously approved in advance, by us, should probably be included in the field bulletin regarding fax blasts.

I personally created the add myself. I copy paste information from our website as you probably have notice. No one approved this flyer from my leaders. They didn't even know I was doing this.

On Wed, Feb 25, 2015 at 9:21 AM, jim hmielewski <ushealthjim@gmail.com> wrote:
Birsen,

Please respond immediately to the questions below and get back to me ASAP.
Answer each question very detailed. Thank you.
We do need this back as soon as you can.

JIm

-

---

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WALTER STRATTON BAGG, ESQUIRE, and COOPER LAW, P.A., individually and on behalf of all others similarly situated,

Plaintiffs,

vs. Case No.: 6:15-cv-1666-Orl-37-GJK

U.S.HEALTH GROUP, INC., a Delaware corporation, and U.S.HEALTH ADVISORS, L.L.C., a Texas limited liability company,

Defendants.

_____________________________/

| | |
|---|---|
| DEPOSITION OF: | BIRSEN GOKSU-SAVLUK |
| TAKEN: | Pursuant to Notice<br>Instance of Plaintiffs |
| DATE: | February 16, 2016 |
| TIME: | 9:54 a.m. to 12:04 p.m. |
| PLACE: | Esquire Deposition Solutions<br>200 East Robinson Street, #725<br>Orlando, Florida 32801 |
| BEFORE: | TRINA SEMINO, RPR<br>Stenographic Court Reporter<br>and Notary Public<br>State of Florida at Large |



APPEARANCES

RICHARD BENNETT, Esquire
Bennett & Bennett
Executive Office Center
1200 Anastasia Avenue
Suite 360
Coral Gables, Florida 33134-6340
305-444-5925
Attorney for Plaintiffs

PETER S. BAUMBERGER, Esquire
Kubicki, Draper, P.A.
25 West Flagler Street
Penthouse
Miami, Florida 33130
305-374-1212

Attorney for Defendant



INDEX


| | PAGE |
|---|---|
| Direct Examination by Mr. Bennett | 4 |
| Cross-Examination by Mr. Baumberger | 68 |
| Continued Cross-Examination by Mr. Baumberger | 90 |
| Redirect Examination by Mr. Bennett | 91 |
| Stipulations | 94 |
| Errata Sheet | 95 |
| Certificate of Oath | 98 |
| Court Reporter's Certification Page | 99 |
| Read and Sign Instructions | 100 |


EXHIBITS


| | |
|---|---|
| Plaintiff's Exhibit Number 1 (Subpoena) | 4 |
| Plaintiff's Exhibit Number 2 (11-25-15 Document) | 7 |
| Plaintiff's Exhibit Number 3 (Fairwinds Statement) | 7 |
| Plaintiff's Exhibit Number 4 (Agent Agreement) | 17 |
| Plaintiff's Exhibit Number 5 (12-12-15 Document) | 28 |
| Plaintiff's Exhibit Number 6 (8-3-15 Document) | 29 |
| Plaintiff's Exhibit Number 7 (1-27-15 Document) | 30 |
| Plaintiff's Exhibit Number 8 (Affidavit) | 56 |
| Plaintiff's Exhibit Number 9 (2-25-15 E-mail) | 58 |
| Plaintiff's Exhibit Number 10 (11-25-15 E-mail) | 63 |
| Plaintiff's Exhibit Number 11 (2-4-16 E-mail) | 65 |
| Plaintiff's Exhibit Number 12 (2-12-16 Document) | 65 |




WHEREUPON,
BIRSEN GOKSU-SAVLUK,
having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:
DIRECT EXAMINATION
BY MR. BENNETT:
Q State your name for the record, please.
A Birsen Goksu-Savluk.
Q May I call you Birsen?
A Yes.
(Whereupon, Plaintiff's Exhibit Number 1 was marked for identification by the Court Reporter).
BY MR. BENNETT:
Q Birsen, I'm going to hand you a copy of a Subpoena.
Did you receive that from me --
A I did.
Q -- by e-mail?
And do you notice I requested that you bring documents --
A Yes.
Q -- here today?
Did you bring any documents responsive to the request?
A I brought bank statements. That's the only



EXHIBIT
tabbies
3

Page 5

thing I could find about anything in this case.
Q Okay. Could I take a look at what you brought?
A Sure. I do have e-mails, as well. I think it was correspondence with Jim Jackson.
MR. BAUMBERGER: The only question I have with this is, I wonder if -- this is your personal banking statement. I don't know if we should redact -- we can maybe address that later.
MR. BENNETT: Let's not mark it. Let me ask her what it is.
MR. BAUMBERGER: Okay.
MR. BENNETT: If it's not useful, we won't use it.
BY MR. BENNETT:
Q So, Birsen, you brought with you this morning, in response to the Subpoena, a copy of some e-mails, the letter that I sent you with a check, and a copy of the Subpoena, a bank statement from Fairwinds Credit Union, a checking account ledger -- is that what you would describe it?
A It's the same account.
Q Oh, it's the same account?
A Yeah.
Q Oh.
A Just three months, total.

Page 6

Q Okay. So, the Fairwinds Credit Union is from January 1, 2015, through March 31, 2015?
A Correct.
Q And you sent a copy of an unsigned Affidavit?
A Yes.
Q So, is that all the documents you had, that were responsive to the request, that you could find?
A Yes.
Q Okay. Could you tell me what the bank statements are in response to?
A Well, just to show the amount of time that I was a member with the fax company, the online company that I signed up with.
Q Okay.
A And I can tell you exact dates of when they withdrew.
Q Okay. Could you show me what you're referring to?
A Sure.
Can I mark on it?
Q Okay, sure.
A This right here, on January 27.
Q You've marked a, "January 27, withdraw debit" --
A Yes.
Q -- "www.Fax87.com"?

Page 7

A Correct.
Q With a telephone number, "866-698-4068"?
A That's what it has on there.
Q Is that a telephone number?
A I'm assuming so, yes.
Q It says, "in the U.S."?
A Yes.
Q Do you know what that means?
A I have no idea.
Q Okay.
A And, then, the second charge was on February 27.
MR. BENNETT: Okay. So, why don't we just mark these two as an exhibit, if nothing else here is --
THE WITNESS: No.
MR. BENNETT: -- that you brought that's relevant.
And we'll just -- before it's attached, I guess, we can redact it, but I would like to note that account number.
MR. BAUMBERGER: Okay, sure.
MR. BENNETT: Okay. So, could you mark this as --
THE COURT REPORTER: Number 3.
(Whereupon, Plaintiff's Exhibits Numbered 2 and 3, respectively, were marked for identification by the Court Reporter).

Page 8

BY MR. BENNETT:
Q There is a portion of the bank statements relating to Fax87 debits.
Can you give me -- I'm going to be asking you questions today in connection with a case that the Plaintiffs filed against USHEALTH Group and USHEALTH Advisors --
A Okay.
Q -- relating to a fax advertisement.
A (Indicating affirmatively).
Q Do you know Mr. Baumberger?
A Yes.
Q You do know him?
A I met him yesterday.
Q Where did you meet him?
A I don't know if it was his office, but at a address provided to me.
Q What was the purpose of the meeting?
A I guess, just to go over everything about, you know, what's going to be asked to me by them.
Q Is he your attorney?
A No, he's not.
Q And why did you want to meet with him?
A They sent me -- is it a disposition -- to sign?

Page 9

Something I didn't sign.
Q Uh-huh.
A I didn't sign it. And I got a call from Mike, I think --
Q Mike Suarez?
A Yes.
Q Uh-huh.
A And he asked if I was willing to meet, and I said sure, and I did.
Q But, do you remember when I first called you and asked you if you would talk to me about USHEALTH?
A I do remember.
Q And do you remember what your response to me was at that time?
A Out of respect for them, I wouldn't talk to you.
Q Right. And you -- you thought it would be more appropriate if the defense lawyers were present for any questions that I had to ask you?
A Of course, yes.
Q Right.
Did you think it was necessary for me to be present when you met with the defense lawyers to discuss the case?
A I didn't think about that, no.
Q Did your position change from what your attitude

Page 10

was with me, to answer my questions, and what your attitude was with the defense lawyers to talk about the case?
MR. BAUMBERGER: Object to form.
You can answer.
THE WITNESS: I mean, I feel that they do represent the company that I have respect for. So, I don't understand why there's an issue why I shouldn't talk to them.
BY MR. BENNETT:
Q Well, what did you discuss?
A Just everything that you have, basically. And they questioned me, I guess, the same way you're going to question me.
Q I see.
So, "everything that I have," meaning what?
A The e-mails, and the disposition, and --
Q By "the disposition," do you mean the Complaint that was filed by the Plaintiffs.
A I mean, it was just general talk about what happened, basically. That's it.
BY MR BENNETT:
Q And who else was present at this meeting?
A Jim Jackson.
Q And how do you know Jim Jackson?

Page 11

A Jim Jackson is the first lawyer that called me. I know that he works off of a Texas office. And I think he works for USHEALTH Advisors, as a lawyer, I'm not sure, but I know he was calling on behalf of them.
Q Had you known him before this call?
A No, I did not.
Q Approximately when was the call made by Mr. Jackson?
A Probably late last year, like, November, December, maybe a little bit more, I don't know. But, just late last year.
Q And what was the purpose of this call to him?
A He said that there was a lawsuit against the fax, and he just wanted to get some information.
Q Did you provide the information?
A I did. As much as I could, yes.
Q Okay. Was anyone else present at this meeting that you had yesterday afternoon?
A No.
Q Okay. How long did the meeting take?
A Maybe an hour or less, I don't remember.
Q Could you tell me something about your background; where you were born, your education?
A Sure. I was born in Turkey. I moved to U.S. when I was ten. I grew up in Atlanta, Georgia. That's

Page 12

where I got my education. I moved to Orlando.
Q What education did you get in Atlanta?
A Well, you know, high school, college. Marketing sales in college, Kennesaw State, which is located in Georgia.
Q Was that your major?
A Yes.
Q And did you get a degree from Kennesaw State?
A I did not complete it, no.
Q Okay.
A No.
Q Well, what was your major course of study?
A Marketing sales.
Q All right. And what year did you spend -- what years did you spend at Kennesaw State?
A 2000 and 2006.
Q Okay. You were there for six years?
A On and off, yes; not the whole entire time.
Q And what did you do after you left Kennesaw State?
A I got married and moved here, to Orlando.
Q Okay. And what's the name of your husband?
A Erkan Savluk.
Q Have you been employed since you've been in Orlando?

Page 13

A Yes.
Q Do you hold any licenses?
A I do.
Q What licenses?
A I have a real estate license and I have health and life insurance license.
Q So, you're a real estate sales associate?
A Yes.
Q And do you work for a company?
A Not at this time, no.
Q Who have you worked for?
A I worked for Century 21, it's a real estate office. I worked for Only Way Realty. Then I got into timeshare, which is a different section of, like, you know, where I can use my license.
Q What company --
A Westgate.
Q -- did you work for?
A Westgate.
Q Westgate? Where is that located?
A They have several, but I worked in Kissimmee and their Orlando offices.
Q Do you work for any of those organizations presently?
A Not until the 13th of this month.

Page 14

Q You quit your job on the 13th of this month?
A I did.
Q For which company?
A Westgate.
Q So, do you still work for Century 21?
A No. That was in the past.
Q So, why did you quit Westgate?
A Personal reasons.
Q Have you held any other employment since you've moved to Orlando from Atlanta?
A Yes. I worked for USHEALTH Advisors.
Q Where did you first hear of USHEALTH Advisors?
A My close friend started with them, maybe, seven or eight years ago.
Q What's the name of your friend?
A Mara Brockman.
Q Does she live in Orlando?
A She does.
Q And does she still work for USHEALTH Advisors?
A She does.
Q Okay. She recommended the company to you?
A She recruited me, yes.
Q Okay. And what did they recruit you to do?
A To be in sales.
Q Okay.

Page 15

A To be a health insurance adviser.
Q So, take me through it.
From her recommendation, how did you end up working with USHEALTH Advisors?
A Well, she's been in the company for a while, she was very successful and she thought I would be a good fit. So, I gave it a try. You know, I went to school, went to the class, went to -- took the state test, got my license, got recruited by her, started with her.
She had her own office at the time, and then she merged with another office that's also a part of USHEALTH Advisors. And I've been with them for two years, exactly two years.
Q Okay. What do you mean when you say "she recruited you."
What did she do?
A Well, we're self-employed. Like, we're subcontracted, I guess you can say. So, you know, she just recruited me.
Q Okay. Well, who did you -- did she introduce you to anyone at USHEALTH Advisors?
A The thing is, the group of friends that I am with her and her group was -- basically works for USHEALTH Advisors. So, I kind of knew most of the people years before some of them even got involved with

Page 16

USHEALTH Advisors.
Q And you knew them in Orlando?
A Yeah.
Q How long have you lived in Orlando?
A Since 2007.
Q So, these are just personal friends --
A Friends.
Q -- of yours that you did not have any business relationship with before?
A No.
Q And they just all happened to be working for USHEALTH Advisors?
A Eventually, yeah.
Q So, did you meet with anyone at the company to be interviewed and offered that?
A I mean, again, Mara was -- she was a manager, at that time. I think she was a division manager or something. I don't know what her title was.
But, again, she had -- she was running her own office, so she was the one that I interviewed with.
Q All right. So, is she the one that offered you a position with the company?
A Exactly.
Q Did you sign a contract with the company?
A I did.

Page 17

(Whereupon, Plaintiff's Exhibit Number 4 was marked for identification by the Court Reporter).

MR. BENNETT: Let me hand you a document marked Exhibit 4.

BY MR. BENNETT:

Q Can you identify what this document is? And take a look at the last page with the signatures.

A Yeah, I remember this.

Q Okay.

A It's a contract.

Q What is it?

A Agent Agreement.

Q Okay. Do you know what the Agreement was about? Do you have a general familiarity with what --

A Honestly, I don't remember. I do know that I was signing up for two years. So, this contract was for two years, from what I recall. And I was representing USHEALTH Advisors and I could not work for another insurance company while I was working for them.

Q Okay.

A And it was only commission based, so...

Q Okay. And who are the signatures on the last page?

A Can I look at it again?

Q Yeah, sure.

Page 18

A Troy McCoy [sic].

Q McQuagge?

A McQuagge.

Q Do you know who that is?

A I do know who that is.

Q Who is Troy McQuagge?

A I know he's located in Texas. I don't know -- I don't remember his exact position, but I know he's of the higher-ups, I guess.

Q Uh-huh. And have you met him personally?

A I have met him personally.

Q Where did you meet him?

A He came to Orlando to one of our meetings.

Q Whose meeting?

A Our office meetings, weekly. We have office meetings every Friday, and he came to one of those.

Q I see.

Does it identify, on this signature page, the title of Mr. McQuagge?

A CEO.

Q Do you know what that means?

A I know what that means, but I'm not sure if I know him as a CEO. I just know he was just, you know, one of the upper management or somebody like that.

Q And what was the purpose of the meeting that --

Page 19

A Just congratulating us on our -- you know, our sales, and our team, and our office. Our success, I guess.

Q Okay. Is that the only time you met him?

A Yes.

Q Did you have a conversation with him then?

A I did.

Q What did you talk about?

A I guess, just general things. Just, you know, glad to meet him.

I do remember the week that he was there, I was a top -- one of the top 20 reps that had a good sales, and he congratulated me and things like that.

Q Top 20 out of how many reps?

A I think it was 65 at that time.

Q In Orlando?

A In our office, yes.

Q And your office was located where?

A In Orlando, downtown Orlando.

Q Do you know the address?

A I'm going to -- I think it was 804 Magnolia Avenue.

Q That's the USHEALTH Advisor office that your friend who recruited you was the manager of?

A No, no. Because, again, she merged after I

Page 20

started. So, her office was originally located on Kirkman Road. And when she merged with the downtown office, that's the one that I'm referring to.

Q I see.

So, when you referred to your team at USHA, who is your team?

A The entire USHA team.

Q In Orlando?

A Yes.

Q Or, in Florida?

A I guess you could say Florida, because we did have satellites that were located in other locations.

Q Okay. But there were 65 representatives in 2014 --

A That I was aware of.

Q -- that was part of your team in Orlando?

A I guess it would be safe to say, in Florida.

Q Sixty-five in all of Florida?

A Yes.

Q Okay. And how do you arrive at that number?

A Um, being mentioned in the meetings --

Q Okay.

A -- you know, by our superiors, our team managers.

Q Was there a list of the agents that -- in

Page 21

rankings, according to sales?
A Not, like, a -- it's not like there's a list. But we did receive weekly e-mails about who sold what, you know, where we were. And there is a list of the people that -- who actually sold, would be on that list.
Q And who sent this e-mail to you?
A It was one of the managers in the office, Jim Hmielewski.
Q Could you spell his name for the court reporter?
A I can spell his first name, but I know I can't spell his last name.
Q Okay.
A It's Jim Hmielewski.
Q And what was his position?
A So, when they merged, I think he was the -- like, a division manager now.
And I know that Mara had stepped down to a satellite, so he was, like, I guess, the top manager, and then it was everybody else.
Q Manager for Florida?
A For our Orlando office.
Q And what is the satellite office that Mara --
A I don't -- there's different divisions. I know -- from what I know, there is divisions, satellites. Then there's, like, team leader, then there's sales

Page 22

agents, writing agents. There's just, like, a ladder.
Q But was this division in another city, or she stayed in Orlando?
A She stayed in Orlando.
Q Okay. So, did you undergo any training from --
A Of course.
Q -- anyone?
Describe the training to me.
A Um, well, there was weekly trainings. Sometimes a couple times a week we would meet in the office and go over materials and, you know, the process. And we would also --
Q Let me stop you there.
So, there are many different categories of people who work at USHEALTH.
What was your category?
A I was a writing agent. I was just an agent.
Q And what does writing agent mean?
A Writing agent is just -- just writing business. That was my role, was writing business.
Q And what is the business?
A It's selling health insurance to prospects.
Q What companies did you write insurance for?
A USHEALTH Advisors.
Q Was there an underwriter involved?

Page 23

A Yes.
Q Which underwriters were those?
A Freedom Life.
Q Is that the only underwriter?
A As far as I'm aware, yes.
Q Did you sell any other insurance product that was not --
A Yes. There are --
Q -- underwritten by Freedom Life?
A Most -- I don't know if they're underwritten by a different company, but I do know that we did sell products in addition to the health insurance, like critical illness, or, you know, accident coverage, or association, things like that.
Q Okay. So, was this all through USHEALTH?
A As far as I know, yes.
Q So, when you -- did you have an initial training session that explained to you what your duties would be as an agent for USHEALTH?
A Yes.
Q What were you told, just generally?
A I mean, it's just -- basically, just the concept: What we do and the products, just the facts about our products, I guess.
Q Were you trained at all in how to market your

Page 24

services?
A Yes.
Q Was it helpful that you had studied marketing at Kennesaw?
A Not really.
Q No?
A Not really, not at all.
Q So, how were you trained to sell the USHEALTH products?
A Well, like, what exactly do you want to know? Like, there's several ways that you can do things.
Q Well, what were you -- I just want to know what the training was to prepare you to sell the insurance products at USHEALTH.
What did they suggest that you do?
A Besides the product knowledge --
Q Uh-huh --
A -- and the --
Q Marketing knowledge is what I'm looking for.
A Marketing knowledge is you buy leads, you call leads and things like that.
Q You buy a list of leads?
A Yes.
Q Where did you obtain these leads?
A Lead companies.

Page 25

Q Give me an example of a lead company.
A Like, I think it's called -- NetQuote is one. ProspectZone is another. Any lead companies that you can search and Google, basically, like, insurance leads.
Q Were these leads provided by USHEALTH Advisors?
A Some were given to me by USHEALTH Advisors, some I purchased myself.
Q What leads were given to you by USHEALTH Advisors?
A The -- they're, I guess, the leads that I had; old leads or, you know, purchased leads that they shared with their agents to get us started.
Q So, your friend provided you with lists of individuals or businesses that had previously purchased insurance from USHEALTH?
A I don't know if they previously purchased, but I know that they were just leads that she gave me.
Q And what did you do with the leads? What were you trained to do --
A I called.
Q -- with the leads?
A I would call. I called.
Q And when you called them, what did you -- what was your sales pitch?
A Whoever is on that lead, you know, that specific

Page 26

person or business, I would, you know, request to talk to them. And then when I did, I just let them know that they had inquired about health insurance and I was just, you know, following up to see if they're still in the market. And if they were, we would just talk and then we'll go from there.
Q If they wanted information from you about a particular product, did you provide it to them?
A Not over the phone. I had to make an appointment and let them know that I have to see them.
Q So, was it against company policy for you to mail them information?
A I don't know. But I never mailed personally, so...
Q And when you purchased leads, did you follow the same procedure that you did with company leads?
A Yes.
Q Okay. Did you ever fax materials to any of the leads?
A No, not the leads that I purchased or that was given to me.
Q Okay. So, how long did you work for USHEALTH Advisors?
A November, 2013, till November, 2015; two years.
Q And why did you leave?

Page 27

A Um, couple of reasons. But one of them was I wanted to try Obamacare and different options in health insurance.
Q What were the other reasons?
A What?
Q What were the other reasons?
A I also wanted to -- I needed to get a stable income, because this is a commission base. So, I did go back to Westgate so that I could have, you know, stable income that wasn't just 100-percent-commission based.
Q So, did you resign from the company?
A I did.
Q Okay. Did you send a resignation letter to them?
A I did not. I just told my friend Mara that I was going to -- you know, what I want to do. And then she said she'll take care of it, and she did.
Q Okay. Did you have a web page at USHEALTH Advisors?
A (Indicating affirmatively).
Q Yes?
A Yes.
Q Okay. And how did you obtain a web page?
A The company provided me with one.
Q Okay. Did you have to pay a fee to have a web

Page 28

page?
A Not that I remember, no.
Q Okay. Did you get inquiries from people who looked at USHEALTH Group or USHEALTH Advisors?
A Not a lot. But, yeah, I did, from my website, yes.
(Whereupon, Plaintiff's Exhibit Number 5 was marked for identification by the Court Reporter).
MR. BENNETT: Let me show you what's been marked as Exhibit 5.
BY MR. BENNETT:
Q Can you identify what that page is?
A Probably an ad I created. I don't know.
Q Okay. Well, I downloaded that from the USHEALTH --
A My website?
Q -- Advisor website for you. And that's one of your pages.
A Okay.
Q Did you have any input into the information that was contained on your website?
A Probably my personal information: My name, my phone number.
Q Did you supply the photograph?
A And my photograph, you're right.

Page 29

Q So, is everything else, all the data that's on the web page, with your photo, provided by USHEALTH Advisors?
A Yes.
Q Okay. Did you ever use the USHEALTH Advisor website to create any advertising?
A Yes. The verbiage, I think -- if I remember correctly, yes, I did.
Q How did you use it?
A How did I use it?
Q Yeah.
A I mean, like the verbiage on here, I just used it on my advertisement.
Q What advertisement are you referring to?
A I'm not sure. I don't know if it was in my e-mail. I don't know if it was, like, for the actual fax that I would use, but -- for things like that. My e-mail and the fax, but I don't remember for which.
MR. BENNETT: Can you mark this, please?
(Whereupon, Plaintiff's Exhibit Number 6 was marked for identification by the Court Reporter).
MR. BENNETT: Let me show you this page.
BY MR. BENNETT:
Q Can you identify what this page is?
A My Linkedin page?

Page 30

Q Yes.
A Uh-huh.
Q Did you create that page?
A I did.
Q Is that the same photograph that you used?
A It is.
Q Did you create this page before USHEALTH Group or --
MR. BAUMBERGER: Object to form.
BY MR. BENNETT:
Q -- the website?
A The website, I think it started when I started with USHEALTH.
Q And was this part of your marketing strategy, to have a Linkedin page?
A Yes. I wasn't very active. I know I created it, but I wasn't very active in it. I'm more active now than I was then.
MR. BENNETT: Okay.
(Whereupon, Plaintiff's Exhibit Number 7 was marked for identification by the Court Reporter).
BY MR. BENNETT:
Q Can you identify what's been marked as Exhibit 7?
A Yes.

Page 31

Q Okay. What is that?
A That's a flier that I created.
Q Okay. Have you created many fliers during your time working for USHEALTH Advisors?
A No. Actually, this is the first one.
Q When was this created?
A I don't know the exact date, but this was created for the faxes that I was planning on sending out.
Q Okay. And how did you arrive at the decision to create a flier?
A When we call leads, sometimes they request -- sometimes they don't have time to talk to you, so sometimes they request: Can you fax over information, a brochure or something, and -- which I never did. You know, I never did that. But that was one of the ideas.
I mean, when you're working as self-employed and you're trying to reach out to prospects, you just kind of come up with ideas. And with my experience, after a year of being with USHEALTH, that was one of the ideas I came up with, is to fax something to businesses like this, and hopefully get prospects.
Q Did anyone else at -- in your team create fliers?
A No.
Q You had never seen anyone that thought of this idea?

Page 32

A No.
Q Did you discuss your idea with anyone --
A I did.
Q -- at your team?
Who did you discuss it with?
A With Jim Hmielewski.
Q And what was the conversation about?
A Um, I know I wanted to meet with him about, you know, what I'd been doing, how things have been going for me in the business, and the idea that I wanted to fax out something like this.
Q Did you explain to him how the flier would be created?
A Honestly, I don't remember the details of what I was going to do. I think I created the flier after I talked to him, so I don't remember the details of what we discussed.
Q Okay. And tell me:
What process did you go through to create a flier?
A Obviously, copy/paste a lot. My picture, the USHEALTH Advisors' logo.
Q Where did you find the USHEALTH Advisors' logo?
A I mean, I think, some things that if you Google,

Page 33

Google has it, the websites have it.
Q Which websites?
A My -- like, agent website. And we also have an agent account with USHEALTH Advisors where you have, you know, access to applications, and brochures, and things like that. So, maybe, pictures from there. I might have copy/pasted them. But I know Google alone would pull out, you know, the logo.
Q So, do you remember exactly the day where you selected the logo and decided to put it at the top of the page?
A I don't remember the exact date.
Q Okay. Do you remember copying your picture to --
A I mean, the --
Q -- the flier?
A -- entire brochure was probably created the same day; so, yes.
Q And where did you find the picture that you used?
A Which one, my picture or the logo?
Q Your picture.
A My picture is my picture. I mean, I had that taken -- actually, for real estate. It's in my business cards, so I used the same one.

Page 34

Q Okay.
A And I still use the same one. It's eight years old.
Q And where did you find the content for the flier?
A I don't know, I just created it myself. Everything, I just put it together, copy/paste, copy/paste, you know.
Q So, you copied, say, the first paragraph?
A That is probably copied through my own personal website with USHEALTH Advisors.
Q Okay. So, you believe that information was on the USHEALTH Advisor page for you, as an agent?
A Yes.
Q Okay. And where did you get the information for the three-year lock rate and those bullet points down?
A Um, this is on our brochure. I think it's on the face -- first page.
Q Which is, the three-year lock rate?
A Yes. They're on our product brochure. This is just a fact. I mean --
Q This is the second bullet point --
A Yes.
Q -- you're pointing at?
A Again, customized plans; we are customized. I

Page 35

mean, that's what we did. These are all just facts about what we do.
Q And you wrote the facts or you copied it from the website?
A These, I -- I've probably handwritten them myself.
Q Okay. So, there's a typographical error there in the -- under the fifth one, the pre-existing?
A This one (indicating).
Q Yes, the second one, Accepting Pre-existing Conditions.
A Uh-huh.
Q Is that something you wrote or something you copied?
A Yeah, I wrote that.
Q You wrote that?
A Uh-huh.
Q So, did you write all of them?
A Yes.
Q Okay. And what does the seal at the right side of the three-year --
A What do you mean, what is that?
Q What?
A This (indicating)?
Q Yes.

Page 36

A It's a picture that I copy/paste.
Q And what does it say?
A It says, "three-year rate guarantee."
Q Okay. And what is that referring to?
A That your premiums are locked, your price that was given -- like, let's say I give you a price today, that's locked in for three years.
Q And at the bottom, there are various logos.
Where did you get those?
A That was in my e-mails, bottom of my e-mail page. When I copied -- so, I copied -- actually, it was mine, but it was -- originally, I copied it from Jim Hmielewski's e-mail.
Q So, Jim had those BBB's and Stevies?
A I don't know about the BBB'S, but he did -- all the Stevies are in his e-mails --
Q Okay.
A -- or were.
Q What is a Stevie?
A Those are Stevie Awards for showing, you know, things; the accomplishments, I guess.
Q In the sales of insurance, health insurance?
A I think -- no, that's just in general in business. I think it's, like, a, you know -- it's not within the company. It's outside of the company, the

Page 37

awards that you receive.
Q So, did anyone ever ask you what those awards were about?
A (Indicating negatively).
Q No?
A Nobody did.
Q Okay. Well, at the top of the page, you see a date here?
A I do.
Q Okay. Do you know what that date refers to?
A Probably a date when I faxed somebody this --
Q Okay.
A -- flier.
Q Do you see it says, "1/27/2015, 12:41 a.m." --
A Uh-huh.
Q -- "from 407-930-9234"?
A Yes.
Q Do you know what that refers to?
A I do. This phone number is the phone number that was provided to me by the company that I signed up with, which was Fax87.com.
Q Do you have a fax machine?
A I do not.
Q Okay. So, tell me about how you determined who to send this fax to.

Page 38

You see the next line says "To," and there's a number?
A Okay. How do I determine it?
Q Yes.
A Okay. There's a website called Manta.com where you can locate businesses.
Q Right.
A So, that's how I did my search. I did local business search. And any businesses that has a website, I would log -- you know, go to the website and look for their information. So, if they have a fax number, I would just copy the fax number, copy it back to this account and then send it.
Q So, you -- do you know who that fax number is for?
A I have no idea.
Q Okay. So, you went to Manta, and you weren't looking for any particular person?
A Not at all.
Q You were just looking for website information that had fax numbers?
A I was looking for small businesses --
Q Okay.
A -- with that information.
Q So, how did you do the search on Manta? What

Page 39

did you input?
A Sometimes I just put Orlando, and then it will list all different types of businesses. Sometimes I was specific: I would put dentists, I would put lawyers, I would put anything that I know would be self-employed or small businesses.
Q Okay. And you copied it to a document?
A It's a website that you log into. And there's a section where you just put phone numbers, and that's where I copied it to.
Q Okay. So, what is this company that you were copying the numbers to?
A Fax87.
Q Okay.
A That allows me to fax to those numbers that I was putting in, so...
Q Okay. How did you discover Fax87?
A I Google searched it. And --
Q What were you Googling for?
A Since I didn't have a fax machine, I wanted to find out how else I can do it online. And, so, when I Googled it, there were several options.
And I think I talked to a couple of different companies before I decided on one particular. So, that's how I did it.

Page 40

Q Do you remember the other companies that you contacted?
A Not at all.
Q And what were you looking for, a price?
A Yes, definitely. That's always a factor.
Q Was Fax87 the least expensive?
A I think it was the least expensive.
Q Did you ever talk to anyone at Fax87?
A I did.
Q Who did you talk to?
A Whatever --I think it was a 1-800 number that they had on the search that I did on Google. And a representative just answered, and I -- you know, I wanted -- I told them what I wanted to do, so they walked me through the process.
Q How did they help you?
A They just gave me information, and price, and that's it.
Q Information about how the system worked?
A A little bit. I mean, I don't remember it, honestly, the whole conversation, but it wasn't like they trained me on it. They just, you know, told me what I could do.
Q And what was the prices you recorded?
A All I remember, that it was 9.99 a month. There

Page 41

would be additional charges if I exceeded a certain amount.
Q A certain amount of faxes -- certain amount of faxes that were sent?
A Yes.
Q Do you remember what type of service that you signed up for? How many faxes were you able to send for 9.99?
A If I remember correctly, it was 30 a month for 9.99. And, then, anything additional would be an extra charge, but I don't know the extra charge, how much it was.
Q Okay. Thirty a month, that's about 33 cents per fax?
A I didn't calculate it that way, I don't know.
Q Okay. But compared to the other companies that were offering to fax your flier, you believed this was a -- the least expensive option that you had?
A Um, honestly, I don't remember exactly why I felt this was a better option. But as far as price, yeah, most definitely it was, you know, something that I thought was very, you know, affordable for me.
Q Okay. That to send 30 faxes of the flier for $10, you thought was a reasonable price and better than the competition?

Page 42

A I guess. I guess, from the information that I received or the search I did. I don't remember the competition.
Q Well, I looked up Fax87 and I saw they were advertising -- and when did you do this, back in 2015, January, 2015?
A Uh-huh.
Q I saw that they were advertising a thousand faxes for 6.99.
A Actually, I looked last night, and they were advising 50 for 4.99. And, then, like, they had different prices all the way up to, like, 40 something.
Q Right. And a thousand was 5.99; is that what you saw?
A No. I saw 4.99 for 50. And they had -- from then on, I don't remember the specifics. But I know that -- obviously they changed the pricing a little bit.
Q So, you think it was less expensive now --
A It seems --
Q -- than when you were looking at it?
A Yes.
Q So, after you developed the flier, did you go back to Jim and show him that -- the flier that you had developed and proposed to send?
MR. BAUMBERGER: Object to form.

Page 43

THE WITNESS: Um, no, not that I remember.
BY MR. BENNETT:
Q So, the only conversation with the division manager you had to discuss your idea to fax fliers was before you actually developed the flier?
A Exactly.
Q Okay. And you never showed him this fax before you sent it out?
A No.
Q Is that correct?
A As far as I remember, no.
Q Okay. So, you believe that you -- your plan provided for up to 30 faxes, and that you didn't send more than 30; is that correct?
A Honestly, I don't know the exact number; I don't. I mean, I don't remember a whole lot of things, now, what happened then, but that's what I remember.
Q Okay. And did you hear from USHEALTH about your faxing the fliers?
A I did.
Q Who did you hear from?
A The first person that talked to me was Jim Hmielewski.
Q And when did that occur?
A Maybe, like, within two weeks or three weeks

Page 44

after I signed up with the Fax87.
Q So, this would have been in February of 2015?
A Yes.
Q Okay. And what was the conversation with him?
A He told me that there was a complaint about a fax that I sent and that I needed to stop immediately.
Q And who was the complaint from?
A I don't remember if he mentioned that, honestly.
Q You mean, one of the recipients of --
A Yes.
Q -- your fax had made a complaint shortly after you sent it?
A Yes.
Q And they had made a complaint to him?
A No. I guess, they complained to the company. I don't know. I mean, we weren't -- I didn't ask.
Q Did anyone complain to you about --
A I don't remember.
Q -- the fax being received?
A Nobody responded to the faxes that I sent.
Q No one did?
A No one did.
Q But one of the recipients called the company in Orlando?
A I don't know who, but I know it wasn't me that

Page 45

they called. So, I know that Jim told me to stop what I was doing.
Q And what was the problem that they were complaining about?
A I didn't know that it was actually illegal to send out faxes. I did not know that, and that they -- I guess they were suing or something in that regards.
Q Who was suing?
A I don't remember. You guys? I don't remember.
Q Or someone else?
A Someone else. I don't know the name -- or, I don't even remember if he told me the name.
Q Okay. So, what was your response?
A I mean, I was worried. I apologized, and I said, what's going to happen, you know. And he told me that there could be a fine that the company might pay, which is $500 per complaint, or fax, or whatever, and that was it.
And I asked him, you know -- you know, how would it affect me. And he said he doesn't know, but I just need to stop what I was doing.
Q And did you?
A Of course, immediately.
Q Okay. Were there any warnings to you that you would have to pay the --

Page 46

A No.
Q -- penalties?
A No.
Q Did you have insurance while you were working for USHEALTH Advisors?
A Yes.
Q What type of insurance was it?
A Well, um, you have to have insurance to cover, like, I guess, you know, anything that could -- I don't know, but I know you have to have insurance. I don't know how to explain it to you.
Q Did you have insurance?
A I did. I know that -- I personally didn't sign up for it -- or, I don't know how that goes about, but I know the company had it, under my name.
Q Did you have to pay any premium amount?
A I think we paid, like, $10 for every paycheck that they cut off --
Q So, it was --
A -- or $50, I don't remember; but there is an amount that they cut off every paycheck.
Q They deducted from your commissions --
A Yes.
Q -- or other --
A Yes.

Page 47

Q -- fees?
A Yes.
Q Okay. Did you get a copy of the policy?
A I don't remember. Possibly, I don't remember.
Q All right. Did you -- when you heard that there might be a penalty to pay, did you inquire of the insurer whether this might be covered under the insurance?
A Not at all, no. I didn't think about that.
Q Did you receive any training about faxing marketing materials to customers?
A No.
Q Was that ever discussed in any meetings --
A No.
Q -- with anyone?
A No.
Q Did you talk to your friend, Marta [sic], when you got the call --
A Mara.
Q I'm sorry, Mara.
-- when you got the call about the complaint that had been received from the fax?
A No. I really never talked to Mara about the entire situation. I think, Jim is the only one in the office that I talked to. That was it.
Q You didn't discuss your idea, to fax people,

Page 48

with any of the other team members?
A Nope, nobody but Jim.
Q And you never have heard of any team member using fax marketing to --
A No.
Q -- targets, or prospects, or leads?
A No.
Q Have you tried to contact Fax87 to see if they had any transmission letters?
A I did.
Q When did you do that?
A I think, after Jim Jackson contacted me. You know, he asked me if I had anything in regards to, you know, like, records. And the first thing I looked was the bank statements or to call Fax87. And I did, I called them.
Q You called the 800 number?
A I did.
Q Okay. And what happened?
A They told me that, unfortunately, they had no record of tracking my account since I canceled it, and the phone number that was given to me was probably already assigned to somebody else.
Q All right. So, the company, Fax87, said they could not give you copies of the transmission records?

Page 49

A Yes. And they said they probably did not have a record of it, or something like that, in that sense.
Q When you sent the faxes out, did you get a receipt from Fax87?
A Not a receipt, but e-mail notification. Whether it went through or it didn't go through, I would get e-mail notification.
Q So, you would get a list of the numbers --
A Yes.
Q -- that they had successfully transmitted --
A Or that didn't go through.
Q And a list of the numbers that didn't --
A Yes.
Q And do you remember what the success rate was?
A I don't remember.
And I did treat those notifications as, like, trash, basically. I just deleted them as I received them.
Q So, you weren't interested in finding out that the $10 you were spending were reaching the people that you copied their fax number?
A I mean, all I know is that some of them didn't go through, so I would just keep trying other companies.
So -- but it wasn't important to me whether it reached everybody that I was trying to reach out to. I was just trying to reach out to as many people, you know,

Page 50

trying to get prospects.
Q So, how many days did you spend looking for faxes and faxing this letter?
MR. BAUMBERGER: Object to form.
THE WITNESS: I don't remember, to be honest. I have no idea.
BY MR. BENNETT:
Q So, was it just one day you did it, or was it every day for a couple of weeks?
A I don't remember. I know it wasn't every day for a couple of weeks. It could have been more than one day, but I don't remember the exact hours, or days, or specific days. I don't remember.
Q Okay. So, you use a Gmail account, correct?
A I do.
Q Have you tried, through Gmail, to recover your deleted --
A I did.
Q You did?
A Not recover, but I tried to find anything in regards to this case that I could find. And there was nothing that I could find.
Q Okay. You know that Gmail offers a program to find your deleted e-mails that you've put in the trash?
A I did not know that. That's new to me.

Page 51

Q So, what efforts did you make with Gmail to find out if you could recover --
A I never reached Gmail personally. I just looked at my account. And I tried to go back to, you know, e-mails that are on, actually, my account currently, to see if there was anything that -- maybe some of the notifications I forgot to delete or anything. I mean, anything that I could get my hands on, but I could not.
Q Okay. Would you be willing to look at your Gmail account, and see if you could recover deleted files so that we could get the transmission lists, and find out who you were successfully faxing the ad to?
A I don't see why I shouldn't, yeah.
Q Because you tried Fax87, and they said they don't have the records?
A Yes.
Q So, Gmail could possibly -- if they were sending notifications to you at Gmail, they could possibly be recovered, and you would turn them over if you could find them?
A Yes.
Q Okay. What type of a computer do you have?
A I don't even know.
Q Is it a laptop?
A It's a desktop.

Page 52

Q It's a desktop?
A Uh-huh.
Q Is it an Apple?
A It's not Apple.
Maybe, HP. I think it's HP.
Q Do you remember when you first bought it?
A No. My husband handles things like that. So, you know, maybe a year ago, two. I don't know.
Q Is it your husband's computer?
A No, it's our computer.
Q So, you both use it for business?
A Personal, business, whatever, yeah.
Q But it's fairly new.
Do you know if you use Windows?
A Yes.
Q You do?
A Yes.
Q Okay. So, it's a Microsoft program that you use?
A Yes.
Q Okay. So, if we sent you an interrogatory asking for the identification of your computer, would you be able to provide that to us: The model number, serial number?
A What will you do with that information?

Page 53

Q What we would do, we would try to recover information about the faxes that you sent and who you sent them to.
A Okay.
Q If it would be possible to do that.
A I see.
I don't know, because -- I mean, I don't know what else you have access to, if I let you do that. I don't know.
Q Well, if they could be protected, if you could see what it was on the computer, that we would just be looking for information about who you faxed to --
A Yeah.
Q -- would you be willing to cooperate with that?
A I mean, I guess, yeah.
Q If you had a confidentiality agreement that nobody would look at it -- you'd get to look at it first and see. But if we could find some tech person to -- with the assignment to find out if fax transmission data was in your computer, and if it was, if it could be located, would you be willing to do that?
MR. BAUMBERGER: All right, let me just stop here and object to the question. And I think the witness would have a right to consult with an attorney before anybody is retained to go through her

Page 54

personal e-mail account.
MR. BENNETT: Absolutely.
MR. BAUMBERGER: So, I just want to make sure the witness is aware of her rights.
THE WITNESS: Okay. I don't know my rights, so --
MR. BENNETT: Okay.
THE WITNESS: -- I guess I would go through an attorney, sure.
MR. BENNETT: Okay.
THE WITNESS: And whatever, you know.
MR. BENNETT: All right.
THE WITNESS: Can we take a short break?
MR, BENNETT: Sure.
(Whereupon, a break was taken at 11:01 a.m., after which the proceedings continued at 11:08 a.m.)
MR. BENNETT: Let me show you what was marked as Exhibit 2, which are e-mails that you brought with you to your deposition today.
THE WITNESS: Okay.
BY MR. BENNETT:
Q How did you search your Gmail to find these e-mails?
A Again, anything that's currently on there, I just -- you know, there's a search area where you can put

Page 55

names or words to search for specific things.
Q Search your e-mails, you mean? In the Gmail list, you're searching for names?
A Like, Fax87.
Also, since I know, exactly, the timeframe that I did what I did, I looked up the dates, and there was nothing on there on those dates.
Q Okay. So, this is everything that you found, you just printed out the e-mails?
A Yes. I don't have anything regarding the process with Fax87.
Q Okay. And were there other e-mails related to this litigation or your fax that you didn't print?
A Not in my personal, no.
Q And what is your personal e-mail?
A It's my first name, BirsenGoksu@Gmail.com.
Q And did you have another e-mail at USHEALTH Advisors?
A I did.
Q And did you search those, as well?
A I didn't even think about searching those, no.
Q Okay.
A And now I don't have access to them, since I left, so...
Q Okay. You're saying you no longer have access

Page 56

to any e-mails you sent or received at USHEALTH Advisors?
A No.
Q But your website is still up.
A Is it?
Q Your page is still up. Recently, I looked at it.
A Oh, okay. Well, I don't have an account with them. I can't personally log into the account.
Q I see.
And you can't log into Fax87 --
A Either, no.
Q -- now?
But you're still using your Gmail account --
A I am, yes.
Q -- that is advertised on the --
A Yes.
Q -- fax we were discussing?
MR. BENNETT: Can we mark this?
(Whereupon, Plaintiff's Exhibit Number 8 was marked for identification by the Court Reporter).
BY MR. BENNETT:
Q Can you identify what this document is?
A It's an Affidavit that Mike Suarez sent me.
Q Okay. And how did this document come to be sent to you? Did you request that he prepare an Affidavit for

you?
A No.
Q Did you sign an Affidavit?
A No.
Q What was the purpose of this Affidavit being sent to you?
A I have no idea.
Q Okay. It was not explained to you?
A I guess this is just explanation of what I told them, you know, and they just wrote it down, and they wanted me to sign my statements of what I said.
Q Okay. And is it accurate, what they wrote down?
A It's very accurate.
Q Okay. But why did you decide that you didn't want to sign it?
A There were two things that I wanted that I thought it should be on there: One was, there were two $9.99 charges, not one, that I noticed on my bank statements. And the fact that I talked to Jim Hmielewski, as well.
Q And did they -- why isn't that information in this?
A Well, I was sick the last ten days. I was literally, like, in bed resting. And Mike tried to call me when I didn't sign this, and I didn't pick up. I mean,


I was sleeping most of the days.
And, then, when he did call me, I think, which was yesterday, and I called him back -- no, I'm sorry. I called him back, for the first time, yesterday. That's when we decided to meet.
Q Okay. But not --
A But I also e-mailed him regarding those two things.
Q Okay. So, you decided to meet with Peter, not Mike, up here?
A I mean, they said that -- you know, he told me are you willing to meet? I said sure. And it was Peter, not Mike.
MR. BENNETT: The Defendants produced some e-mails to me.
(Whereupon, Plaintiff's Exhibit Number 9 was marked for identification by the Court Reporter).
BY MR. BENNETT:
Q Can you take a look at this and tell me if you've seen it before?
A Yes.
Q Okay. Could you read the date on this e-mail?
A February 25, 2015.
Q Okay. And it says it's from Debra Silva.
Do you know who she is?


A No.
Q Okay. And it was to Lisa Silvia.
Do you know either one of them?
A (Indicating negatively).
Q Well, the main body of the e-mail is to -- from you to Jim Hmielewski.
A Uh-huh.
Q And the copy -- did you write this cc? Was this copied to you?
A That, I did not. I don't remember.
Q Who is Bill Shelton?
A He is one of the managers in our Orlando office -- or, was, when I was there.
Q All right. And Mara Brockman?
A Is my friend who --
Q Does she still work for USHEALTH Advisors?
A She does.
Q And what is her position today?
A I don't know.
Q And Taraina McCants?
A McCants.
Q Who is that?
A She is the regional manager, as far as I know.
Q The region being Florida?
A No. Region being, like, south region of the


United States.
Q Okay. And is she based in Orlando?
A No. She's in Atlanta, Georgia.
Q And, then, you see Debra Silva is listed again?
A Debra Silva -- I mean, if Bill Shelton's on there, maybe -- I'm guessing -- she's another manager that I'm not really -- I wasn't very familiar with. I don't know.
Q And Travis Yoder?
A You know what, I think Travis Yoder is someone that I'm confusing with Troy McCoy [sic].
I think it was Travis that we were talking about earlier, not Troy. I don't know. I don't know which one is which.
Q Okay. Well, McQuagge signed the contract with you --
A Okay.
Q -- and it said he was a CEO, correct?
A So, I think Travis is the one I mentioned about who came to Orlando. I think that's who -- that's who he is.
Q From Fort Worth?
A Uh-huh.
Q Okay. All right. Well, what is this fax with these questions and these answers?

Page 61

A These were questions that wanted -- they wanted me to answer --
Q Who --
A -- and I didn't.
Q Who wanted you to answer?
A I guess, Jim originally sent me this e-mail. To be honest, I don't remember this. And I don't have this on my e-mail records.
Q So, in blue, there are numbered questions.
A Right.
Q And you think Jim Hmielewski was the one asking you these questions?
A No. I think he's the one who sent me the original e-mail.
Q Okay. So, you cut and pasted the answers.
And this e-mail is from you to Jim, giving him the answers he wanted?
A All I did is answer the questions.
Q Right, right.
But this e-mail is from you to Jim, with copies to the other people?
A Right. So, probably, what I'm guessing is, if Jim is the one who sent me the original questions that had these people, I just probably respond to all.
Q Okay. In answer to Number 3, you say that

Page 62

you -- you "talked to Fax87, and they offered me a product that would be a good fit."
What do you mean by "a product"?
A That actually would do what I wanted to do, is be able to fax things out.
Q Okay. Just to upload fax numbers with a flier --
A Brochure or flier.
Q -- and they would send it for you.
So, they were recommending a price and a number to you --
A Yeah. I mean, they were --
Q -- that you could --
A -- basically could accomplish the idea that I had.
Q And in answer to Number 5, you said that you copied the -- "copied and paste the information from our website, as you probably have noticed."
Is that correct?
A Yes.
Q That's all the information you gave.
And you still stand by those answers? You wouldn't correct anything?
A The only thing I -- again, I did not mention on here -- yes, nobody approved it, nobody saw it. That's --

Page 63

I mean, that was -- is Number 4.
It was my idea completely. And I didn't know it was illegal or anything. But I did tell Jim Hmielewski what I was doing, like, as far as the idea.
MR. BAUMBERGER: For clarification, you did or did not know it was illegal?
THE WITNESS: I did not know it was illegal.
(Whereupon, Plaintiff's Exhibit Number 10 was marked for identification by the Court Reporter).
BY MR. BENNETT:
Q Let me hand you Exhibit 10, which is an e-mail from Jim Jackson to Peter Baumberger and Michael Suarez dated November 25, 2015.
Do you remember this e-mail?
A Yes.
Q There's no message here.
Was there a message that you were responding to?
A That, I don't know, to be honest. I don't remember.
Q Well, you say, at the bottom, here, it says from you to Jim Jackson.
A Uh-huh.
Q Okay. Did you send that?
A I did, yes.
Q Okay. And could you read it over and tell me if

Page 64

that -- you believe that's still accurate information?
A I just chatted with them and found that I used my fax number, 407-930-9234: "Since the account has been canceled back in February, I no longer can log back into that account, no longer exists, so I have no record of who I sent the fax to. I had signed up back in January 28, and it was canceled on February 28. I checked my bank account, and they charged 9.99, and there's no additional charge. That tells me that I did not go over 30, since it was 30 for 9.99, and plus additional fees for more."
Q Okay. When you say you "chatted with them," they have an online chat where you do it on your keyboard?
Is that --
A No.
Q -- what you mean by chatted, or do you mean you had a telephone conversation?
A I had a telephone conversation.
Q Okay. And, then, there's another message on November 25, where you advised that Fax87 gave you the fax number that's on the fax.
Is that --
A I checked all my e-mails, but I have no other -- (witness mumbling) -- yes.
Q That's correct, Fax87 gave you the number that appears on the fax, and you uploaded them --

A When I called them?
Q Yes.
A I don't remember how I got that information, to be honest. Most likely they did, I don't know.
(Whereupon, Plaintiff's Exhibit Number 11 was marked for identification by the Court Reporter).
BY MR. BENNETT:
Q This is Exhibit~11, which is an e-mail from you to Mike Suarez dated February 4.
A Uh-huh.
Q Okay. Is that information correct that you sent to Mike?
A Yeah. This is an e-mail that I sent to Mike, yes.
Q And is the content -- you wouldn't change anything? That's still your testimony today?
A Yes.
MR. BENNETT: If you'll give me one second.
MR. BAUMBERGER: Sure. I can start looking at the exhibits, because I'm going to have some questions.
(Whereupon, Plaintiff's Exhibit Number 12 was marked for identification by the Court Reporter).
MR. BENNETT: Exhibit 12 was produced by the Defendants.


BY MR. BENNETT:
Q Have you ever seen this document before, from Freedom Life Insurance Company of America?
A Not like this, but I do have a letter or a little package from them saying this.
Q Saying what?
A The termination date.
Q So, were you terminated by Freedom Life Insurance Company?
A I don't know, to be honest. I didn't even look at the --
Q Did you ever work for Freedom Life Insurance Company?
A Not that I'm aware of, no.
Q So, were you terminated by USHEALTH Advisors?
A I should be, because that's who I worked for.
Q Well, your testimony was you resigned because you wanted to have a fixed income rather than a --
A Right.
Q -- commission income; is that right?
A Yes.
Q You were not fired by USHEALTH --
A I was not fired.
Q -- is that correct?
No one at the company said: As a result of


these faxes, we are going to --
A No.
Q -- discontinue your employment?
A No.
Q This was totally your idea?
A It was completely my idea.
Q And it wasn't related to any complaints about your fax?
A Not at all, no.
Q And is this the date, 11/21/2015, that you resigned?
A I guess, when -- no. I told my friend, on September 19, at a dinner, that I wanted to resign, that I didn't want to work with her or the company.
Q Who is your friend?
A Mara Brockman.
Q Was this a company-sponsored dinner?
A No. It was -- we were just celebrating my husband's birthday.
Q So, you said September 19 --
A (Indicating affirmatively).
Q -- you told her you wanted -- and it was just -- took awhile for the --
A Um, yeah, it did. I mean, I was still actively working. I still had clients and, you know, things like


that.
MR. BENNETT: I have no further questions for you.
MR. BAUMBERGER: I've got a few questions.
I apologize if I go over some of the same stuff, but I just want to try and put everything in order here.
CROSS-EXAMINATION
BY MR. BAUMBERGER:
Q My understanding is that your agency relationship with USHEALTH Advisors was approximately two years; is that right?
A Yes.
Q And I believe we've already marked it: Exhibit 4 is a copy of the contract which contained the terms and conditions of your agency relationship with USHEALTH Advisors; is that right?
A Yes.
Q And was your agency contract with USHEALTH Advisors or with USHEALTH Group?
A Advisors.
Q All right. Did you ever have any contracts or agreements specifically with USHEALTH Group?
A Not that I'm aware of, no.
Q And do you specifically know who or what

Page 69

USHEALTH Group is, specifically or legally?
A No.
Q I believe that you testified that you left on your own volition and you were not fired --
A Yes.
Q -- is that correct?
A Correct.
Q All right. And when you did have the agency relationship with USHEALTH Group, did you understand that you were an independent contractor for -- strike that.
When you did have your agency relationship with USHEALTH Advisors, did you understand that you were working as an independent contractor with that company?
A Yes.
Q And I believe you were asked some questions about leads, and generating applications and enrollments.
A Yes.
Q And my question is:
Did you generally use your own judgment in generating or soliciting applications or enrollments?
A What does that mean?
Q I mean, is that work that you performed on your own, for the most part, in seeking out leads and trying to enroll new applicants?
A I mean, yeah, you're self-employed, so that's

Page 70

what you do.
Q And I believe you testified that you worked off commissions?
A I did.
Q And let's talk, again, about the -- this fax ad. I'm going to hand you Exhibit 7.
Exhibit 7 is the fax that's the basis of the lawsuit, that's why we're here --
A Okay.
Q -- is that correct?
A Yes; as far as I know, yes.
Q All right. And I believe you testified that you're not aware of anybody who's associated with USHEALTH Advisors that ever recommended to you or gave you the idea of sending out faxes; is that --
A No.
Q Okay. The idea to send out this particular fax, which is marked as Exhibit 7, whose idea was that?
A Mine.
Q And the information that's contained on that particular advertising page on Exhibit 7, is that a page that you created on your own?
A Yes.
Q And I believe that you testified that you did not show that to anybody before you sent the fax out; is

Page 71

that correct?
A Yes. As far as I remember, yes.
Q And I just want to ask you a few more questions about how the process worked with the faxing.
I believe you testified that you located a company, called Fax87, online?
A Uh-huh, yes.
Q Was that through, purely, internet research?
A Yes, Googled.
Q That you did on your own?
A Yes.
Q And the way you described the process, am I correct in understanding that you had to actually input fax numbers onto the website that were eventually faxed out?
A Yes.
Q And you mentioned that you located these fax numbers on a website?
A Manta.com, yes.
Q Did you keep any notes or did you save any pages that would indicate what fax numbers were used?
A No.
Q Do you have any record whatsoever of where you obtained these fax numbers or any record of -- that identifies the fax numbers?

Page 72

A No.
Q Do you have any identification or records that identify the names of the individuals or businesses that you were attempting to fax this information to?
A No.
Q I'm going to hand you -- you brought with you some e-mails that you were able to locate. And I guess my first question is:
All the e-mails that you were able to locate on your own, have they been marked as Defense Exhibit -- or, Plaintiff's Exhibit 2?
A Yes.
Q Let me take a look at that again real quick.
A (Witness complies).
Q Defense Exhibit 2 are the e-mails that you brought with you here today?
A I think so, yes.
Q And I just want to make sure that I'm understanding the order of e-mails that you have here.
From what I can tell, it looks like the older e-mails are in the back of this exhibit, Exhibit 2, and then the newer ones are moved forward from the last page; is that correct?
A Um, this is separate from all of this (indicating), because I think this is between me and

Page 73

Mr. Jackson here.
Q But taking a look at the last page of Exhibit 2, is that the oldest e-mail?
A Yes, it is.
Q Okay. And that refers to a communication that took place in 2013?
A Yes.
Q And, then, from my review of these records, the next oldest e-mail is the next -- second page from the bottom; is that right?
A I'm sorry, say that again.
Q Sure.
From my review of this exhibit, Exhibit 2, the second oldest e-mail is the second one from the bottom; is that right?
A There's no date on here.
Q If you look at the next page, I think it starts at the bottom.
A November, yes.
Q And what's the date and time of this e-mail?
A November 25, 2015.
Q Okay. And, then, is this an e-mail that you wrote to Jim Jackson?
A Yes.
Q All right. And does it appear that it's in

Page 74

response to any e-mail, or is it just an e-mail that appears that you just wrote?
A I think this is what I wrote to him.
Q Let me take a quick look at that e-mail.
A (Witness complies).
Q And in this e-mail that you sent to Jim Jackson on November 25, 2015, at 1:51 p.m., are you describing your efforts in locating records that relate to the faxing that you were involved in?
A Yes.
Q Okay.
A Yes.
Q And everything that's contained within this e-mail that you wrote Mr. Jackson on November 25, 2015, at 1:51 p.m.; is that correct?
A Yes, it is.
Q Okay. And it looks like the next e-mail that you sent, according to the records that you brought -- well, strike that.
It looks like Mr. Jackson responded to the e-mail that we just discussed, and said: "Thanks for your assistance. Let me know if you happen to run across anything"; is that correct?
A Yes.
Q Then your next e-mail is dated November 25,

Page 75

2015, at 3:14 p.m.
A Yes.
Q And you're now responding to Mr. Jackson's previous e-mail, who's thanking you for your assistance and asking you to let him know if you run across anything; is that right?
A Yes.
Q My question is: Here, you -- this is the e-mail that you've previously been asked about, but it starts off, "I just chatted with them and found out that I used -- my fax number is 407-930-9234."
That's how your e-mail begins?
A I guess, yes.
Q Okay. And my question is:
When you were saying "I just chatted with them," who are you referring to, Fax87?
A Fax87, uh-huh.
Q So, you specifically contacted them to see if they had any records of --
A I did.
Q -- the faxing?
And what did they tell you?
A That, again, since I canceled my account, there was no record that I could go back to.
Q Okay. In looking, again, at Exhibit 2 -- and

Page 76

I'm referring to your e-mail of November 25, 2015, at 3:14 p.m. This one right here (indicating).
A Okay. What about it?
Q Towards the end of that e-mail, you reference the fact that you went back and checked your bank account?
A Yes.
Q And you mentioned a charge for 9.99?
A Yes.
Q And then you say that, "There is no additional charge"; is that right?
A I checked my bank account and they charge- -- yes.
Q But you did find, in your bank records, that there were two charges?
A Of 9.99, yes.
Q Then you have a note here: "That tells me that I did not go over 30, since it was 30 for 9.99, plus additional fee for more."
A Yes.
Q So, based upon your recollection of when these faxes were sent out, was it your understanding that 30 faxes would be sent for the price of 9.99?
A Yes.
Q That was your recollection of what the charges were, back when you performed the faxing?

Page 77

A As far as what I remember, yes.
Q Okay. And do you have a personal recollection of sitting at the computer, back at the time that you inputted the fax numbers, and inputting a humongously [sic] large number of faxes --
A No.
Q -- hundreds or thousands?
A No. That's impossible, I didn't have time for that.
Q So, just based upon -- I know you testified that you don't remember exactly how long this took, but based upon your recollection of, at least, the time that you took inputting numbers, do you think the numbers are closer to 30 or much more?
A Honestly, I don't know. I really don't know.
This is an extra way for me to get prospects. It wasn't -- like, it's just the extra time that I had. My main ways were calling, and other ways, not this. This was just if I had free time, that's when I did it, until I was warned.
Q All right. But do you have a recollection of researching hundreds of fax numbers on Manta, and inputting --
A No.
Q -- hundreds of fax numbers?

Page 78

A No. It can't be hundreds, I know that.
Q All right. And as you sit here today, is there any way for you to confirm the identity of people or businesses that you sent a fax to, or the fax numbers that you sent faxes to, back at the time that you sent Exhibit 7 through the Fax87 website?
A No.
Q In taking a look at Exhibit 9 -- you were asked some questions about Exhibit 9. I believe you testified that Exhibit 9 is an e-mail that you sent on February 25, 2015, at 8:46 a.m. --
A Uh-huh.
Q Is that right?
A I guess, yeah.
Q That was just over a year ago?
A Uh-huh, yes.
Q Okay. And in taking a look at these questions -- just to go through a couple.
In response to Question 1:
Did you indicate that you found an E-fax company online?
A Yes.
Q And, then, in response to Question 3, you identify how you found Fax87?
A Yes.

Page 79

Q And how did you find them? What do you reference?
A Google. I don't know if it's on here.
Q Okay.
A I found -- yes, it is, Google search.
Q Looking at a series of questions which was Number 4, which begins: "Who authorized this agent to do this? We don't -- we obviously do not authorize any fax blasts, so I'm concerned about whether this was a lone wolf or whether this practice is being encouraged in a particular region."
What was your response to that particular question?
A I took full responsibility that it was my idea and I didn't ask anybody.
Q Okay. Then, taking a look at your response to Question 5, Question 5 had a series of questions, which begins: "Where did the form of the ad used come from?"
What was your response to Question 5?
A That I personally created the ad myself. I copy/paste information from our website, and no one approved the flier, from my leaders, they didn't even know I was doing this.
Q So, in looking at your answer to Question 5, which was sent about a year ago, in this response, you

Page 80

specifically stated that nobody approved of the flier and that they didn't know you were doing this, correct?
A Yes.
Q All right. But now you're saying that you did have a conversation with Mr. Jim Hmielewski --
A Yes.
Q -- is that right?
A Yes.
Q But that testimony, you'll agree, is inconsistent with your answer to --
A Yes.
Q -- Number 5?
A I see that.
Q And when you answered Question 5, that was a little bit closer in time to when the faxes actually were sent out; is that correct?
A It is, yes.
Q And the Affidavit that we provided you, which is Exhibit 8 --
A Uh-huh.
Q -- did you get a chance to review this?
A I did.
Q Okay. And is that consistent with the answers that you provided in your e-mail of February 25, 2015, at 8:46 a.m.?

Page 81

A Yes, yes.
Q Okay. You were asked some questions about the fact that you had a conversation with Jim following a complaint?
A Yes.
Q All right. And I believe you testified that you don't recall the identity of the person who complained?
A No.
Q All right.
A I mean, I don't remember the conversation exactly.
Q Do you know if it was the Plaintiffs who are suing in this case?
A It could be, possibly.
Q Just a couple of questions about Jim Hmielewski.
Do you know what his specific title was with USHEALTH Advisors back when you worked there? Do you recall the specific title he had?
A All I know is, like -- again, there's a ladder. So, he was, like, the division manager.
Q But do you know what his -- I mean, have you had a chance to review his contract or --
A No.
Q -- agreement?
A No.

Page 82

Q All right. So, do you specifically know what his, you know, legal job title and obligations were with the company?
A No.
Q Just taking a quick look at -- let's go over your contract really quickly. I think it's Exhibit -- you've got it there.
Is that Exhibit --
A It's 4.
Q -- 4. All right. Just to go over a few of the terms of the contract.
This is the contract -- Exhibit 4 is the agreed-upon terms and conditions of your agency relationship with USHEALTH Advisors during the time that you were associated with this company; is that right?
A Yes. I tried to find a copy, but I couldn't, last night. So, I don't know if this is --
Q But does this appear --
A Yes.
Q -- to be the agreement?
A It does.
Q In taking a look at the first paragraph, Section A, does this reference that you were an independent contractor for USHEALTH Advisors?
A Yes.

Page 83

Q Taking a look at Page 4, if you will, for a second --
A Page 4?
Q Yes.
A Okay.
Q -- of Exhibit 4.
Taking a look at Section 4, which discusses your responsibilities as an agent; is that right?
A Yes.
Q All right. And the very first paragraph here says: "Agent, at all times, shall comply with all of USHEALTH Advisors' rules and regulations, as such may be amended from time to time, and with all laws and regulations of the states in which agent solicits business."
A Okay.
Q Is that what it says?
A Yes.
Q And was that one of the obligations or responsibilities that you had as an agent, per the agreement?
A Yes. I mean -- yeah.
Q Okay. Do you recall receiving -- when you first associated with the company, do you recall receiving any memos or materials that talked about the company policies

Page 84

and things of that nature?
A Yes.
Q Do you recall all the particulars that were contained in those agreements or memos?
A I usually don't read things like that.
Q Understood, understood.
A No, I don't know.
Q Okay. And, then, taking a look at the last paragraph here of Section 4, which is entitled, "Responsibilities."
Did this also require the agent to comply with all laws and regulations of the states in which agent solicits business?
A That's what it says, yes.
Q And I believe that you testified that at the time that you sent out the faxes, you didn't know that unsolicited faxes were not legal; is that correct?
A I did not know that, yes.
Q Did not know. All right.
And, then, taking a look at Exhibit 5 -- or, Section 5, which is entitled, "Term" --
A Uh-huh, yes.
Q -- taking a look at the first paragraph, does Section 5 contain the list of offenses that could result in the termination of the agreement?

Page 85

A Can you just give me a minute?
Q Sure.
A Okay.
Q Yes?
A Yes.
Q All right. And taking a look at the list, there's several examples of conduct that could result in the termination of the agreement.
It's listed A through J; is that right?
A Yes.
Q All right. And Section D states the following: "Published, distribute or use any circulars, advertising, sales material or other material -- or, other matter referring to USHEALTH Advisors, or to policies, coverage, products, the benefits or services of carriers, including the name of any applicable insurance carrier, without first securing the written approval of USHEALTH Advisors and each applicable carrier."
Do you see that?
A Yes, I do.
Q So, does this indicate that before you do any advertising, you were required to first secure written approval?
A Yes.
Q Did you do that before you sent out the fax at

Page 86

issue in this case?
A No, I did not.
Q All right. And taking a look at Exhibit -- or Section 19, which is on Page 11 of the same agreement --
A Okay.
Q -- did you specifically agree, pursuant to Section 19, that you would not use any advertisements referring to USHEALTH Advisors without first securing USHEALTH Advisors' written approval?
A I see that on here, yes.
Q That was one of the agreements that you had, pursuant to this contract?
A Again, I don't -- I didn't read the contract, and I couldn't find the contract, so I don't know.
Q Understood.
But that is contained in your contract?
A Yes.
Q And, again, before you sent out that fax, did you ever receive written approval from USHEALTH Advisors?
A No, I did not.
MR. BAUMBERGER: Just a few other questions.
BY MR. BAUMBERGER:
Q With respect to the faxing that was sent through Fax87, did anybody contact you directly, that you can recall, following that?

Page 87

A No.
Q Now, I believe that you mentioned that, on occasion, in your practice -- strike that.
During the time that you were associated with USHEALTH Advisors, I believe that you testified that sometimes you had conversations with leads who asked you to fax information to them?
A Yes.
Q And, in those cases, they were inviting you to send faxes?
A Information, yes.
Q With respect to the -- any of the fax numbers that you sent, do you know whether or not any of those fax numbers were associated with companies that had asked you to send them fax information?
A Possibility, but I don't know.
Q So, that's possible, but you don't have any way to verify?
A No, I do not.
Q But are you certain that, from time to time, you were requested by certain companies or individuals to send them fax information?
A Yes.
Q And did you keep track or a note of the identities of those individuals, or companies, or their

Page 88

fax numbers?
A No, not at that time.
Q When you spoke with Fax87 about this program that they were offering, did they give you any training or guidance?
A No, not over the phone. And I don't know if they had anything available on their website, to be honest.
Q Did they caution you against entering numbers of anybody that you had no relationship with?
A What do you mean?
Q Did they caution you against entering fax numbers on their page, for businesses or individuals that you had no prior established business relationship with?
A No, they did not.
Q And as you sit here today, with respect to any faxes that were sent as a part of this process, do you have any way of knowing which of those faxes went through and which of them did not go through?
A I have no idea.
MR. BAUMBERGER: May I have just a moment?
MR. BENNETT: Sure.
(Whereupon, a break was taken at 11:54 a.m., after which the proceedings continued at 11:59 a.m.)
MR. BAUMBERGER: Let's just take a look again at

Page 89

Exhibit 2. And I'm referring specifically to the e-mail that you sent on -- to Jim Jackson on November 25, 2015.
BY MR. BAUMBERGER:
Q What was -- back at that point in time, which was over a year ago, what was the number of faxes that you estimated that you sent pursuant to this e-mail?
A Thirty or less.
Q Okay. And I know you've testified that you don't know for sure, but best -- to your best recollection, is that the number that you believe were sent or attempted to be sent to the website?
A Yes. I mean, as far as the membership with Fax87, I think that's what I signed up for, 30 or -- for a month, for 9.99.
Q So, you believe that 9.99 bought you 30 faxes?
A Yes.
Q But that didn't confirm that they would actually go through?
A No.
Q All right. And the money that you spent to pay for 9.99 to Fax87, was that something that you paid for personally?
A Yes.
Q Were you reimbursed that by the company?

Page 90

A No.
MR. BAUMBERGER: I have no further questions at this time. Thank you.
MR. BENNETT: No.
MR. BAUMBERGER: Very good.
CONTINUED CROSS-EXAMINATION
BY MR. BAUMBERGER:
Q Is there anything sensitive -- I mean, I don't think anybody's going to be looking at this, but is there anything sensitive on these bank statements?
A No.
Q Is there any account number -- let me see.
I don't even see an account number on here, because I think that would probably be the only thing that would be sensitive.
A Can I take a look, just in case?
(Counsel tenders bank statement to witness).
MR. BENNETT: Oh, I have one more question, I'm sorry.
THE WITNESS: No, that's fine (indicating bank statement).
MR. BAUMBERGER: I had a question about your e-mail address.
THE WITNESS: Okay.
BY MR. BAUMBERGER:

Page 91

Q In taking a look at the fax that you sent --
A Uh-huh.
Q -- I think it's Exhibit 7 or, maybe --
A 7?
Q Yes.
Which e-mail address did you provide on there, your --
A Personal.
Q -- Gmail?
A Yes.
Q Is that the one that you typically used back at the time that you were associated with the company?
A Yeah. For the most part I did, yes.
Q All right. Is that the one that's associated with your Linkedin account?
A Currently, yes.
MR. BAUMBERGER: I've got no further questions.
REDIRECT EXAMINATION
BY MR. BENNETT:
Q For the two charges that were made to Fax87, did you only send what you estimate to be 30 total, or 30 for each month that you were billed 9.99?
A I stopped within the first two to three weeks that I signed up for. So, I don't even know how I got the second charge. I should not have been, because I wasn't a

Page 92

member -- or, I wasn't active that period.
Q And when you went to Manta, did you copy and paste --
A The phone numbers?
Q -- just the fax number and paste it into the online thing?
A As far as I remember, yes.
Q Okay. So, you could do those rather quickly, if you were just going down the list of dentists, copying fax numbers back and forth?
A Well, it doesn't work like that. You don't go to Manta.com and look for businesses. You actually have to go to the website, if they have a website, and then look for their contact information, see if they have a fax provided. So, it is a long process.
MR. BENNETT: Okay, thank you. No further questions for me.
MR. BAUMBERGER: Me either. Okay, all done.
THE WITNESS: Are we good?
MR. BENNETT: Yeah.
MR. BAUMBERGER: You're all done. Oh, and reading and waiving, did you want to talk to her about that?
MR. BENNETT: Well, if you would like to see a copy of the written transcript of this, and read it

for accuracy, you have the right to do that, and change any of your answers if you believe they were inaccurately transcribed or if you remembered something differently than what you testified to.

THE WITNESS: I see.

MR. BENNETT: And you would probably have to come here and you could sign it --

THE WITNESS: At another time?

MR. BENNETT: -- and make any changes.

Well, they would notify you, if you wish to, when it was available, and give you a time period to come in before they do that.

THE WITNESS: Sure, that's fine.

MR. BAUMBERGER: You can reserve the right and then make the decision later, I think, too.

MR. BENNETT: Right.

THE WITNESS: Sure.

MR. BENNETT: But they will notify you, if you ask them to, of when it's ready.

THE WITNESS: Okay.

THE COURT REPORTER: Can I have a contact phone number?

THE WITNESS: Sure: 407-450-3499.

THE COURT REPORTER: Thank you.

(Whereupon, the deposition concluded at



12:04 p.m.)

STIPULATION

It is hereby stipulated and agreed, by and between counsel present at this deposition, that the reading and signing of this deposition would be reserved.



DEPOSITION ERRATA SHEET

Our Assignment No. J0323573
Case Caption: Bagg, et al. vs. USHEALTH Advisors

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter, or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of
____________, 20___.

______________________________
BIRSEN GOKSU-SAVLUK



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________
_______________________________________________
Reason for change:_____________________________
Page No._____Line No._____Change to:______________
_______________________________________________
Reason for change:_____________________________
Page No._____Line No._____Change to:______________
_______________________________________________
Reason for change:_____________________________
Page No._____Line No._____Change to:______________
_______________________________________________
Reason for change:_____________________________
Page No._____Line No._____Change to:______________
_______________________________________________
Reason for change:_____________________________
Page No._____Line No._____Change to:______________
_______________________________________________
Reason for change:_____________________________
Page No._____Line No._____Change to:______________
_______________________________________________
Reason for change:_____________________________

SIGNATURE:_______________________DATE:___________
BIRSEN GOKSU-SAVLUK

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________
______________________________________________
Reason for change:______________________________
Page No._____Line No._____Change to:______________
______________________________________________
Reason for change:______________________________
Page No._____Line No._____Change to:______________
______________________________________________
Reason for change:______________________________
Page No._____Line No._____Change to:______________
______________________________________________
Reason for change:______________________________
Page No._____Line No._____Change to:______________
______________________________________________
Reason for change:______________________________
Page No._____Line No._____Change to:______________
______________________________________________
Reason for change:______________________________
Page No._____Line No._____Change to:______________
______________________________________________
Reason for change:______________________________

SIGNATURE:_______________________DATE:____________
BIRSEN GOKSU-SAVLUK



CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF SEMINOLE

I, THE UNDERSIGNED AUTHORITY, CERTIFY THAT THE WITNESS NAMED HEREIN PERSONALLY APPEARED BEFORE ME AND WAS DULY SWORN BY ME.

WITNESS my hand and official seal this 25th day of March, 2016.

NOTARY PUBLIC STATE OF FLORIDA
TRINA SEMINO
MY COMMISSION # EE 844836
EXPIRES: February 18, 2017
Bonded Thru Budget Notary Services

TRINA SEMINO, RPR
Court Reporter and
Notary Public
My Commission Expires:
February 18, 2017
#EE 844836



CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF SEMINOLE

I, TRINA SEMINO, REGISTERED PROFESSIONAL REPORTER, CERTIFY THAT I WAS AUTHORIZED TO AND DID STENOGRAPHICALLY REPORT THE FOREGOING DEPOSITION; AND THAT THE FOREGOING TRANSCRIPT IS A TRUE RECORD OF THE TESTIMONY GIVEN BY THE WITNESS.

I FURTHER CERTIFY THAT I AM NOT A RELATIVE, EMPLOYEE, ATTORNEY, OR COUNSEL OF ANY OF THE PARTIES, NOR AM I A RELATIVE OR EMPLOYEE OF ANY OF THE PARTIES' ATTORNEYS OR COUNSEL CONNECTED WITH THE ACTION, NOR AM I FINANCIALLY INTERESTED IN THE ACTION.

DATED THIS 25TH DAY OF MARCH, 2016, AT SEMINOLE COUNTY, FLORIDA.

TRINA SEMINO, RPR
Notary Public-State of Florida
Commission Number: EE 844836
Expires: February 18, 2017



NOTICE TO READ AND SIGN DEPOSITION

IN RE: DEPOSITION OF BIRSEN GOKSU-SAVLUK
BIRSEN GOKSU-SAVLUK
C/O PETER S. BAUMBERGER, ESQUIRE
KUBICKI, DRAPER, P.A.
25 WEST FLAGLER STREET, PENTHOUSE
MIAMI, FLORIDA 33130

WALTER BAGG/COOPER LAW, ET AL., VS. USHEALTH ADVISORS, LLC
Enclosed, please find a notice of reading & signing of the above-referenced deposition in which you and/or your attorney have indicated that you wish to read.
It is imperative that you read and sign your transcript immediately so that any necessary corrections can be supplied to all requesting parties.
Please contact this office within 14 days of receipt of this letter to set up a convenient time for you to come to my office and read your deposition.
After 30 days, you will forfeit your right to read.

Please note, if your case settles, you MUST still complete reading and signing of transcript.
We thank you in advance for your assistance and cooperation in this important matter.

Sincerely,

Production Department of:
Esquire Deposition Solutions
200 East Robinson Street, Suite 725
Orlando, Florida 32801
(407) 426-7676

cc: Richard Bennett, Esquire

**$**

**$10** 41:24 46:17 49:19
**$50** 46:20
**$500** 45:17
**$9.99** 57:18

**-**

**--I** 40:11

**1**

**1** 4:11 6:2 78:19
**1-800** 40:11
**1/27/2015** 37:14
**10** 63:8,11
**100-percent-commission** 27:10
**11** 65:5 86:4
**11/21/2015** 67:10
**11:01** 54:15
**11:08** 54:16
**11:54** 88:23
**11:59** 88:24
**12** 65:22,24
**12:41** 37:14
**13th** 13:25 14:1
**19** 67:13,20 86:4,7
**1:51** 74:7,15

**2**

**2** 7:24 54:18 72:11,15, 21 73:2, 13 75:25 89:1
**20** 19:12,14
**2000** 12:16
**2006** 12:16
**2007** 16:5
**2013** 26:24 73:6
**2014** 20:14
**2015** 6:2 26:24 42:5,6 44:2 58:23 63:13 73:21 74:7,14 75:1 76:1 78:11 80:24 89:3
**21** 13:12 14:5
**25** 58:23 63:13 64:19 73:21 74:7,14, 25 76:1 78:10 80:24 89:3
**27** 6:22,23 7:11
**28** 64:6,7

**3**

**3** 7:23,25 61:25 78:23
**30** 41:9,23 43:13,14 64:9,10 76:17,21 77:14 89:14,16 91:21
**31** 6:2
**33** 41:13
**3:14** 75:1 76:2

**4**

**4** 17:1,4 63:1 65:9 68:15 79:7 82:9,10, 12 83:1, 3,6,7 84:9
**4.99** 42:11,15
**40** 42:12
**407-450-3499** 93:23
**407-930-9234** 37:16 64:3 75:11

**5**

**5** 28:7,10 62:16 79:17,19, 24 80:12, 14 84:20, 21,24
**5.99** 42:13
**50** 42:11,15

**6**

**6** 29:20
**6.99** 42:9
**65** 19:15 20:13

**7**

**7** 30:20,24 70:6,7, 18,21 78:6 91:3,4

**8**

**8** 56:19 80:19
**800** 48:17
**804** 19:21
**866-698-4068** 7:2
**8:46** 78:11 80:25

**9**

**9**
58:16
78:8,9,10

**9.99**
40:25
41:8,10
64:8,10
76:7,15,
17,22
89:15,16,
22 91:22

**A**

**a.m.**
37:14
54:15,16
78:11
80:25
88:23,24

**Absolutely**
54:2

**Accepting**
35:10

**access**
33:5 53:8
55:23,25

**accident**
23:13

**accomplish**
62:14

**accomplishments**
36:21

**account**
5:19,21,
22 7:19
33:4
38:12
48:21
50:14
51:4,5,10
54:1
56:7,8,13
64:3,5,8
75:23
76:5,11
90:12,13
91:15

**accuracy**
93:1

**accurate**
57:12,13
64:1

**active**
30:16,17
92:1

**actively**
67:24

**actual**
29:16

**ad**
28:13
51:12
70:5
79:18,20

**addition**
23:12

**additional**
41:1,10
64:8,10
76:9,18

**address**
5:8 8:18
19:20
90:23
91:6

**advertised**
56:15

**advertisement**
8:10
29:13,14

**advertisements**
86:7

**advertising**
29:6
42:5,8
70:21
85:12,22

**advised**
64:19

**adviser**
15:1

**advising**
42:11

**Advisor**
19:23
28:17
29:5
34:13

**Advisors**
8:8 11:3
14:11,12,
19 15:4,
12,21,24
16:1,12
17:18
22:24
25:5,6,9
26:23
27:19
28:4 29:3
31:4 33:4
34:11
46:5
55:18
56:1
59:16
66:15
68:11,17,
20,21
69:12
70:14
81:17
82:14,24
85:14,17
86:8,19
87:5

**Advisors'**
32:23,24
83:12
86:9

**affect**
45:20

**Affidavit**
6:4
56:23,25
57:3,5
80:18

**affirmatively**
8:11
27:20
67:21

**affordable**
41:22

**afternoon**
11:18

**agency**
68:10,16,
19 69:8,
11 82:13

**agent**
17:12
22:17,18,
19 23:19
33:3,4
34:13
79:7
83:8,11,
14,20
84:11,12

**agents**
20:25
22:1
25:12

**agree**
80:9 86:6

**agreed-upon**
82:13

**agreement**
17:12,13
53:16
81:24
82:20
83:21
84:25
85:8 86:4

**agreements**
68:23
84:4
86:11

**amended**
83:13

**America**
66:3

**amount**
6:11
41:2,3
46:16,21

**answers**
60:25
61:15,17
62:22
80:23
93:2

**anybody's**
90:9

**apologize**
68:5

**apologized**
45:14

**appears**
64:25
74:2

**Apple**
52:3,4

**applicable** 85:16,18

**applicants** 69:24

**applications** 33:5 69:16,20

**appointment** 26:10

**approval** 85:17,23 86:9,19

**approved** 62:25 79:22 80:1

**approximately** 11:7 68:11

**area** 54:25

**arrive** 20:20 31:9

**assigned** 48:23

**assignment** 53:19

**assistance** 74:22 75:4

**associate** 13:7

**association** 23:14

**assuming** 7:5

**Atlanta** 11:25 12:2 14:10 60:3

**attached** 7:17

**attempted** 89:12

**attempting** 72:4

**attitude** 9:25 10:2

**attorney** 8:22 53:25 54:9

**authorize** 79:8

**authorized** 79:7

**Avenue** 19:22

**awards** 36:20 37:1,2

**aware** 20:15 23:5 54:4 66:14 68:24 70:13

**awhile** 67:23

**B**

**back** 27:9 38:12 42:5,23 51:4 58:3,4 64:4,6 72:21 75:24 76:5,25 77:3 78:5 81:17 89:5 91:11 92:10

**background** 11:23

**bank** 4:25 5:18 6:9 8:3 48:15 57:18 64:7 76:5,11, 13 90:10, 17,20

**banking** 5:6

**base** 27:8

**based** 17:21 27:10 60:2 76:20 77:10,11

**basically** 10:12,21 15:23 23:22 25:4 49:17 62:14

**basis** 70:7

**Baumberger** 5:5,11 7:20 8:12 10:4 30:9 42:25 50:4 53:22 54:3 63:5,12 65:19 68:4,9 86:21,22 88:21,25 89:4 90:2,5,7, 22,25 91:17 92:18,21 93:14

**BBB'S** 36:14,15

**bed** 57:24

**begins** 75:12 79:7,18

**behalf** 11:4

**believed** 41:17

**benefits** 85:15

**BENNETT** 4:6,13 5:9,12,14 7:12,15, 21 8:2 10:10,22 17:3,5 28:9,11 29:19,22, 23 30:10, 19,22 43:2 50:7 54:2,7, 10,12,14, 17,21 56:18,21 58:14,18 63:10 65:7,18, 24 66:1 68:2 88:22 90:4,18 91:19 92:16,20, 24 93:6, 9,16,18

**Bill** 59:11 60:5

**billed** 91:22

**Birsen** 4:2,8,9, 14 5:15

**Birsengoksu@gmail.com.** 55:16

**birthday** 67:19

**bit** 11:10 40:20 42:17 80:15

**blasts** 79:9

**blue** 61:9

**body** 59:5

**born** 11:23,24

**bottom** 36:8,10 63:20 73:10,14,

18

**bought**
52:6
89:16

**break**
54:13,15
88:23

**bring**
4:19,23

**brochure**
31:14
33:17
34:17,20
62:8

**brochures**
33:5

**Brockman**
14:16
59:14
67:16

**brought**
4:25 5:2,
15 7:15
54:18
72:6,16
74:18

**bullet**
34:16,22

**business**
16:8
22:19,20,
21 26:1
32:11
33:24
36:24
38:9
52:11,12
83:15
84:13
88:14

**businesses**
25:14
31:20
38:6,9,22
39:3,6
72:3 78:4
88:13
92:12

**buy**
24:20,22

**C**

**calculate**
41:15

**call**
4:9 9:3
11:5,7,12
24:20
25:22
31:11
47:17,20
48:15
57:24
58:2

**called**
9:10 11:1
25:2,20,
22,23
38:5
44:23
45:1
48:15,17
58:3,4
65:1 71:6

**calling**
11:4
77:18

**canceled**
48:21
64:4,7
75:23

**cards**
33:25

**care**
27:17

**carrier**
85:16,18

**carriers**
85:15

**case**
5:1 8:6
9:23 10:3
50:21
81:13
86:1
90:16

**cases**
87:9

**categories**
22:14

**category**
22:16

**caution**
88:9,12

**celebrating**
67:18

**cents**
41:13

**Century**
13:12
14:5

**CEO**
18:20,23
60:18

**chance**
80:21
81:22

**change**
9:25
65:15
93:2

**changed**
42:17

**charge**
7:11
41:11
64:9
76:7,10
91:25

**charge-**
76:11

**charged**
64:8

**charges**
41:1
57:18
76:14,24
91:20

**chat**
64:12

**chatted**
64:2,11,
15 75:10,
15

**check**
5:17

**checked**
64:7,22
76:5,11

**checking**
5:19

**circulars**
85:12

**city**
22:2

**clarificati
on**
63:5

**class**
15:8

**clients**
67:25

**close**
14:13

**closer**
77:14
80:15

**college**
12:3,4

**commission**
17:21
27:8
66:20

**commissions**
46:22
70:3

**communicati
on**
73:5

**companies**
22:23
24:25
25:3
39:24
40:1
41:16
49:22
87:14,21,
25

**company**
6:12 10:7
13:9,16
14:3,21
15:5
16:14,22,
24 17:19
23:11
25:1
26:11,16
27:11,24
36:25
37:20
39:11
44:15,23
45:16
46:15
48:24

66:3,9, 13,25 67:14 69:13 71:6 78:20 82:3,15 83:24,25 89:25 91:12

**company-sponsored** 67:17

**compared** 41:16

**competition** 41:25 42:3

**complain** 44:17

**complained** 44:15 81:7

**complaining** 45:4

**complaint** 10:18 44:5,7, 11,14 45:17 47:20 81:4

**complaints** 67:7

**complete** 12:9

**completely** 63:2 67:6

**complies** 72:14 74:5

**comply** 83:11 84:11

**computer** 51:22 52:9,10, 22 53:11, 20 77:3

**concept** 23:23

**concerned** 79:9

**concluded** 93:25

**conditions** 35:11 68:16 82:13

**conduct** 85:7

**confidentiality** 53:16

**confirm** 78:3 89:18

**confusing** 60:11

**congratulated** 19:13

**congratulating** 19:1

**connection** 8:6

**consistent** 80:23

**consult** 53:24

**contact** 48:8 86:24 92:14 93:21

**contacted** 40:2 48:12 75:18

**contained** 28:21 68:15 70:20 74:13 84:4 86:16

**content** 34:4 65:15

**continued** 54:16 88:24 90:6

**contract** 16:24 17:10,16 60:15 68:15,19 81:22 82:6,11, 12 86:12, 13,14,16

**contractor** 69:10,13 82:24

**contracts** 68:22

**conversation** 19:6 32:8 40:21 43:3 44:4 64:16,17 80:5 81:3,10

**conversations** 87:6

**cooperate** 53:14

**copied** 34:9,10 35:3,14 36:11,12 39:7,10 49:20 59:9 62:17

**copies** 48:25 61:20

**copy** 4:14 5:16,17 6:4 38:12 47:3 59:8 68:15 82:16 92:2,25

**copy/paste** 32:22 34:7,8 36:1 79:21

**copy/pasted** 33:7

**copying** 33:13 39:12 92:9

**correct** 6:3 7:1 43:10,14 50:14 60:18 62:19,23 64:24 65:11 66:24 69:6,7 70:10 71:1,13 72:23 74:15,23 80:2,16 84:17

**correctly** 29:8 41:9

**correspondence** 5:4

**counsel** 90:17

**couple** 22:10 27:1 39:23 50:9,11 78:18 81:15

**court** 4:12 7:23 8:1 17:2 21:9 28:8 29:21 30:21 56:20 58:17 63:9 65:6,23 93:21,24

**cover** 46:8

**coverage** 23:13 85:14

**covered** 47:7

**create**
29:6
30:3,7
31:10,22
32:20

**created**
28:13
30:16
31:2,3,6,8 32:14,16 33:17
34:6
70:22
79:20

**Credit**
5:18 6:1

**critical**
23:13

**CROSS-EXAMINATION**
68:8 90:6

**customers**
47:10

**customized**
34:25

**cut**
46:18,21
61:15

**D**

**data**
29:1
53:19

**date**
31:7
33:12
37:8,10,11 58:22
66:7
67:10
73:16,20

**dated**
63:13
65:9
74:25

**dates**
6:15
55:6,7

**day**
33:9,18
50:8,9,10,12

**days**
50:2,12,13 57:23
58:1

**debit**
6:23

**debits**
8:4

**Debra**
58:24
60:4,5

**December**
11:10

**decide**
57:14

**decided**
33:10
39:24
58:5,9

**decision**
31:9
93:15

**deducted**
46:22

**Defendants**
58:14
65:25

**defense**
9:17,22
10:2
72:10,15

**degree**
12:8

**delete**
51:7

**deleted**
49:17
50:17,24
51:10

**dentists**
39:4 92:9

**deposition**
54:19
93:25

**describe**
5:19 22:8

**describing**
74:7

**desktop**
51:25
52:1

**details**
32:15,17

**determine**
38:3

**determined**
37:24

**developed**
42:22,24
43:5

**differently**
93:4

**dinner**
67:13,17

**DIRECT**
4:5

**directly**
86:24

**discontinue**
67:3

**discover**
39:17

**discuss**
9:22
10:11
32:3,6
43:4
47:25

**discussed**
32:18
47:12
74:21

**discusses**
83:7

**discussing**
56:17

**disposition**
8:25
10:17,18

**distribute**
85:12

**division**
16:17
21:16
22:2 43:3
81:20

**divisions**
21:23,24

**document**
17:3,6
39:7
56:22,24
66:2

**documents**
4:20,23
6:6

**downloaded**
28:14

**downtown**
19:19
20:2

**duly**
4:3

**duties**
23:18

**E**

**E-fax**
78:20

**e-mail**
4:18 21:6
29:16,17
36:10,13
49:5,7
54:1
55:15,17
58:22
59:5
61:6,8,14,16,20
63:11,14
65:8,13
73:3,9,14,20,22
74:1,4,6,14,17,21,25 75:4,8,12
76:1,4
78:10
80:24
89:2,7
90:23
91:6

**e-mailed**
58:7

**e-mails**
5:3,16
10:17
21:3
36:10,16
50:24
51:5

54:18,23 55:2,9,12 56:1 58:15 64:22 72:7,9, 15,19,21

**earlier** 60:13

**education** 11:23 12:1,2

**efforts** 51:1 74:8

**employed** 12:24

**employment** 14:9 67:3

**encouraged** 79:10

**end** 15:3 76:4

**enroll** 69:24

**enrollments** 69:16,20

**entering** 88:9,12

**entire** 12:18 20:7 33:17 47:23

**entitled** 84:9,21

**Erkan** 12:23

**error** 35:7

**established** 88:14

**estate** 13:5,7,12 33:24

**estimate** 91:21

**estimated** 89:7

**eventually** 16:13 71:14

**exact** 6:15 18:8 31:7 33:12 43:15 50:12

**EXAMINATION** 4:5 91:18

**examples** 85:7

**exceeded** 41:1

**exhibit** 4:11 7:13 17:1,4 28:7,10 29:20 30:20,24 54:18 56:19 58:16 63:8,11 65:5,22, 24 68:15 70:6,7, 18,21 72:10,11, 15,21 73:2,13 75:25 78:6,8,9, 10 80:19 82:6,8,12 83:6 84:20 86:3 89:1 91:3

**exhibits** 7:24 65:20

**Exhibit~11** 65:8

**exists** 64:5

**expensive** 40:6,7 41:18 42:18

**experience** 31:18

**explain** 32:13 46:11

**explained** 23:18 57:8

**explanation** 57:9

**extra** 41:10,11 77:16,17

**F**

**face** 34:18

**fact** 34:21 57:19 76:5 81:3

**factor** 40:5

**facts** 23:23 35:1,3

**fairly** 52:13

**Fairwinds** 5:18 6:1

**familiar** 60:7

**familiarity** 17:14

**fax** 6:12 8:10 11:14 26:18 29:16,18 31:13,20 32:11 37:22,25 38:11,12, 14,21 39:15,20 41:14,17 43:4,7 44:6,11, 19 45:17 47:21,25 48:4 49:20 53:19 55:13 56:17 60:24 62:5,6 64:3,6, 19,20,25 67:8 70:5,7, 17,25 71:14,17, 21,24,25 72:4 75:11 77:4,22, 25 78:4 79:8 85:25 86:18 87:7,12, 13,15,22 88:1,12 91:1 92:5,9,14

**Fax87** 8:4 39:13,17 40:6,8 42:4 44:1 48:8,15, 24 49:4 51:14 55:4,11 56:10 62:1 64:19,24 71:6 75:16,17 78:6,24 86:24 88:3 89:14,22 91:20

**Fax87.com.** 37:21

**faxed** 37:11 53:12 71:14

**faxes** 31:8 41:3,4,7, 23 42:9 43:13 44:20 45:6 49:3 50:3 53:2 67:1 70:15 76:21,22

77:5 78:5 80:15 84:16,17 87:10 88:17,18 89:6,16

**faxing**
43:19 47:9 50:3 51:12 71:4 74:8 75:21 76:25 86:23

**February**
7:11 44:2 58:23 64:4,7 65:9 78:10 80:24

**fee**
27:25 76:18

**feel**
10:6

**fees**
47:1 64:10

**felt**
41:20

**filed**
8:7 10:19

**files**
51:10

**find**
5:1 6:7 32:24 33:19 34:4 39:21 50:20,21, 22,24 51:1,11, 19 53:18, 19 54:22 76:13 79:1 82:16 86:14

**finding**
49:18

**fine**
45:16 90:20 93:13

**fired**
66:22,23 69:4

**fit**
15:6 62:2

**fixed**
66:18

**flier**
31:2,10 32:13,16, 21 33:16 34:5 37:13 41:17,23 42:22,23 43:5 62:7,8 79:22 80:1

**fliers**
31:3,23 43:4,19

**Florida**
20:10,11, 17,18 21:20 59:24

**follow**
26:15

**forgot**
51:7

**form**
10:4 30:9 42:25 50:4 79:18

**Fort**
60:22

**forward**
72:22

**found**
55:8 64:2 75:10 78:20,24 79:5

**free**
77:19

**Freedom**
23:3,9 66:3,8,12

**Friday**
18:16

**friend**
14:13,15 19:24 25:13 27:15 47:16 59:15 67:12,15

**friends**
15:22 16:6,7

**full**
79:14

**G**

**gave**
15:7 25:17 40:17 62:21 64:19,24 70:14

**general**
10:20 17:14 19:9 36:23

**generally**
23:21 69:19

**generating**
69:16,20

**Georgia**
11:25 12:5 60:3

**give**
8:5 25:1 36:6 48:25 65:18 85:1 88:4 93:11

**giving**
61:16

**glad**
19:10

**Gmail**
50:14,16, 23 51:1, 3,10,17, 18 54:22 55:2 56:13 91:9

**Goksu-savluk**
4:2,8

**good**
15:6 19:12 62:2 90:5 92:19

**Google**
25:4 32:25 33:1,7 39:18 40:12 79:3,5

**Googled**
39:22 71:9

**Googling**
39:19

**grew**
11:25

**group**
8:7 15:22,23 28:4 30:7 68:20,23 69:1,9

**guarantee**
36:3

**guess**
7:17 8:20 10:13 15:18 18:9 19:3,9 20:11,17 21:18 23:24 25:10 36:21 42:1 44:15 45:7 46:9 53:15 54:8 57:9 61:6 67:12 72:7

75:13 78:14

**guessing** 60:6 61:22

**guidance** 88:5

**guys** 45:9

**H**

**hand** 4:14 17:3 63:11 70:6 72:6

**handles** 52:7

**hands** 51:8

**handwritten** 35:5

**happen** 45:15 74:22

**happened** 10:21 16:11 43:17 48:19

**health** 13:5 15:1 22:22 23:12 26:3 27:2 36:22

**hear** 14:12 43:18,21

**heard** 47:5 48:3

**held** 14:9

**helpful** 24:3

**high** 12:3

**higher-ups** 18:9

**Hmielewski** 21:8,13 32:7 43:23 57:19 59:6 61:11 63:3 80:5 81:15

**Hmielewski's** 36:13

**hold** 13:2

**honest** 50:5 61:7 63:18 65:4 66:10 88:8

**honestly** 17:15 32:15 40:21 41:19 43:15 44:8 77:15

**hour** 11:21

**hours** 50:12

**HP** 52:5

**humongously** 77:4

**hundreds** 77:7,22, 25 78:1

**husband** 12:22 52:7

**husband's** 52:9 67:19

**I**

**idea** 7:9 32:1, 3,11 38:16 43:4 47:25 50:6 57:7 62:14 63:2,4 67:5,6 70:15,17, 18 79:14 88:20

**ideas** 31:15,18, 19

**identification** 4:12 7:25 17:2 28:8 29:21 30:21 52:22 56:20 58:17 63:9 65:6,23 72:2

**identifies** 71:25

**identify** 17:6 18:18 28:12 29:24 30:23 56:22 72:3 78:24

**identities** 87:25

**identity** 78:3 81:7

**illegal** 45:5 63:3,6,7

**illness** 23:13

**immediately** 44:6 45:23

**important** 49:23

**impossible** 77:8

**inaccurately** 93:3

**including** 85:15

**income** 27:8,10 66:18,20

**inconsistent** 80:10

**independent** 69:10,13 82:24

**indicating** 8:11 27:20 35:9,24 37:4 59:4 67:21 72:25 76:2 90:20

**individuals** 25:14 72:3 87:21,25 88:13

**information** 11:14,15 26:7,12 28:20,22 31:13 34:12,15 38:11,20, 24 40:17, 19 42:1 52:25 53:2,12 57:21 62:17,21 64:1 65:3,11 70:20 72:4 79:21 87:7,11, 15,22 92:14

**initial** 23:17

**input** 28:20 39:1 71:13

**inputted** 77:4

**inputting**

77:4,13, 23

**inquire** 47:6

**inquired** 26:3

**inquiries** 28:3

**insurance** 13:6 15:1 17:19 22:22,23 23:6,12 24:13 25:4,15 26:3 27:3 36:22 46:4,7,8, 10,12 47:7 66:3,9,12 85:16

**insurer** 47:6

**interested** 49:18

**internet** 71:8

**interrogatory** 52:21

**interviewed** 16:15,20

**introduce** 15:20

**inviting** 87:9

**involved** 15:25 22:25 74:9

**issue** 10:8 86:1

**J**

**Jackson** 5:4 10:24,25 11:1,8 48:12 63:12,21 73:1,23 74:6,14, 20 89:2

**Jackson's** 75:3

**January** 6:2,22,23 42:6 64:6

**Jim** 5:4 10:24,25 11:1 21:8,13 32:7 36:13,14 42:23 43:23 45:1 47:23 48:2,12 57:19 59:6 61:6,11, 16,20,23 63:3,12, 21 73:23 74:6 80:5 81:3,15 89:2

**job** 14:1 82:2

**judgment** 69:19

**K**

**Kennesaw** 12:4,8, 15,20 24:4

**keyboard** 64:12

**kind** 15:24 31:17

**Kirkman** 20:2

**Kissimmee** 13:21

**knew** 15:24 16:2

**knowing** 88:18

**knowledge** 24:16,19, 20

**L**

**ladder** 22:1 81:19

**laptop** 51:24

**large** 77:5

**late** 11:9,11

**laws** 83:13 84:12

**lawsuit** 11:13 70:8

**lawyer** 11:1,3

**lawyers** 9:17,22 10:2 39:4

**lead** 24:25 25:1,3,25

**leader** 21:25

**leaders** 79:22

**leads** 24:20,21, 22,24 25:4,5,8, 10,11,17, 18,21 26:15,16, 19,20 31:11 48:6 69:16,23 87:6

**leave** 26:25

**ledger** 5:19

**left** 12:19 55:24 69:3

**legal** 82:2 84:17

**legally** 69:1

**letter** 5:17 27:13 50:3 66:4

**letters** 48:9

**license** 13:5,6,15 15:8

**licenses** 13:2,4

**life** 13:6 23:3,9 66:3,8,12

**Linkedin** 29:25 30:15 91:15

**Lisa** 59:2

**list** 20:25 21:2,4,5 24:22 39:3 49:8,12 55:3 84:24 85:6 92:9

**listed** 60:4 85:9

**lists** 25:13 51:11

**literally** 57:24

**litigation** 55:13

**live** 14:17

**lived** 16:4

**local**
38:8

**locate**
38:6
72:7,9

**located**
12:4
13:20
18:7
19:18
20:1,12
53:20
71:5,17

**locating**
74:8

**locations**
20:12

**lock**
34:16,19

**locked**
36:5,7

**log**
38:10
39:8
56:8,10
64:4

**logo**
32:23,24
33:8,10,
21

**logos**
36:8

**lone**
79:9

**long**
11:20
16:4
26:22
77:11
92:15

**longer**
55:25
64:4,5

**looked**
28:4
42:4,10
48:14
51:3 55:6
56:5

**lot**
28:5
32:22
43:16

**M**

**machine**
37:22
39:20

**made**
11:7
44:11,14
91:20

**Magnolia**
19:22

**mail**
26:12

**mailed**
26:13

**main**
59:5
77:18

**major**
12:6,12

**make**
26:9 51:1
54:3
72:18
93:9,15

**management**
18:24

**manager**
16:16,17
19:24
21:16,18,
20 43:4
59:23
60:6
81:20

**managers**
20:24
21:7
59:12

**Manta**
38:17,25
77:22
92:2

**Manta.com**
38:5
71:19
92:12

**Mara**
14:16
16:16
21:17,22
27:15
47:18,19,
22 59:14
67:16

**March**
6:2

**mark**
5:9 6:20
7:12,21
29:19
56:18

**marked**
4:12 6:23
7:25
17:2,3
28:8,9
29:21
30:21,23
54:17
56:20
58:17
63:9
65:6,23
68:14
70:18
72:10

**market**
23:25
26:4

**marketing**
12:3,13
24:3,19,
20 30:14
47:10
48:4

**married**
12:21

**Marta**
47:16

**material**
85:13

**materials**
22:11
26:18
47:10
83:25

**matter**
85:13

**Mccants**
59:20,21

**Mccoy**
18:1
60:11

**Mcquagge**
18:2,3,6,
19 60:15

**meaning**
10:16

**means**
7:8
18:21,22

**meet**
8:16,24
9:8 16:14
18:12
19:10
22:10
32:9
58:5,9,12

**meeting**
8:19
10:23
11:17,20
18:14,25

**meetings**
18:13,15,
16 20:21
47:12

**member**
6:12 48:3
92:1

**members**
48:1

**membership**
89:13

**memos**
83:25
84:4

**mention**
62:24

**mentioned**
20:21
44:8
60:19
71:17
76:7 87:2

**merged**
15:11
19:25
20:2
21:15

**message**
63:16,17

64:18

**met**
8:15 9:22 18:10,11 19:4

**Michael**
63:12

**Microsoft**
52:18

**Mike**
9:3,5 56:23 57:24 58:10,13 65:9,12, 13

**mine**
36:12 70:19

**minute**
85:1

**model**
52:23

**moment**
88:21

**money**
89:21

**month**
13:25 14:1 40:25 41:9,13 89:15 91:22

**months**
5:25

**morning**
5:15

**moved**
11:24 12:1,21 14:10 72:22

**mumbling**
64:23

N

**names**
55:1,3 72:3

**nature**
84:1

**needed**
27:7 44:6

**negatively**
37:4 59:4

**Netquote**
25:2

**newer**
72:22

**night**
42:10 82:17

**note**
7:18 76:16 87:24

**notes**
71:20

**notice**
4:19

**noticed**
57:18 62:18

**notification**
49:5,7

**notifications**
49:16 51:7,18

**notify**
93:10,18

**November**
11:9 26:24 63:13 64:19 73:19,21 74:7,14, 25 76:1 89:3

**number**
4:11 7:2, 4,19,23 17:1 20:20 28:7,23 29:20 30:20 37:19 38:2,11, 12,14 40:11 43:15 48:17,22 49:20 52:23,24 56:19 58:16 61:25 62:10,16 63:1,8 64:3,20, 24 65:5, 22 75:11 77:5 79:7 80:12 89:6,11 90:12,13 92:5 93:22

**numbered**
7:24 61:9

**numbers**
38:21 39:9,12, 15 49:8, 12 62:6 71:14,18, 21,24,25 77:4,13, 22,25 78:4 87:12,14 88:1,9,13 92:4,10

O

**Obamacare**
27:2

**object**
10:4 30:9 42:25 50:4 53:23

**obligations**
82:2 83:19

**obtain**
24:24 27:23

**obtained**
71:24

**occasion**
87:3

**occur**
43:24

**offenses**
84:24

**offered**
16:15,21 62:1

**offering**
41:17 88:4

**offers**
50:23

**office**
8:17 11:2 13:13 15:10,11 16:20 18:15 19:2,17, 18,23 20:1,3 21:7,21, 22 22:10 47:24 59:13

**offices**
13:22

**older**
72:20

**oldest**
73:3,9,14

**online**
6:12 39:21 64:12 71:6 78:21 92:6

**option**
41:18,20

**options**
27:2 39:22

**order**
68:6 72:19

**organizations**
13:23

**original**
61:14,23

**originally**
20:1
36:12
61:6
91:13

**Orlando**
12:1,21, 25 13:22
14:10,17
16:2,4
18:13
19:16,19
20:8,16
21:21
22:3,4
39:2
44:24
59:12
60:2,20

**P**

**p.m.**
74:7,15
75:1 76:2

**package**
66:5

**pages**
28:18
71:20

**paid**
46:17
89:22

**paragraph**
34:9
82:22
83:10
84:9,23

**part**
15:11
20:16
30:14
69:23
88:17

**particulars**
84:3

**past**
14:6

**paste**
62:17
92:3,5

**pasted**
61:15

**pay**
27:25
45:16,25
46:16
47:6
89:21

**paycheck**
46:17,21

**penalties**
46:2

**penalty**
47:6

**people**
15:24
21:4
22:15
28:3
47:25
49:19,25
61:21,24
78:3

**performed**
69:22
76:25

**period**
92:1
93:11

**person**
26:1
38:18
43:22
53:18
81:7

**personal**
5:6 14:8
16:6
28:22
34:10
52:12
54:1
55:14,15
77:2 91:8

**personally**
18:10,11
26:13
46:13
51:3 56:8
79:20
89:23

**Peter**
58:9,12
63:12

**phone**
26:9
28:23
37:19
39:9
48:22
88:6 92:4
93:21

**photo**
29:2

**photograph**
28:24,25
30:5

**pick**
57:25

**picture**
32:22
33:13,19, 21,22,23
36:1

**pictures**
33:6

**pitch**
25:24

**place**
73:6

**Plaintiff's**
4:11 7:24
17:1 28:7
29:20
30:20
56:19
58:16
63:8
65:5,22
72:11

**Plaintiffs**
8:7 10:19
81:12

**plan**
43:12

**planning**
31:8

**plans**
34:25

**point**
34:22
89:5

**pointing**
34:24

**points**
34:16

**policies**
83:25
85:14

**policy**
26:11
47:3

**portion**
8:3

**position**
9:25
16:22
18:8
21:14
59:18

**Possibility**
87:16

**possibly**
47:4
51:17,18
81:14

**practice**
79:10
87:3

**pre-existing**
35:8,10

**premium**
46:16

**premiums**
36:5

**prepare**
24:13
56:25

**present**
9:17,22
10:23
11:17

**presently**
13:24

**previous**
75:4

**previously**
25:14,16
75:9

**price**
36:5,6
40:4,17
41:20,24
62:10
76:22

**prices**
40:24

42:12

**pricing**
42:17

**print**
55:13

**printed**
55:9

**prior**
88:14

**problem**
45:3

**procedure**
26:16

**proceedings**
54:16
88:24

**process**
22:11
32:20
40:15
55:11
71:4,12
88:17
92:15

**produced**
58:14
65:24

**product**
23:6
24:16
26:8
34:20
62:1,3

**products**
23:12,23, 24 24:9, 14 85:15

**program**
50:23
52:18
88:3

**proposed**
42:24

**prospects**
22:22
31:17,21
48:6 50:1
77:16

**Prospectzone**
25:3

**protected**
53:10

**provide**
11:15
26:8
52:23
91:6

**provided**
8:18
25:5,13
27:24
29:2
37:20
43:13
80:18,24
92:15

**Published**
85:12

**pull**
33:7

**purchased**
25:7,11, 14,16
26:15,20

**purely**
71:8

**purpose**
8:19
11:12
18:25
57:5

**pursuant**
86:6,12
89:7

**put**
33:10
34:7
39:2,4,5, 9 50:24
54:25
68:6

**putting**
39:16

**Q**

**question**
5:5 10:14
53:23
69:18
72:8
75:8,14
78:19,23
79:13,17, 19,24
80:14
90:18,22

**questioned**
10:13

**questions**
8:6 9:18
10:1
60:25
61:1,9, 12,18,23
65:21
68:2,4
69:15
71:3
78:9,18
79:6,17
81:2,15
86:21
90:2
91:17

92:17

**quick**
72:13
74:4 82:5

**quickly**
82:6 92:8

**quit**
14:1,7

**R**

**rankings**
21:1

**rate**
34:16,19
36:3
49:14

**reach**
31:17
49:24,25

**reached**
49:24
51:3

**reaching**
49:19

**read**
58:22
63:25
84:5
86:13
92:25

**reading**
92:22

**ready**
93:19

**real**
13:5,7,12
33:24
72:13

**Realty**
13:13

**reasonable**
41:24

**reasons**
14:8
27:1,4,6

**recall**
17:17
81:7,18
83:23,24
84:3
86:25

**receipt**
49:4,5

**receive**
4:16 21:3
37:1 47:9
86:19

**received**
42:2
44:19
47:21
49:17
56:1

**receiving**
83:23,24

**Recently**
56:5

**recipients**
44:9,23

**recollection**
76:20,24
77:2,12, 21 89:11

**recommendation**
15:3

**recommended**
14:21
70:14

**recommending**
62:10

**record**
4:7 48:21 49:2 64:5 71:23,24 75:24

**recorded**
40:24

**records**
48:14,25 51:15 61:8 72:2 73:8 74:8,18 75:19 76:13

**recover**
50:16,20 51:2,10 53:1

**recovered**
51:19

**recruit**
14:23

**recruited**
14:22 15:9,15, 19 19:24

**redact**
5:7 7:18

**REDIRECT**
91:18

**reference**
76:4 79:2 82:23

**referred**
20:5

**referring**
6:17 20:3 29:14 36:4 75:16 76:1 85:14 86:8 89:1

**refers**
37:10,18 73:5

**region**
59:24,25 79:11

**regional**
59:23

**regulations**
83:12,14 84:12

**reimbursed**
89:25

**relate**
74:8

**related**
55:12 67:7

**relating**
8:4,10

**relationship**
16:9 68:11,16 69:9,11 82:14 88:10,14

**relevant**
7:16

**remember**
9:10,12, 13 11:21 17:8,15 18:8 19:11 28:2 29:7,18 32:15,17 33:9,12, 13 40:1, 20,25 41:6,9,19 42:2,16 43:1,11, 16,17 44:8,18 45:9,12 46:20 47:4 49:14,15 50:5,10, 12,13 52:6 59:10 61:7 63:14,19 65:3 71:2 77:1,11 81:10 92:7

**remembered**
93:3

**reporter**
4:12 7:23 8:1 17:2 21:9 28:8 29:21 30:21 56:20 58:17 63:9 65:6,23 93:21,24

**represent**
10:7

**representative**
40:13

**representatives**
20:13

**representing**
17:17

**reps**
19:12,14

**request**
4:24 6:7 26:1 31:11,13 56:25

**requested**
4:19 87:21

**require**
84:11

**required**
85:22

**research**
71:8

**researching**
77:22

**reserve**
93:14

**resign**
27:11 67:13

**resignation**
27:13

**resigned**
66:17 67:11

**respect**
9:15 10:7 86:23 87:12 88:16

**respond**
61:24

**responded**
44:20 74:20

**responding**
63:17 75:3

**response**
5:16 6:10 9:13 45:13 74:1 78:19,23 79:12,16, 19,25

**responsibilities**
83:8,20 84:10

**responsibility**
79:14

**responsive**
4:23 6:7

**resting**
57:24

**result**
66:25 84:24 85:7

**retained**
53:25

**review**
73:8,13 80:21 81:22

**rights**
54:4,5

**Road**
20:2

**role**
22:20

**rules**

83:12

**run** 74:22 75:5

**running** 16:19

## S

**safe** 20:17

**sales** 12:4,13 13:7 14:24 19:2,12 21:1,25 25:24 36:22 85:13

**satellite** 21:18,22

**satellites** 20:12 21:24

**save** 71:20

**Savluk** 12:23

**school** 12:3 15:7

**seal** 35:20

**search** 25:4 38:8,9,25 40:12 42:2 54:22,25 55:1,2,20 79:5

**searched** 39:18

**searching** 55:3,21

**section** 13:14 39:9 82:23 83:7 84:9,21, 24 85:11 86:4,7

**secure** 85:22

**securing** 85:17 86:8

**seeking** 69:23

**selected** 33:10

**self-employed** 15:17 31:16 39:5 69:25

**sell** 23:6,11 24:8,13

**selling** 22:22

**send** 27:13 37:25 38:13 41:7,23 42:24 43:13 45:6 62:9 63:23 70:17 87:10,15, 21 91:21

**sending** 31:8 51:17 70:15

**sense** 49:2

**sensitive** 90:8,10, 15

**separate** 72:24

**September** 67:13,20

**serial** 52:23

**series** 79:6,17

**service** 41:6

**services** 24:1 85:15

**session** 23:18

**shared** 25:11

**she'll** 27:17

**Shelton** 59:11

**Shelton's** 60:5

**short** 54:13

**shortly** 44:11

**show** 6:11,17 28:9 29:22 42:23 54:17 70:25

**showed** 43:7

**showing** 36:20

**sic** 18:1 47:16 60:11 77:5

**sick** 57:23

**side** 35:20

**sign** 8:25 9:1, 3 16:24 46:13 57:3,11, 15,25 93:7

**signature** 18:18

**signatures** 17:7,22

**signed** 6:13 37:20 41:7 44:1 60:15 64:6 89:14 91:24

**signing** 17:16

**Silva** 58:24 60:4,5

**Silvia** 59:2

**sit** 78:2 88:16

**sitting** 77:3

**situation** 47:23

**Sixty-five** 20:18

**sleeping** 58:1

**small** 38:22 39:6

**sold** 21:3,5

**soliciting** 69:20

**solicits** 83:14 84:13

**south** 59:25

**specific** 25:25 39:4 50:13 55:1 81:16,18

**specifically** 68:23,25 69:1 75:18 80:1 82:1 86:6 89:1

**specifics**

42:16

**spell**
21:9,10,
11

**spend**
12:14,15
50:2

**spending**
49:19

**spent**
89:21

**spoke**
88:3

**stable**
27:7,9

**stand**
62:22

**start**
65:19

**started**
14:13
15:9 20:1
25:12
30:12

**starts**
73:17
75:9

**state**
4:7 12:4,
8,15,20
15:8

**stated**
80:1

**statement**
5:7,18
90:17,21

**statements**
4:25 6:10
8:3 48:15
57:11,19

90:10

**states**
60:1
83:14
84:12
85:11

**stayed**
22:3,4

**stepped**
21:17

**Stevie**
36:19,20

**Stevies**
36:14,16

**stop**
22:13
44:6
45:1,21
53:22

**stopped**
91:23

**strategy**
30:14

**strike**
69:10
74:19
87:3

**studied**
24:3

**study**
12:12

**stuff**
68:5

**Suarez**
9:5 56:23
63:12
65:9

**subcontract
ed**
15:18

**Subpoena**
4:15
5:16,18

**success**
19:2
49:14

**successful**
15:6

**successfull
y**
49:10
51:12

**suggest**
24:15

**suing**
45:7,8
81:13

**superiors**
20:23

**supply**
28:24

**sworn**
4:3

**system**
40:19

**T**

**taking**
73:2
78:8,17
79:16
82:5,22
83:1,7
84:8,20,
23 85:6
86:3 91:1

**talk**
9:11,15
10:2,9,20
19:8

26:1,5
31:12
40:8,10
47:16
70:5
92:22

**talked**
32:17
39:23
43:22
47:22,24
57:19
62:1
83:25

**talking**
60:12

**Taraina**
59:20

**targets**
48:6

**team**
19:2
20:5,6,7,
16,23
21:25
31:22
32:5
48:1,3

**tech**
53:18

**telephone**
7:2,4
64:16,17

**tells**
64:9
76:16

**ten**
11:25
57:23

**tenders**
90:17

**Term**
84:21

**terminated**
66:8,15

**termination**
66:7
84:25
85:8

**terms**
68:16
82:11,13

**test**
15:8

**testified**
4:4 69:3
70:2,12,
24 71:5
77:10
78:9 81:6
84:15
87:5 89:9
93:4

**testimony**
65:16
66:17
80:9

**Texas**
11:2 18:7

**thanking**
75:4

**thing**
5:1 15:22
48:14
62:24
90:14
92:6

**things**
19:9,13
23:14
24:11,21
29:17
32:10,25

33:5 36:21 43:16 52:7 55:1 57:16 58:8 62:5 67:25 84:1,5

**Thirty**
41:13 89:8

**thought**
9:16 15:6 31:25 41:21,24 57:17

**thousand**
42:8,13

**thousands**
77:7

**three-year**
34:16,19 35:21 36:3

**till**
26:24

**time**
6:11 9:14 12:18 13:10 15:10 16:17 19:4,15 31:4,12 58:4 73:20 77:3,8, 12,17,19 78:5 80:15 82:14 83:13 84:16 87:4,20 88:2 89:5 90:3 91:12 93:8,11

**timeframe**
55:5

**times**
22:10 83:11

**timeshare**
13:14

**title**
16:18 18:19 81:16,18 82:2

**today**
4:22 8:6 36:6 54:19 59:18 65:16 72:16 78:2 88:16

**told**
23:21 27:15 40:14,22 44:5 45:1,12, 15 48:20 57:9 58:11 67:12,22

**top**
19:12,14 21:18 33:10 37:7

**total**
5:25 91:21

**totally**
67:5

**track**
87:24

**tracking**
48:21

**trained**
23:25 24:8 25:19 40:22

**training**
22:5,8 23:17 24:13 47:9 88:4

**trainings**
22:9

**transcribed**
93:3

**transcript**
92:25

**transmission**
48:9,25 51:11 53:19

**transmitted**
49:10

**trash**
49:17 50:24

**Travis**
60:9,10, 12,19

**treat**
49:16

**Troy**
18:1,6 60:11,13

**truth**
4:3,4

**Turkey**
11:24

**turn**
51:19

**type**
41:6 46:7 51:22

**types**
39:3

**typically**
91:11

**typographical**
35:7

**U**

**U.S.**
7:6 11:24

**uh-huh**
9:2,7 18:10 24:17 30:2 35:12,17 37:15 42:7 52:2 59:7 60:23 63:22 65:10 71:7 75:17 78:12,16 80:20 84:22 91:2

**undergo**
22:5

**understand**
10:8 69:9,12

**understanding**
68:10 71:13 72:19 76:21

**understood**
84:6 86:15

**underwriter**
22:25 23:4

**underwriters**
23:2

**underwritten**
23:9,10

**Union**
5:18 6:1

**United**
60:1

**unsigned**
6:4

**unsolicited**
84:17

**upload**
62:6

**uploaded**
64:25

**upper**
18:24

**USHA**
20:5,7

**USHEALTH**
8:7 9:11 11:3

14:11,12, 19 15:4, 12,21,24 16:1,12 17:18 19:23 22:15,24 23:15,19 24:8,14 25:5,6,9, 15 26:23 27:19 28:4,15 29:3,5 30:7,13 31:4,19 32:23,24 33:4 34:11,13 43:18 46:5 55:18 56:1 59:16 66:15,22 68:11,17, 20,23 69:1,9,12 70:14 81:17 82:14,24 83:12 85:14,17 86:8,9,19 87:5

V

**verbiage** 29:7,12

**verify** 87:18

**volition** 69:4

W

**waiving** 92:22

**walked** 40:14

**wanted** 11:14 26:7 27:2,7 32:9,11 39:20 40:14 57:11,16 61:1,5,17 62:4 66:18 67:13,22

**warned** 77:20

**warnings** 45:24

**ways** 24:11 77:18

**web** 27:18,23, 25 29:2

**website** 28:5,16, 17,21 29:6 30:11,12 33:3 34:11 35:4 38:5,9, 10,20 39:8 56:3 62:18 71:14,18 78:6 79:21 88:7 89:12 92:13

**websites** 33:1,2

**week** 19:11 22:10

**weekly** 18:15 21:3 22:9

**weeks** 43:25 50:9,11 91:23

**Westgate** 13:17,19, 20 14:4,7 27:9

**whatsoever** 71:23

**Windows** 52:14

**withdraw** 6:23

**withdrew** 6:16

**wolf** 79:10

**words** 55:1

**work** 13:9,18, 23 14:5, 19 17:18 22:15 26:22 59:16 66:12 67:14 69:22 92:11

**worked** 13:11,12, 13,21 14:11 40:19 66:16 70:2 71:4 81:17

**working** 15:4 16:11 17:19 31:4,16 46:4 67:25 69:13

**works** 11:2,3 15:23

**worried** 45:14

**Worth** 60:22

**write** 22:23 35:18 59:8

**writing** 22:1,17, 18,19,20

**written** 85:17,22 86:9,19 92:25

**wrote** 35:3,13, 15,16 57:10,12 73:23 74:2,3,14

**www.fax87. com** 6:25

Y

**year** 11:9,11 12:14 31:18 52:8 78:15 79:25 89:6

**years** 12:15,17 14:14 15:12,13, 25 17:16, 17 26:24 34:2 36:7 68:12

**yesterday** 8:15 11:18 58:3,4

**Yoder** 60:9,10

**From:** Jackson, Jim
**To:** Peter S. Baumberger; Michael F. Suarez
**Subject:** Bagg v. USHG, et al.
**Date:** Wednesday, November 25, 2015 3:22:42 PM

---

**From:** birsen goksu [mailto:birsengoksu@gmail.com]
**Sent:** Wednesday, November 25, 2015 2:14 PM
**To:** Jackson, Jim
**Subject:** Re: Hi

I just chatted with them and found that I used my fax number as 407 930-9234, Since the account has been canceled back in Feb. I no longer can log back in or that account no longer exist..... So I have no record of who I sent a fax to..... I had signed up back in January28 and it was canceled in Feb28... I checked my bank account and they charged 9.99 and there is no additional charge. That tells me that I did not go over 30 since it was 30 for 9.99 and plus additional fee for more

On Wed, Nov 25, 2015 at 2:52 PM, Jackson, Jim <JacksonJ@ushealthgroup.com> wrote:
Thanks for your assistance. Let me know if you happen to run across anything.

Jim

James L. Jackson, Jr.
Associate General Counsel
300 Burnett Street, Suite 200
Fort Worth, Texas 76102
817-878-3861 (direct)
817-878-3672 (facsimile)
jacksonj@ushealthgroup.com

**From:** birsen goksu [mailto:birsengoksu@gmail.com]
**Sent:** Wednesday, November 25, 2015 1:51 PM
**To:** Jackson, Jim

EXHIBIT
tabbies
5

**Subject:** Hi

Hi Jim,

I checked all my emails but I have no records for the faxes I sent out. I would get notification when they were sent but I must of deleted them.

When I was checking to find the company I signed up with I found the name, its Fax87 that I signed up with. You had to pick a fax number to fax out. I don't remember what the number is so I can't log in to their website..... So I have no record of who I faxed to or how many.

I have no email records or the account I used with Fax87.

Birsen

--
Birsen Goksu-Savluk
Health Insurance Broker
(Office) 407-450-3499
(Cell) 407-450-3499
bgoksu.acaexpress.com

https://www.healthsherpa.com/?_agent_id=birsen-goksu-savluk

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential or proprietary information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

------------------------------------------------------------------------------ This transmission is intended only for the person(s) named above. The information contained in this transmission may contain privileged and confidential information. It is intended only for review and/or use by the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, please send an email to postmaster@ushealthgroup.com. USHEALTHGROUP.COM DISCLAIMER, 2014 ------------------------------------------------------------------------------

--
Birsen Goksu-Savluk
Health Insurance Broker
(Office) 407-450-3499

(Cell) 407-450-3499
bgoksu.acaexpress.com

https://www.healthsherpa.com/?_agent_id=birsen-goksu-savluk

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential or proprietary information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

-------------------------------------------------------------------------------- This transmission is intended only for the person(s) named above. The information contained in this transmission may contain privileged and confidential information. It is intended only for review and/or use by the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, please send an email to postmaster@ushealthgroup.com. USHEALTHGROUP.COM DISCLAIMER, 2014 ------------------------------------------------------------------------------

# USHEALTH Advisors Agent Agreement

This USHEALTH Advisors Agent Agreement ("Agreement") is entered into by and between USHEALTH Advisors, L.L.C., a limited liability company organized under the laws of the state of Texas ("USHEALTH Advisors"), and Birsen Goksu ("Agent"), Agent #__________, All terms that are capitalized and bold face herein shall have the meaning and definitions set forth in this Agreement.

## SECTIONS

### 1. RELATIONSHIP – SCOPE OF AUTHORITY

**USHEALTH Advisors** hereby appoints **Agent** to represent and promote the insurance coverage and other services, memberships and products offered for sale, enrollment or distribution by **USHEALTH Advisors**. The relationship of **Agent** to **USHEALTH Advisors** is that of an independent contractor, and nothing herein is intended or shall be construed to create the relationship of employee and employer. **Agent** is free to exercise his/her own judgment as to the time and manner for performing services required under this **Agreement**. **Agent** is also free to exercise his/her own judgment as to the persons from whom **Agent** will solicit applications and enrollments, as well as the time and place of the solicitation; provided, however, that in each instance such solicitation shall be is in accordance with applicable local, state, and federal laws. **Agent** is only authorized under this **Agreement** to do the following:

a. personally solicit applications and enrollment forms with respect to association memberships, discount benefit plans, health maintenance organization plans, and insurance products and coverage for **USHEALTH Advisors** and the insurance companies and other companies and associations with whom **USHEALTH Advisors** is contracted to sell the insurance policies, certificates of coverage under a group insurance plan, as well as benefits, privileges and discounts of such association membership enrollments, and the products and services of such other companies (such insurance companies, associations, and other companies hereinafter individually referred to as "**Carrier**" and collectively as "**Carriers**"),

b. personally assist interested individuals in timely and properly completing applications for all such applicable insurance plans, and coverage underwritten by a **Carrier**,

c. forward those applications to either **USHEALTH Advisors** or the applicable **Carrier** as directed for approval or rejection by such **Carrier**,

d. personally assist interested individuals in enrolling as members in applicable associations or other obtaining the products and services of other organizations, which in each instance is a **Carrier**,

e. forward those enrollment forms and/or other applicable documents for action by such **Carrier**, and

f. collect payment of only the initial applicable premium, enrollment fee, monthly dues or fees due on such applications or enrollment forms for the applicable **Carrier**.

However, **Agent** is not authorized to engage in the solicitation of such applications or enrollment forms, or the sale of any such insurance coverage, memberships and/or services or products offered by, through or in conjunction with **Carriers** in any territory, region or state until (i) **Agent** is appointed by each applicable insurance **Carrier** with the departments of insurance or other applicable regulatory agency in each applicable state, (ii) this **Agreement** is executed by the parties and is in effect, and (iii) **Agent** is properly trained by **USHEALTH Advisors**.

The appointment of **Agent** by any **Carrier** in any state, region or territory is not exclusive to **Agent**. **USHEALTH Advisors** and each **Carrier** retain the right to contract and/or appoint general agents, marketing directors, regional sales leaders, regional managers, division managers, district managers, training agents, agents, and other individuals and entities, direct or otherwise, in any territory, region or state assigned by **USHEALTH Advisors** to **Agent**, as well in any other state in which **Agent** is licensed. **USHEALTH Advisors** shall have the right at all times and in its sole discretion to terminate this **Agreement** with **Agent** for any reason.

**Agent** shall not have any authority from **USHEALTH Advisors** or any **Carrier** to make any representations or commitments of any type to any applicant (i) as to whether insurance coverage will be issued or the date of issuance of any insurance coverage sold, or (ii) that any insurance coverage sold will cover or provide benefit payments for either any pre-existing medical conditions not disclosed on the application or any medical or surgical procedures recommended for an applicant on or prior to the date of the application. In addition, **Agent** is not authorized to incur any liability on behalf of **USHEALTH Advisors** or any **Carrier**.

When making a face-to-face marketing presentation and personally taking a written application for insurance coverage each **Agent** shall, directly and in person, ask each applicant every question on each application, and either record the applicant's answers or assist the applicant in recording such answers, which in each case shall be truthful and complete without omitting



3748 revised 04/01/11
Webform 720

EXHIBIT 4
Deponent Goksu
Date 2-16-16 Rptr. TS
WWW.DEPOBOOK.COM

EXHIBIT
6

any facts that were in any way stated or related by the applicant in response to any question. Moreover, when making a marketing presentation and taking an application via an electronic transaction format, **Agent** shall assist the applicant in completing the electronic application process, including recording of truthful and complete answers to each question on the application without omitting any facts, and **Agent** shall not do anything to, disrupt, interfere with or discourage an applicant from providing full, complete and truthful information in connection with such electronic transaction and electronic signature.

2. <u>COMPENSATION-FIRST YEAR COMMISSIONS, RENEWAL COMMISSIONS, DISCRETIONARY BONUSES</u>

A. <u>Commissions.</u> Subject to the terms and conditions of this Agreement, **USHEALTH Advisors** shall pay to **Agent** the commissions and fees specified in the **Commission Schedule** in force on the date that each insurance application is secured by **Agent** as the commission compensation in full for all services performed and all expenses incurred by **Agent**, both in connection with the solicitation and sale of such coverage by **Agent** and customer service provided by **Agent** to each applicant after such coverage is issued. The original **Commission Schedule** is attached hereto, marked Exhibit 1, and by this reference incorporated herein for all purposes. **USHEALTH Advisors** may, in its sole discretion, determine the amount of commissions to be offered under any **Commission Schedule. USHEALTH Advisors** may, in its sole discretion, determine the amount of commissions to be offered to **Agent** in connection with future products not listed on Exhibit 1.

**Commission Compensation** (defined below) reflected in any **Commission Schedule** may be modified for the products stated therein from time to time by **USHEALTH Advisors** upon a minimum of ten days (10) days advance written notice delivered to **Agent** in the form of either a personal written communication or a general field agent bulletin, unless an insurance statute, regulation or other insurance department requirement in any state requires **USHEALTH Advisors** to modify applicable **Commission Compensation** reflected in any such **Commission Schedule** sooner than a ten (10) day advance written notice to **Agent** would permit, in which event **USHEALTH Advisors** shall take reasonable steps to provide as much advance notice to **Agent** of the change as reasonably possible. Any future amendment to the original **Commission Schedule** is, likewise, incorporated herein for all purposes.

Unless otherwise specified in the applicable written notice of a change in a **Commission Schedule**, the **Commission Compensation** modification contained in the new **Commission Schedule** will apply to the applications dated on or after the effective date of the modified **Commission Schedule**. Unless subsequently modified in such a written notification, the **Commission Schedule** in effect on the date of any insurance application secured by **Agent** shall be applicable and remain in effect for calculating **Commission Compensation** earned in connection with the insurance coverage issued by **Carriers** in response to such application.

**Agent** shall earn and be paid only on insurance premiums paid in cash to **Carriers** on policies, certificates of coverage, benefit plans and other insurance coverage offered for sale through **USHEALTH Advisors** and personally sold by **Agent**, which have applications or enrollment forms bearing the **Agent's** name. Provided, however, **USHEALTH Advisors** shall be free to apply and credit any earned **Commission Compensation** of **Agent** hereunder to any debt of financial obligation of **Agent** to **USHEALTH Advisors** that pre-dates the effective date of this Agreement, if any, and otherwise pursue any and all other collection activities it deems reasonably appropriate regarding such pre-existing debt, if any.

Subject to the foregoing and other limitations set forth herein, the amount of first year commissions earned by and payable to **Agent** by **USHEALTH Advisors** for the sale by **Agent** of insurance plans and coverage underwritten or offered by **Carriers**, as well as renewal commissions earned by the renewal of such plans and coverage shall consist of the following components:

1) first year commission earned by **Agent** during each month of the first twelve (12) months of coverage under any **Carrier's** insurance policy, certificate of insurance coverage, or insured plan of coverage sold by **Agent** shall be calculated by multiplying the applicable first year commission percentage shown on the applicable **Commission Schedule** times the amount of the initial month's premium charged by such insurance **Carrier** for such coverage and paid by the policyholder or certificate holder ("**First Year Commissions**");
2) renewal commission earned by **Agent** under any **Carrier's** insurance policy, certificate of coverage, or insured plan of coverage sold by **Agent** and thereafter renewed by the primary insured after the twelfth (12th) month of such coverage shall be calculated by multiplying the applicable renewal commission percentage shown on the applicable Commission **Schedule** times the applicable amount subsequent renewal premium payment paid by the primary insured to the Carrier for the thirteenth (13th) month of coverage and thereafter ("**Renewal Commissions**");
3) generally, the controlling **Commission Schedule** for purposes of calculating both **First Year Commissions** and **Renewal Commissions** will be the **Commission Schedule** that was in force on the date of the applicable application for the insurance coverage that was completed in connection with the sale of such coverage by **Agent**, unless subsequently modified, as stated above;
4) all **First Year Commissions** and **Renewal Commissions** are based only on the amount of the original premium charged by the insurance **Carrier** on the effective date the insurance coverage was issued such that the difference between the amount of any future premium rate increase charged by the insurance **Carrier** for any reason and the amount of the

original premium charged by it on the original effective date of coverage is not commissionable, and no percentage or part thereof shall be earned or otherwise payable to Agent; and

5) No **First Year Commissions** or **Renewal Commissions** shall be earned or paid to **Agent** unless and until **USHEALTH Advisors** first receives payment of such specified **First Year Commissions** and **Renewal Commissions**, together with **USHEALTH Advisors'** override commissions, if any, from the **Carriers**.

Such **First Year Commissions** and **Renewal Commissions** are referred to herein collectively as "**Commission Compensation**". **Commission Compensation** shall be payment in full for all services performed and expenses incurred by **Agent** relative to the underwritten insurance coverage of the insurance **Carriers** sold by **Agents**. Such **Commission Compensation** earned by **Agent** shall be vested in accordance with the terms of Section 15.

B. Other Fees. The amounts of any other fees and compensation, if any, earned by and payable to **Agent** in connection with the insurance coverage sold by **Agent** under this **Agreement** ("**Other Fees**") are, likewise, generally based upon the date of the original sale, and shall be set forth on a **Commission Schedule**. Unless subsequently modified, the controlling **Commission Schedule** for purposes of calculating any such **Other Fees** shall be the **Commission Schedule** that was in force on the date of the applicable application was completed by the applicant, and are subject to the following conditions:
Any **Commission Schedule** with respect to **Other Fees** may be, likewise, modified from time to time by **USHEALTH Advisors** in its sole discretion, upon a minimum of ten (10) days advance written notice delivered to **Agent** in the form of either a personal written communication or a general field agent bulletin, unless an insurance statute, regulation or other insurance department requirement in any state requires **USHEALTH Advisors** to modify applicable **Other Fees** reflected in any such **Commission Schedule** sooner than a ten (10) day advance written notice to **Agent** would permit, in which event **USHEALTH Advisors** shall take reasonable steps to provide as much advance notice to **Agent** of the change as reasonably possible. Unless otherwise specified in the applicable written notice of a change in a **Commission Schedule**, the **Other Fees** modification contained in the new **Commission Schedule** will apply to the applications dated on or after the effective date of the modified **Commission Schedule**. Unless subsequently modified in such a written notification, the **Commission Schedule** in effect on the date of any insurance application secured by **Agent** shall be applicable and remain in effect for calculating **Other Fees** earned in connection with the insurance coverage issued by **Carriers** in response to such application.

1) Generally, the **Commission Schedule** in effect on the date of any application secured by **Agent** shall be applicable and remain in effect for calculating **Other Fees**, if any, earned by **Agent** unless subsequently modified, as stated above.
2) **Other Fees** earned by and payable to **Agent** shall be vested in accordance with the terms of Section 15; but no **Other Fees** shall be earned or paid to Agent unless and until **USHEALTH Advisors** first receives payment of such specified **Other Fees**, together with **USHEALTH Advisors'** override thereon, if any, from the **Carriers**.

C. Incentive Bonuses and Other Discretionary Incentive Programs. **USHEALTH Advisors** shall be free, in its sole discretion, to at any time create and maintain, as well as thereafter cancel and terminate upon a minimum of ten (10) days advance written notice delivered to **Agent** in the form of either a personal written communication or a general field agent bulletin, a discretionary fee or cash incentive payment under a bonus program ("**Incentive Bonuses**"). Provided, however, prior to the termination of this **Agreement** the cancellation of any such **Incentive Bonus** program by **USHEALTH Advisors** shall not affect Agent's right to the receipt of any **Incentive Bonus** earned by and payable to **Agent** pursuant to the terms and conditions of such bonus program prior to the effective date of the cancellation of such program. Upon receipt by **Agent** of notice from **USHEALTH Advisors** of the establishment of a discretionary additional fee, incentive or bonus program not reflected on the **Commission Schedule** and **Agent's** entitlement to participate thereunder, **Agent** shall be entitled to participate in such discretionary program and receive payment of any applicable fee or bonus earned thereunder only during the term of such discretionary program and prior to the termination of this **Agreement**.

D. Payment to Agent. Subject to the provisions and limitations contained in Section 6 (COMMISSION COMPENSATION AND OTHER FEES LIMITATIONS), Section 7 (ADVANCES), Section 10 (AGENT PROMISSORY NOTE), Section 11 (PLEDGE AND COLLATERAL), Section 13 (EVENTS OF DEFAULT), Section 14 (REMEDIES OF SECURED PARTY UPON DEFAULT), and Section 15 (VESTING SCHEDULE) **USHEALTH Advisors** shall pay by check payable to Agent, or alternatively at his/her election by electronic funds transfer directly into a banking account designated by **Agent**, the applicable amount of **Commission Compensation, Other Fees** and **Incentive Bonuses**. During the term of this **Agreement** and thereafter, as applicable, **USHEALTH Advisors** will furnish **Agent** with a monthly statement of **Agent's** earned and advanced **Commission Compensation**, as well as earned and advanced **Other Fees**, if any. Upon receipt of any such statement or payment, **Agent** shall immediately examine the content of the statement and the amount of any payment, together with any accompanying documents. If Agent is not completely satisfied as to the accuracy of each item, then Agent shall, within thirty (30) days of the date of the receipt of such statement, payment and/or accompanying documents, provide **USHEALTH Advisors** with a written statement containing the full particulars of any discrepancy. If **Agent** does not provide such a written statement of discrepancies within thirty (30) days of such items, then the statement, payment, calculation of such payment, and any accompanying documents shall be deemed accepted by **Agent** as true, correct and accurate for all purposes during the period covered by the statement and payment, and **Agent** waives the right to contest the

content of such statement or the amount of such payment in the future. **USHEALTH Advisors** will also provide periodic updates on **Agent's** on target **Incentive Bonuses**, if any.

3. GEOGRAPHIC TERRITORY AND EXCLUSIVE INSURANCE PRODUCT SALES

A. Territory. During the term of this **Agreement**, **Agent** may solicit only when product and rates have been authorized and released in advance by **USHEALTH Advisors** in writing, but only if **Agent** is properly licensed in such state(s), and only if no specific counties are excluded in writing by **USHEALTH Advisors**. It is understood and agreed that no territory, county, state or region is assigned exclusively to **Agent** by **USHEALTH Advisors** unless expressly done so in writing by **USHEALTH Advisors**. It is further understood and agreed that regardless of any such express exclusivity provided to **Agent** by **USHEALTH Advisors**, **Carriers** shall be, in each instance, nevertheless free to contract with any and all other agents, independent marketing organizations, master general agents, general agents, regional sales leaders, regional managers, district managers, career agents, career agencies, brokers, as well as any other agencies and marketers in any state at any time and for any reason without any liability or obligation to either **Agent**.

B. Agent to Exclusively Represent USHEALTH Advisors and Carriers. In consideration of the mutual promises and covenants contained in this **Agreement**, **Agent** represents and warrants to **USHEALTH Advisors** that **Agent** will only represent **USHEALTH Advisors** and **Carriers** during the term of the **Agreement**, such that **Agent** will exclusively solicit applications for the insurance coverage offered and to be offered by **Carriers**. In this regard **Agent** will not sell, solicit, attempt to sell, or attempt to solicit any insurance policies, certificates of coverage, products, benefits, association memberships, privileges or services during the term of this **Agreement** for any individual or entity other than **Carriers**.

C. Discontinuance of Products by Carriers. Each **Carrier** and/or **USHEALTH Advisors** may, in its sole discretion, discontinue conducting all or any part of its business or products in all or any part of **Agent's** territory, county, state or region without liability to **Agent**, even if (i) still licensed and authorized therein, and (ii) conducting business through other marketing channels therein.

4. RESPONSIBILITIES

**Agent** shall at all times comply with all of **USHEALTH Advisors'** rules and regulations as such may be amended from time to time and with all laws and regulations of the states in which **Agent** solicits business. **Agent** shall not rebate any premiums to any party or applicant. **Agent** shall be responsible for acquiring and maintaining all licenses in any territory in which **Agent** solicits insurance applications, as required by applicable law. **Agent** shall pay for all of license fees, appointment fees, bond fees, and fees and taxes of **Agent** that are required by any federal, state or local government. **Agent** is solely responsible for the performance, fidelity and honesty of **Agent's** employees, if any, during the term of their employment relationship with **Agent**. All funds collected by **Agent**, conditionally or otherwise, from applicants or enrollees for the insurance plans, coverage, or other benefits offered by **Carriers** are to be held by **Agent** in trust and are the property of the applicable **Carrier**, and **Agent** shall act as a fiduciary with respect to those funds, which will in no event be used by **Agent** for personal, business or other purposes. **Agent** agrees to work diligently to prevent lapsing and replacement of insurance policies effected and sold hereunder. All insurance coverage, association memberships and all other products, policies, benefits and services sold by **Agent** hereunder are and shall remain the property of each applicable **Carrier**. Moreover, the customers, consumers and/or clients to whom such coverage, policies, products, benefits and services were sold are and shall remain the confidential customers, consumers and clients of **USHEALTH Advisors** and **Carriers**.

**Agent** shall at all times (i) comply with all rules and regulations promulgated by **USHEALTH Advisors** and/or **Carriers**, which may be amended from time to time, that do not conflict with the terms of this **Agreement**, (ii) truthfully and accurately describe the insurance products offered and to be offered by **Carriers**, (iii) comply with all laws and regulations of the states in which **Agent** solicits business, and (iv) not engage in any false, misleading, or deceptive act or practice in connection with **USHEALTH Advisors** or any applicant or insured of **Carriers**.

5. TERM

This **Agreement** shall be for an initial term of one (1) year from the date of execution set forth below and shall automatically renew for an additional one (1) year period on each anniversary date of its commencement unless it is terminated as set forth below. Either party upon five (5) days written notice to the other may terminate this **Agreement** at any time for any or no reason. In addition, **USHEALTH Advisors** may terminate this **Agreement** "for cause" immediately upon mailing written notice to **Agent's** last known address if **Agent** or any of **Agent's** employees shall:

a. commit any fraud or material misrepresentation (i) upon **USHEALTH Advisors**, any **Carrier**, or any applicant in connection with applications solicited by **Agent** on behalf of any **Carrier**, or (ii) upon **USHEALTH Advisors** or any **Carrier** in connection with **Agent's** other duties under this **Agreement**;

b. violate or breach (i) the payment terms of the **Obligations** pursuant to **Section** 10 of this **Agreement**, which violation or breach is not cured by **Agent** within three (3) business days after being put on notice of such payment default and/or (ii) the laws or regulations governing insurance sales in connection with insurance sales in any state or states in which **Agent** is licensed, which has not been completely cured by **Agent** within thirty (30) days of written or e-mail communication from **USHEALTH Advisors** and/or any **Carrier**;
c. be convicted of any felony or any misdemeanor involving or affecting the business of insurance generally or in the judgment of **USHEALTH Advisors** adversely affect **Agent's** future insurance marketing;
d. publish, distribute or use any circulars, advertising, sales material or other matter referring to **USHEALTH Advisors** or to policies, coverage, products, benefits or services of **Carriers**, including the name of any applicable insurance company without first securing the written approval of **USHEALTH Advisors** and each applicable **Carrier**;
e. violate or breach the exclusivity provisions of Section 3b of this **Agreement**;
f. initiate contact or attempt to communicate with any customer, policyholder, or client of **USHEALTH Advisors** or any **Carrier** for the purpose of suggesting or inducing such person to lapse, cancel or otherwise terminate the policy, coverage, product, benefit or service sold hereunder and pursuant to which sale **Agent** was paid a commission hereunder by **USHEALTH Advisors**, and replace it with policies, coverage, products benefits or services of any other company;
g. contact, solicit, recruit or attempt to recruit any agent of **USHEALTH Advisors** away from **USHEALTH Advisors** and to another agency or insurance company;
h. failure to maintain the confidentiality of **Trade Secret Information**;
i. breach any warranty or representation of **Agent** under this **Agreement**, including, but not limited to **Section** 9, BEST EFFORTS TO SELL PRODUCTS OF CARRIERS ; or
j. target and thereafter directly communicating with any **Carrier's** insured for the purpose of replacing such coverage with coverage of any other insurance company.

If this **Agreement** is terminated "for cause" by **USHEALTH Advisors**, then all of **Agent's** vested or non-vested rights to the future receipt of any **Commission Compensation, Other Fees** and **Incentive Bonuses** shall immediately and irrevocably terminate and be forfeited by **Agent**.

6. COMMISSION COMPENSATION AND OTHER FEES LIMITATIONS

No **Commission Compensation** or **Other Fees** are earned, due or payable to **Agent** on any (i) monthly policy fee, (ii) monthly certificate of coverage fee, or (iii) monthly service fee not specifically listed as the premium for such coverage, and no **Commission Compensation** shall be deemed earned until the applicable policy or certificate of coverage is issued by the applicable **Carrier**, delivered by **Agent** or the applicable **Carrier**, and accepted by the applicant with the initial premium paid.

**Commission Compensation** and **Other Fees** shall be paid, without interest thereon, within forty five (45) days after their receipt by **USHEALTH Advisors** of all applicable commissions (including any **USHEALTH Advisors** override commissions) from each applicable **Carrier**. All **Commission Compensation** and **Other Fees** earned by **Agent** shall be based only upon the amount of the original insurance premium required for such coverage on the date of the application, unless (i) the insured at any time after the issue date of such coverage elects to reduce the benefits originally afforded under such plan or eliminate the number of insureds covered under such plan, (in which event **Commission Compensation** and **Other Fees** earned after the effective date of such change(s) will be based upon the reduced amount of premium required for such reduced coverage, net of any renewal rate increases implemented after the issue date of the plan of coverage due to change in the original table rate of premiums, trend, medical inflation or any other economic or non-economic factors), or (ii) the insured within the first twelve (12) months after the issue date of such coverage elects to increase benefits originally afforded under such plan or add insureds covered under such plan, (in which event **Commission Compensation** and **Other Fees** earned after the effective date of such change(s) will be based upon the increased amount of premium required for such enhanced coverage, net of any renewal rate increases implemented after the issue date of the plan of coverage due to change in the original table rate of premiums, trend, medical inflation or any other economic or non-economic factors).

Provided, however, no **Commission Compensation** and **Other Fees** will be earned by or due and payable to **Agent** on the amount of any (i) increase in the insurance premium charged by the applicable **Carrier** after the issue date of such coverage as a result of a change in the table rate of premiums, (ii) increase in the insurance premium charged by a **Carrier** for trend, the attained age of insured, medical inflation or any other economic or non-economic factors over the original premium charged in order for the insured right to renew such coverage, (iii) policy fee or policy administration fee charged by a **Carrier**, (iv) certificate of coverage fee or certificate of coverage administration fee charged by a **Carrier**, or (v) service fee not listed as the premium for such coverage.

Upon the termination of this **Agreement**, **Agent** is neither required nor authorized to provide ongoing customer service to any insured to whom **Agent** previously sold coverage hereunder. Therefore, any **Commission Compensation** and **Other Fees** earned by **Agent** pursuant to **Section** 2 and payable to **Agent** after termination pursuant to **Section** 15 shall be subject to

an annual five percent (5%) customer service and Account administration fee applied by and paid to USHEALTH Advisors for ongoing customer service to be provided by USHEALTH Advisors to such insureds and Account administration.

7. <u>ADVANCES</u>

USHEALTH Advisors may, at its discretion, offer Agent the advance payment of a certain portion of the anticipated earned First Year Commissions under the terms and conditions set forth in this Agreement, as well as loan Agent other sums (each an "Advance"). All such offered Advances that are accepted by Agent and paid by USHEALTH Advisors shall be reflected as a debt of Agent in Agent's Account or Accounts (collectively "Account") on the books of USHEALTH Advisors. The provisions of this Agreement, including Section 10, shall govern repayment of Advances by Agent and such repayments shall be secured by Section 11. USHEALTH Advisors may modify the terms of USHEALTH Advisors' advance schedule at any time without the consent of Agent although USHEALTH Advisors shall endeavor to notify Agent promptly of any changes in the advance schedule. The current advance schedule is set forth in the original Commission Schedule, Exhibit 1.

It is understood that USHEALTH Advisors shall never be obligated to make any such Advance. Moreover, any such discretionary Advance by USHEALTH Advisors shall be subject to the following:

A. <u>Agent's Account</u>. Each Advance or other loaned amounts provided to Agent by USHEALTH Advisors will be debited to the Agent's Account, herein pledged to USHEALTH Advisors to secure repayment of the Advances.

B. <u>Repayment</u>. All Advances will be deemed to be evidenced by the Account and the Agent Promissory Note set forth in Section 10.

C. <u>Account Credits</u>. Applicable Commission Compensation and Other Fees earned by Agent after an Advance payment by USHEALTH Advisors under the Agreement will be credited to Agent's Account in order to reduce the debit balance of such Account. Earned Commission Compensation, Other Fees and Incentive Bonuses may be held by USHEALTH Advisors in order to offset all or any part of the debit balance of Agent's Account. Therefore, USHEALTH Advisors, in its sole discretion, may withhold payment of Commission Compensation and/or Other Fees earned by Agent until all amounts owed to USHEALTH Advisors by Agent are fully repaid, including all Advances to USHEALTH Advisors.

D. <u>Advance Requirements</u>. USHEALTH Advisors has the sole discretion whether to make an Advance to Agent. Reasons USHEALTH Advisors may exercise its discretion to not make an Advance to Agent include, but are not limited to, the following: (i) if the check accompanying the application is non-negotiable or does not clear, the bank draft information provided on the application is not accurate or the initial premium draft is not honored or if the credit card information provided on the application is not accurate or the initial premium charge is declined; (ii) if the coverage applied for is rejected or declined by the applicable Carrier; (iii) economic factors, (iv) if the coverage applied for is changed by the applicant or the effective date postponed beyond the time limit approved by the applicable Carrier; (v) if USHEALTH Advisors, in its discretion, determines to discontinue Advances for any reason; or (vi) if USHEALTH Advisors, in its discretion, determines Agent's Account does not warrant the risk of making such Advance.

E. <u>Refunds</u>. Agent shall promptly refund to USHEALTH Advisors all Advances received with respect to (i) submitted applications for which policies are not issued, (ii) issued coverage, which is not accepted by the applicant, (iii) premiums which are refunded by the applicable Carrier for any other reason, and (iv) policies which are rescinded because of a fraudulent application. All such refunds, when received by USHEALTH Advisors, will be credited to Agent's Account.

F. <u>Chargebacks</u>. USHEALTH Advisors has the right to immediately "chargeback" and collect from Agent the amount of that portion of the Agent's Account that represents unearned First Year Commissions and Other Fees previously Advanced to Agent that will not be earned in the future because the policy or certificate of coverage that was responsible for such Advance has lapsed or terminated, by (i) first, deducting the amount of such "chargeback" from any Advance reserve account established by USHEALTH Advisors (ii) second, if collection of the "chargeback" is not possible by (i), then deducting the amount of such "chargeback" from the amount of cash to be received by Agent from the next scheduled future Advance, (iii) third, if collection of the "chargeback" is not possible by (ii), then requiring immediate payment by Agent of the amount of such "chargeback," and (iv) fourth, if collection of the "chargeback" has not occurred under (i), (ii) and/or (iii), then debiting the amount of such "chargeback" against earned Commission Compensation and Other Fees that are earned. In addition, if the policy or certificate of coverage lapses or terminates prior to the expiration of the three (3) months from the coverage effective date, then USHEALTH Advisors has the right to immediately "chargeback" and collect from Agent the entire amount of First Year Commissions (earned and unearned) previously Advanced to Agent in connection with the sale of such coverage, in the same manner provided in (i), (ii), (iii) and (iv) immediately above.

8. <u>LEADS</u>

USHEALTH Advisors may, in its sole discretion, create a new sale lead program. USHEALTH Advisors will attempt to supply Agent with new sale leads through any such program that might be established. However, Agent shall only use any such leads provided for solicitation of applications on behalf of USHEALTH Advisors and Carriers. In this regard, Agent shall maintain records of leads provided in order to account to USHEALTH Advisors as requested for all leads furnished.

9. **BEST EFFORTS TO SELL PRODUCTS OF CARRIERS**

In consideration of USHEALTH Advisors' agreements and covenants contain herein, (including, but not limited to, USHEALTH Advisors agreement to provide Agent with leads for new business sales and the issuance of Advances to Agent upon the issuance of coverage by Carrier), Agent covenants and agrees that Agent will use his/her to best efforts sell the products, services, benefits, plans and coverages offered by Carriers in Agent's territory. In connection therewith, Agent represents and warrants to USHEALTH Advisors that with respect to insurance coverages offered by Carriers, Agent will use his/her best efforts to submit a properly completed application for insurance coverage to the applicable Carrier for each individual that meets the field underwriting guidelines of such Carrier. If Agent fails to perform in accordance with this Section or otherwise breaches it, this Agreement can be terminated "for cause" by USHEALTH Advisors and Agent will forfeit vested Commission Compensation pursuant to Section 15.

10. **AGENT PROMISSORY NOTE**

FOR VALUE RECEIVED, the undersigned Agent, as maker, promises to pay to and to the order of USHEALTH Advisors the aggregate of all sums from time to time Advanced by USHEALTH Advisors to Agent or for the benefit of Agent as reflected in all of Agent's Accounts on the books of USHEALTH Advisors or otherwise owed by Agent to USHEALTH Advisors, with interest on the principal balance from time to time remaining unpaid until this note shall have been paid in full at the rate hereinafter provided. Agent agrees and acknowledges that all Advances and other amounts advanced or deemed advanced to Agent by USHEALTH Advisors pursuant to the Agreement or otherwise, whether for fees, "chargebacks", dues, interest, First Year Commission Advances or any other charges to the Account, together with all other payment obligations of Agent under this Agreement, as well as the performance by Agent of all non-payment obligations owed to USHEALTH Advisors or its assigns, including but not limited to those set forth in the Agreement (collectively the "Obligations"), shall be deemed to be principal amount payable pursuant to this note.

A. **Interest Rate**. The unpaid principal balance from time to time outstanding shall, prior to maturity, bear interest at a per annum rate that may be adjusted on an annual basis by USHEALTH Advisors on January 1 of each calendar year. The current annual interest rate is equal to 0.75% per month (9% per year).

B. **Payment**. The unpaid amounts of both principal and interest outstanding under this note shall be due and payable on demand, but if no demand has theretofore been made then demand shall be deemed to have been given immediately upon the termination of this Agreement.

C. **Prepayment**. The principal or interest of this note may be prepaid from time to time and at any time, in whole or in part, without premium or penalty. All prepayments shall be applied first to accrued but unpaid interest and then to principal.

D. **Default Interest**. After the maturity hereof (whether by demand, acceleration or otherwise), all past due principal, and if permitted by applicable law all past due interest, shall bear interest at the lesser of eighteen percent (18%) per annum or the highest rate permitted by applicable law.

E. **Default**. Without in any way limiting the demand provisions hereof, the occurrence of any of the following events shall be considered a default hereunder:

1) the failure of Agent to make timely payment of any principal or interest due hereunder;
2) the termination of this Agreement by USHEALTH Advisors for cause;
3) the bankruptcy or insolvency of, the assignment for the benefit of creditors by, or the appointment of a receiver for any of the property of Agent;
4) a failure of Agent to timely and properly perform any covenant or provision of this Agreement.

At the option of the holder of this note, upon the occurrence of any default, the entire outstanding principal balance and all accrued unpaid interest shall at once become due and payable, without presentment, demand, protest, notice or grace, and the holder may, in addition to all its other rights and remedies, report Agent's name and Account information to credit reporting agencies.

The failure to exercise the foregoing options upon the happening of one or more of the foregoing defaults shall not constitute a waiver of the right to exercise any of said options at any subsequent time in respect of the same default or any other default. The acceptance by the holder of this note of any payment hereunder which is less than the payment in full of all amounts due

and payable at the time of such payment shall not constitute a waiver of the right to exercise any of said options at that time or at any subsequent time or nullify any prior exercise of any such option.

F. <u>Attorneys' Fees</u>. If this note is not paid at maturity (whether by demand, acceleration or otherwise), or if it is collected through a bankruptcy, probate, or other court, whether before or after any such maturity, Agent shall pay all costs of collection incurred by the holder hereof, including but not limited to reasonable attorneys' fees.

G. <u>Waiver of Notice and Consent</u>. Agent waives presentment, notice of dishonor, notice of intention to accelerate the maturity hereof, diligence in collecting, grace, notice and protest, and Agent consents to all extensions which from time to time may be granted by the holder hereof and to all partial payments hereof, whether before or after maturity (whether by demand, acceleration or otherwise).

H. <u>Legal Interest Limitations</u>. All agreements between Agent and the holder hereof, whether now existing or hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of the maturity hereof, or otherwise, shall the amount paid, or agreed to be paid to the holder hereof for the use, forbearance, or detention of the money advanced or to be advanced by USHEALTH Advisors to Agent and evidenced hereby or otherwise or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing, or pertaining to the indebtedness evidenced hereby, exceed the maximum amount permissible under applicable law. If from any circumstance whatsoever, fulfillment of any provision hereof or of such other documents, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law, then ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any such circumstance the holder hereof shall ever receive as interest or otherwise an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the principal indebtedness of Agent to the holder hereof, and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal hereof, such excess shall be refunded to Agent. All sums paid or agreed to be paid by Agent for the use, forbearance or detention of the indebtedness of Agent to the holder hereof, as evidenced hereby or otherwise, shall to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full term of such indebtedness until payment in full in such manner that there will be no violation of applicable laws pertaining to the maximum rate or amount of interest which may be contracted for, charged or received with respect to such indebtedness. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between the undersigned and the holder hereof.

I. <u>Assignment</u>. USHEALTH Advisors or any subsequent holder of this note may assign its rights as holder without notice to Agent and without Agent's consent.

11. <u>PLEDGE AND COLLATERAL</u>

For value received, Agent hereby assigns and transfers to USHEALTH Advisors and grants USHEALTH Advisors a security interest in any and all First Year Commissions, Renewal Commissions, Other Fees, Incentive Bonuses, as well as Agent's benefits under any deferred compensation plan created by USHEALTH Advisors, or its parent, subsidiaries or affiliates, in which Agent becomes a participant, and any other amounts payable by USHEALTH Advisors to Agent at any time and from time to time as reflected in the Agent's Account, whether earned or unearned (the "Collateral"). The Collateral is pledged to USHEALTH Advisors and held by it to secure the repayment of any and all Advances and Obligations.

This pledge of Collateral by Agent to USHEALTH Advisors will remain in effect until released by USHEALTH Advisors in writing. USHEALTH Advisors has no obligation to release the Collateral except upon payment in full of the Obligations. While this pledge of Collateral is in effect, neither Agent nor any other party except USHEALTH Advisors and its assigns and designees can withdraw all or any part of the Collateral. Agent agrees that no joint owner, beneficiary, surviving spouse or representative of Agent's estate shall have any rights in the Collateral in the event of Agent's death or incapacity unless and until the Obligations are paid in full and then only to the extent the Collateral has vested in and is payable to Agent pursuant to the Agreement.

Agent hereby assigns and grants to USHEALTH Advisors the right to setoff and apply all or any part of the Collateral toward the repayment of the Obligations, whether or not Agent is in default of all or any part of the Obligations. If Agent is in default of all or any part of the Advances and Obligations, USHEALTH Advisors may exercise such right of setoff without any notice to Agent or consent from Agent (unless such notice or consent is required by law and cannot be waived). Provided, however, if in USHEALTH Advisors' sole discretion, the amount of the Collateral is insufficient at any point in time after such default by Agent to repay the amount of the Obligations then owed by Agent, then USHEALTH Advisors shall be free to pursue all other remedies available to it by law or equity in order to collect the unpaid amount of the Obligations from Agent while USHEALTH Advisors continues to receive Collateral that will be setoff and credited against such the amount of Obligations.

12. **ADDITIONAL WARRANTIES AND REPRESENTATIONS REGARDING THE COLLATERAL**

Agent warrants and represents to **USHEALTH Advisors** that: (a) except for the security interest created by this **Agreement**, **Agent** has title to the **Collateral** free from any lien, security interest, encumbrance or claim, and **Agent** will, during the term of this **Agreement** at **Agent's** cost, keep the **Collateral** free from other liens, security interests, encumbrances or claims, and defend any action which may affect the security interest created herein or **Agent's** title to the **Collateral**; (b) no financing statement covering the **Collateral** or any part or proceeds thereof is on file in any public office and, at **USHEALTH Advisors'** request, **Agent** will join in executing all financing statements and other instruments deemed necessary by **USHEALTH Advisors** to perfect the security interest created herein; and (c) no part of the **Collateral** is exempt or protected by law from the effects of this **Agreement**.

13. **EVENTS OF DEFAULT**

The happening of any of the following events or conditions shall be a breach of this **Agreement** and a default hereunder by **Agent**: (i) a default in the timely payment or performance of the **Obligations**; (ii) breach of any warranty or representation made by **Agent** herein; or (iii) **Agent's** failure to timely perform any covenant or other obligations under the **Agreement** or any other agreement between **Agent** and **USHEALTH Advisors**.

14. **REMEDIES OF SECURED PARTY UPON DEFAULT**

When default or an event of default occurs, and at any time thereafter, **USHEALTH Advisors** may proceed to enforce payment of the **Obligations** and may immediately offset any and all remaining **Collateral** against the **Obligations** and may exercise any other remedies available under applicable law.

15. **VESTING SCHEDULE**

A. **Commission Compensation and Other Fees Vesting Schedule.**

Subject to the limitations of **Sections** 2 and 6, as well as the elimination and forfeiture provisions of **Section 15B** below and the limitation provisions of **Section 15C** below, after the termination of this **Agreement** either by **Agent** for any reason or by **USHEALTH Advisors** without "cause", all **Commission Compensation** and **Other Fees** earned by **Agent** pursuant to Section 2 hereof shall be payable to **Agent** during the period of time provided in the following vesting schedule:

1) if such termination of this **Agreement** occurs before it has been in continuous force and effect for at least twelve (12) months, then no **Commission Compensation** and/or **Other Fees** shall be vested in, due, or payable to **Agent** after the date of such termination;
2) if such termination of this **Agreement** occurs after it has been in continuous force and effect for at least twelve (12) months, but less than twenty four (24) months, then all **Commission Compensation** and **Other Fees** earned by **Agent** hereunder for each applicable policy or certificate of coverage issued by each **Carrier** shall be vested and paid monthly, as earned, after the date of such termination for the period of time which is the lesser of either the period set forth in the applicable **Commission Schedule** for each applicable policy or certificate of coverage, or the period of twelve (12) months from the date of such termination, after which applicable period the payment of all **Commission Compensation** and **Other Fees** shall terminate with respect to each policy or certificate of coverage;
3) if such termination of this **Agreement** occurs after it has been in continuous force and effect for at least twenty four (24) months, but less than thirty six (36) months, then all **Commission Compensation** and **Other Fees** earned by **Agent** hereunder for each applicable policy or certificate of coverage issued by each **Carrier** shall be vested and paid monthly, as earned, after the date of such termination for the period of time which is the lesser of either the period set forth in the applicable **Commission Schedule** for each applicable policy or certificate of coverage, or the period of twenty four (24) months from the date of such termination, after which applicable period the payment of all **Commission Compensation** and **Other Fees** shall terminate with respect to each policy or certificate of coverage;
4) if such termination of this **Agreement** occurs after it has been in continuous force and effect for at least thirty six (36) months, but less than forty eight (48) months, then all **Commission Compensation** and **Other Fees** earned by **Agent** hereunder for each applicable policy or certificate of coverage issued by each **Carrier** shall be vested and paid monthly, as earned, after the date of such termination for the period of time which is the lesser of either the period set forth in the applicable **Commission Schedule** for each applicable policy or certificate of coverage, or the period of thirty six (36) months from the date of such termination, after which applicable period the payment of all **Commission Compensation** and **Other Fees** shall terminate with respect to each policy or certificate of coverage;
5) if such termination of this **Agreement** occurs after it has been in continuous force and effect for at least forty eight (48) months, but less than sixty (60) months, then all **Commission Compensation** and **Other Fees** earned by **Agent** hereunder for each applicable policy or certificate of coverage issued by each **Carrier** shall be vested and paid monthly, as earned, after the date of such termination for the period of time which is the lesser of either the period set forth in the applicable **Commission Schedule** for each applicable policy or certificate of coverage, or the period of forty eight (48)

months from the date of such termination, after which applicable period the payment of all **Commission Compensation** and **Other Fees** shall terminate with respect to each policy or certificate of coverage; and

6) if such termination of this **Agreement** occurs after it has been in continuous force and effect for at least sixty (60) months, then all **Commission Compensation** and **Other Fees** shall be vested and paid monthly, as earned, to **Agent** after the date of such termination for the period of time set forth in the applicable **Commission Schedule** with respect to each policy or certificate of coverage.

Provided, however, for purposes of satisfying each level of the vesting schedule above, **Agent** shall be given credit for each calendar month prior to the effective date of this **Agreement** that Agent was continuously contracted with either (i) Security Health Advisors, L.L.C. under an agent contract entitled, Security Health Advisors Agent Agreement, or (ii) USHEALTH Career Agency, Inc. under an agent contract entitled, USHEALTH Career Agent Agreement.

B. <u>Vested Commission Compensation and Other Fees Elimination and Forfeiture.</u>
Notwithstanding the Vesting Schedule contained in Section 15A above or any other matter to the contrary contained herein, **Agent's** right to payment of **Commission Compensation** and/or **Other Fees**, if any, shall immediately and irrevocably terminate such that no further **Commission Compensation** and/or **Other Fees** shall be thereafter earned, due or payable to **Agent** under any one or more of the following conditions and/or circumstances:

1) this **Agreement** is terminated, by **USHEALTH Advisors** "for cause" as defined in Section 5;
2) this **Agreement** is terminated by **Agent** for any reason or by **USHEALTH Advisors** without "cause", and thereafter **Agent** or **Agent's** employees (1) engage in or commit any of the prohibited acts in Section 5, 22, or 23 of this **Agreement**, or (2) fail to perform or breaches any other post-termination, obligations required in Sections 1, 4, 8, 22, 23, 24, or 28 of the **Agreement**; or
3) in any twelve (12) month period **Commission Compensation** and **Other Fees** are less than $1,200; and/or
4) if the number of policies or certificates of coverage procured by **Agent** and issued by insurance **Carriers** that remain inforce is less than twenty five (25).

C. <u>Suspension of Payment of Vested Commission Compensation and Other Fees.</u>
Notwithstanding the Vesting Schedule in Section 15A, at any time after either a for any reason termination by **Agent** or a without "cause" termination by **USHEALTH Advisors**, **Agent's** right to payment of **Commission Compensation** and/or **Other Fees**, if any, shall be suspended if:

1) **Agent** is in breach or violation of Sections 7, 10, 11, and 12 on the date any such post termination payment would otherwise be due, in which event the amount of any such suspended **Commission Compensation** and **Other Fees** payment to **Agent** shall be applied by **USHEALTH Advisors** toward payment of the **Obligations**;
2) **Agent** is in breach or violation of Sections 18, or 19 in which event the amount of any such suspended **Commission Compensation** and **Other Fees** payment to **Agent** shall be held by **USHEALTH Advisors** to offset damages sustained by it as a result of such breach or violation; and
3) **USHEALTH Advisors** is conducting an investigation and evaluation regarding whether **Agent** may have violated Section 15 B 2).

D. <u>Death of Agent - Payment of Vested Commission Compensation and Other Fees</u>
The amount of any **Commission Compensation** and **Other Fees** vested and payable hereunder after termination of this **Agreement** will be paid by **USHEALTH Advisors** upon **Agent's** death to the individual heirs or beneficiaries designated by **Agent**, subject to the provisions of Sections 2, 7, 10, 11, 12, 13, 14, 15A, 15B, 15C, 18 and 24 hereof, or in the absence of the receipt by **USHEALTH Advisors** of such written designation prior to **Agent's** death, then to the estate of **Agent**.

E. <u>Incentive Bonuses Not Vested</u>

Any **Incentive Bonus** established pursuant to a discretionary fee or bonus program created and maintained by **USHEALTH Advisors** in its sole discretion pursuant to Section 2C hereof, shall be earned by and payable to **Agent**, (subject to the provisions of Sections 7, 9, 10, 11, 12, 13, 14, 18 and 24 hereof), only during the term of such discretionary program and prior to the termination of this **Agreement**. **Agent** shall in no event earn, be vested in or entitled to payment of any **Incentive Bonus** after the termination of this **Agreement**.

## 16. <u>METHOD OF REMITTANCE ON NEW APPLICATIONS</u>

**Agent** shall immediately remit to **USHEALTH Advisors** or the applicable insurance **Carrier**, (as designated by **USHEALTH Advisors**), the amount of all premiums **Agent** collects. **Agent** shall also immediately remit to **USHEALTH Advisors** or the applicable **Carrier**, (as designated by **USHEALTH Advisors**), the amount of all other dues, enrollment fees, or other fees **Agent** collects. It is understood and agreed that some **Carriers** may not accept an application for coverage

unless accompanied by the conditional tender of the amount of the initial premium to be charged for such insurance coverage, or the applicable dues or fees to be charged for such other Carrier's products, services or memberships.

17. REINSTATED POLICIES AND CONVERTED POLICIES

No **Renewal Commissions** shall be paid on lapsed policies. If a lapsed policy is reinstated as a result of the direct actions of **Agent** during the policy grace period, then **Renewal Commissions** shall be paid to **Agent** under the previously applicable **Commission Schedule**. If the reinstatement of a lapsed policy written by **Agent** is accomplished during or after the policy grace period by a different **USHEALTH Advisors'** agent, or accomplished by any insurance **Carrier** or other **USHEALTH Advisors** efforts, **Agent** shall not be entitled to a **Renewal Commissions**. Commissions on exchanges, replacement, or conversion of one form of policy of an insurance **Carrier** to another form of the same **Carrier** are governed by the **Commission Schedule**.

18. RECORDS AND REPORTS

**Agent** shall render such reports and keep such records and business accounts as **USHEALTH Advisors** requests. For so long as **Agent** represents **USHEALTH Advisors**, **USHEALTH Advisors** will furnish **Agent** with a monthly statement of **Agent's Account** (which may be delivered to **Agent** electronically), and **USHEALTH Advisors** will pay any amount due **Agent**. Upon receipt of such statement, **Agent** shall immediately examine it, and if not satisfied as to its accuracy, **Agent** shall return such statement and the payment to **USHEALTH Advisors** with full particulars of any discrepancy therein within thirty (30) days; otherwise the statement shall be deemed accepted by **Agent** as true and correct, and **Agent** waives the right to contest the content of such statement or the amount of such payment in the future. The **Account** on the books of **USHEALTH Advisors** shall be competent evidence of such **Account** for all purposes.

19. PRINTED MATERIAL

**USHEALTH Advisors** will furnish **Agent** with all supplies, applications, circulars and printed matter **USHEALTH Advisors** deems necessary for doing business under this **Agreement**. **Agent** agrees not to publish, distribute or use any circulars, advertising, sales material or other matter referring to **USHEALTH Advisors** or to **USHEALTH Advisors** policies without first securing **USHEALTH Advisors'** written approval. All printed matter and supplies **USHEALTH Advisors** furnishes are property of **USHEALTH Advisors** and shall be promptly returned to **USHEALTH Advisors** upon request or when this **Agreement** terminates.

20. REFUNDS/REJECTION

The insurance **Carriers** of **USHEALTH Advisors** reserve the right, at all times, to reject any application for insurance without specifying cause, and to cancel, refuse to renew, or modify any policy. **Agent** shall promptly refund all monies collected on any application by **Agent** on which a policy is declined, on any application by **Agent** on which insurance **Carriers** of **USHEALTH Advisors** issued a policy not accepted by the applicant, and on any application by **Agent** for which the premium is refunded.

21. DISCONTINUANCE OF POLICY FORMS

**USHEALTH Advisors** may discontinue or withdraw any policy or coverage now or hereafter made available for sale. **Security Health** may determine **First Year Commissions** and **Renewal Commissions** on any policy or certificate of coverage not listed on the attached **Commission Schedule**, which policies or certificates may, in **Security Health's** sole discretion, not be offered to **Agent** for sale to the public.

22. POLICY REPLACEMENT PROHIBITED

**Agent** agrees that during the term of this **Agreement**, and for a period of thirty-six (36) months following the date of its termination for any reason, **Agent** and **Agent's** employees and agents will not, directly or indirectly, contact, communicate or meet with any of the **USHEALTH Advisors** or insurance **Carrier** policyholders for the purpose of attempting or discussing a rewriting, canceling, lapsing or replacing such **USHEALTH Advisors** or insurance **Carrier** policies or coverage with a new policy or coverage from another insurance company; and **Agent** will not at any time following termination of the **Agreement** rewrite, cancel, lapse or replace any **USHEALTH Advisors** or insurance **Carrier** policy with a policy from another company. Also, **Agent** agrees that during the term of this **Agreement**, and for a period of thirty-six (36) months following the date of its termination for any reason, **Agent** and **Agent's** employees and agents will not, directly or indirectly, contact, communicate or meet with any of the **USHEALTH Advisors** or insurance **Carrier** association members or product or service holders for the purpose of attempting or discussing a rewriting, canceling, lapsing or replacing such **USHEALTH Advisors** or **Carrier** memberships, products or services with a new membership from another association or products and services of another company; and **Agent** will not at any time following termination of the **Agreement** rewrite, cancel, lapse

or replace any **USHEALTH Advisors** or **Carrier** memberships, products or services with a new membership from another association or products and services of another company.

In addition, **Agent** will not at any time after such termination attempt to solicit or recruit, directly or indirectly, any sub-agent of **USHEALTH Advisors** away from it and to any other individual or entity which is in the same or similar business of **USHEALTH Advisors** or **Carriers**. In addition, for a period of thirty six (36) months following termination of this **Agreement** for any reason, neither **Agent** nor **Agent's** employees and agents will directly or indirectly contact, communicate or meet for any reason or purpose with any **USHEALTH Advisors** or insurance **Carrier** policyholder with respect to whom **Agent** has received **First Year Commissions**, **Renewal Commissions**, or other fee, or compensation during the term of this **Agreement**.

23. <u>TRADE SECRET INFORMATION</u>

**Agent** does hereby acknowledge, agree and accept that the **Trade Secret Information** as used in this **Agreement** includes, but is not limited to: **Agent**, customer or client lists, including names, addresses, telephone numbers, and amounts and types of insurance; expiration and renewal dates of policies; lists of business leads, claims histories; due dates of premium and amounts thereof; and statements of monthly accounts submitted to **Agent** by **USHEALTH Advisors**. All **Trade Secret Information** furnished to **Agent** shall be and remain the property of **USHEALTH Advisors** and **Carriers**. **Agent** acknowledges that **USHEALTH Advisors** derives independent economic value from the **Trade Secret Information** and from its not being generally known to the public or to other persons who can obtain economic value from its disclosure. **Agent** will not during or after the term of this **Agreement** divulge, make known, or otherwise make use of any **Trade Secret Information** for any purpose, including, but not limited to, except as expressly authorized by **USHEALTH Advisors** in writing, the solicitation of business from any person or entity.

24. <u>INDEMNITY</u>

**Agent** shall indemnify, defend (with counsel reasonably acceptable to **USHEALTH Advisors** and **Carriers**) and hold **USHEALTH Advisors** and **Carriers** harmless from any claims, cause of action, suits, judgments, settlements, costs, expenses or other damages, including attorneys' fees, which **USHEALTH Advisors** and/or **Carrier** may suffer or incur as the result of any actual or alleged negligence, misrepresentations, fraudulent conduct, wrongful act, statement, or unauthorized act, error or omission of **Agent** and/or employees or agents of **Agent**. **USHEALTH Advisors** and **Carriers** shall have exclusive authority to direct the defense and effect settlement of any claim, cause of action or suit, without regard to the actual fault, if any, of **Agent**, but for which the foregoing indemnity and hold harmless obligation nevertheless applies. In any claim, cause of action or suit brought jointly against (i) **Agent** and **USHEALTH Advisors**, (ii) **Agent** and **Carrier**, (iii) **Agent's** agent(s) or employee(s) and **USHEALTH Advisors**, (iv) **Agent's** agent(s) or employee(s) and **Carrier**, (v) **Agent**, **Agent's** agent(s) or employee(s) and **USHEALTH Advisors**, (vi) **Agent**, **USHEALTH Advisors** and **Carrier**, (vii) **Agent's** agent(s) or employee(s), **USHEALTH Advisors** and **Carrier** or (viii) **Agent**, **Agent's** agent(s) or employee(s), **USHEALTH Advisors** and **Carrier**, without regard to the actual fault, if any, of **Agent** and/or the applicable agent(s) or employee(s) of **Agent**, but for which the foregoing indemnity and hold harmless obligation nevertheless applies, **USHEALTH Advisors** and/or **Carrier** shall have exclusive authority, but not the obligation, to direct the joint defense of such parties and effect settlement thereof. **Agent** agrees to be bound by the terms of any such settlements, and **Agent** shall, upon demand, pay **USHEALTH Advisors** and/or **Carrier**, as applicable, any sums expended by either or both of them to fund any such settlement. The amount of any such settlement, together with all defense costs, defense expenses and attorneys' fees incurred by **USHEALTH Advisors** and/or **Carrier** in any such suit shall be an **Obligation** and a debt of **Agent** hereunder. The right of **Agent** or any person claiming through **Agent** to receive any **Renewal Commissions**, compensation, or other monies pursuant to the **Agreement** shall at all times be subordinate to the right of **USHEALTH Advisors** to offset or apply such **Renewal Commissions**, compensation and other money against any indebtedness and **Obligation** of **Agent** to **USHEALTH Advisors** as a result of this Section, as well as and Sections 10, 11, 12, 13 and 14.

25. <u>ERRORS AND OMISSIONS</u>

During the term of this **Agreement**, **Agent** agrees to pay or reimburse **USHEALTH Advisors** his/her pro rata cost of Errors and Omissions liability insurance issued to **USHEALTH Advisors** as the named insured and covering Agent as an additional insured. It is agreed that the amount of coverage under such policy shall not be less than $1,000,000 per occurrence and may be in any higher amount that **USHEALTH Advisors** may reasonably require. It is understood that as of the effective date of this **Agreement**, the current, Error and Omissions liability insurance coverages issued to **USHEALTH Advisors** have been underwritten by Pacific Casualty Company, Inc. with coverage as additional insureds for agents exclusively representing and contracted with **USHEALTH Advisors**, including **Agent**, for a premium of $10.50 per week per agent. **Agent** agrees that **Agent's** pro rata share of the applicable Error and Omissions premium paid by **USHEALTH Advisors** to Pacific Casualty Company, Inc. or other designated Errors and Omissions insurance company will be treated as an **Advance**, which **Advance** will become part of **Agent's Account** and an **Obligation** of **Agent**.

## 26. SURVIVABILITY

Sections 4, 5, 7, 8, 10, 11, 12, 13, 14, 15, 18, 20, 22, 23, 24, 27, 28, 29, 30, and 32 of this **Agreement** shall survive its termination for any reason.

## 27. ASSIGNMENT

Agent may not, without the express written consent of **USHEALTH Advisors**, assign any of its rights or responsibilities hereunder. **USHEALTH** Advisors may assign its rights hereunder to a third party including, but not limited to, any lender.

## 28. MANDATORY MEDIATION AND BINDING ARBITRATION

### A. Mandatory Mediation

Except as otherwise provided in this **Agreement**, all claims, disputes, and controversies arising out of or in any manner relating to this **Agreement**, or any other **Agreement** executed in connection with this **Agreement**, or to the performance, interpretation, application or enforcement hereto including, but not limited to, breach hereof (in each case, "**Dispute**"), shall be referred to mediation before, and as a condition precedent to, the initiation of any adjudicative action or proceeding, including arbitration, and any suit, action or arbitration shall be barred unless mediation has been attempted in good faith. If there is a **Dispute**, the party claiming the existence of a **Dispute** must make written demand for mediation prior to instituting a lawsuit, action or arbitration proceeding.

The mediation shall be conducted in Tarrant County, Texas. Each party shall bear its own expenses incurred as a result of submitting the matter to mediation with the expense of the mediator borne equally and in advance by the parties. Should **Agent** fail to pay such fees in advance, such mediation and arbitration shall be abated until a reasonable period of time after the cure of such non-payment by **Agent**. The mediator shall be chosen by joint **Agreement** of **USHEALTH Advisors** and **Agent**. In the event an **Agreement** cannot be reached with respect to a mediator, either party may request that Judicial Arbitration and Mediation Services, Inc. or its successor ("**JAMS**") appoint a mediator; Selection of the mediator by **JAMS** shall be binding.

### B. Mandatory Binding Arbitration

SHOULD MEDIATION BE UNSUCCESSFUL, IT IS AGREED THAT THE **DISPUTE** SHALL BE SUBMITTED TO BINDING, NON-APPEALABLE ARBITRATION AND THAT SUCH ARBITRATION SHALL BE GOVERNED BY THE TEXAS ARBITRATION ACT.

Either party may within sixty (60) days from the date of such unsuccessful mediation or one (1) year from the date of the alleged breach or occurrence resulting in the **Dispute**, whichever is later, make a demand for arbitration by filing a demand in writing with the other party and serving the same by depositing it in the U. S. Mail, certified mail, return receipt requested. **USHEALTH Advisors** and **Agent** shall each choose, within sixty (60) days after demand for arbitration is made, a former officer or executive of an insurance company as its arbitrator and the two appointed arbitrators shall choose a third arbitrator possessing the same qualifications. If either party fails to appoint an arbitrator within sixty (60) days after the written demand for arbitration is made, the party who has appointed an arbitrator may select the second arbitrator. If the two party arbitrators have failed within sixty (60) days to appoint the third arbitrator, either party may petition a District Court of Tarrant County, Texas for an order selecting the third arbitrator. All reasonable costs incurred as a result of obtaining the court order compelling appointment of an arbitrator shall be paid by the non-complying party.

All arbitration hearings conducted hereunder, and all judicial proceedings to enforce any of the provisions hereof, shall take place in Tarrant County, Texas. The hearing before the arbitrators of the matter to be arbitrated shall be at the time and place within said County as is selected by the arbitrators. Notice shall be given and the hearing conducted in accordance with the Uniform Arbitration Act.

After selection of the arbitrators as above provided, the arbitration hearing shall be conducted in accordance with the Commercial Rules of the American Arbitration Association.

The decision of any two arbitrators with respect to a **Dispute** shall be binding and conclusive and non-appealable and shall be submitted to the court for confirmation with the same effect as a judgment.

Each of the parties hereby irrevocably waives punitive, exemplary, consequential and other non-compensatory damages in connection with any arbitration award with respect to any **Dispute**.

The costs and expenses of arbitration, including the fees of the arbitrators, shall be borne by the losing party or in such proportions as the arbitrators shall determine. The successful party shall recover as expenses all reasonable attorneys' fees incurred by said party in connection with the arbitration proceedings.

C. **Exclusivity**

Each party agrees that compliance with the requirements of this Section 28 is a condition to its right to assert any claims with respect to a **Dispute** in any other forum, except only as set forth in subparagraph D below.

D. **Exceptions**

Notwithstanding any other provision of this **Agreement**, **USHEALTH Advisors** may enforce **Agent's** compliance with any restrictive covenant, policy replacement prohibition, confidentiality provision or trade secret provision contained in this **Agreement** to the fullest extent permitted by law by seeking any remedy available at law or in equity, including but not limited to obtaining a temporary restraining order or injunction, without having to mediate and/or arbitrate, and without need to post a bond to do so.

In addition, nothing contained in this **Agreement** shall in any manner limit **USHEALTH Advisors'** rights to recover through legal process all amounts due under the **Agent's** Promissory Note and enforce all remedies available under the provisions of **Sections** 10, 11, 12, 13 and 14 in connection with the pledge of **Collateral** without the necessity of mediation or arbitration.

**Agent** agrees that **Agent** is not excused from complying with any restrictive covenant, policy placement prohibition, confidentiality provision or trade secret provision because of any claim **Agent** may have against **USHEALTH Advisors**.

29. **APPLICABLE LAW**

This **Agreement** shall be governed by the laws of the State of Texas. Exclusive venue and jurisdiction with respect to all matters hereunder shall be Tarrant County, Texas.

30. **WAIVER**

No waiver by **USHEALTH Advisors** of any right hereunder or of any default by **Agent** shall be binding upon **USHEALTH Advisors** unless in writing executed by **USHEALTH Advisors**. Failure or delay by **USHEALTH Advisors** to exercise any right hereunder or waiver of any default of **Agent** shall not operate as a waiver of any other right, of further exercise of such right, or of any further default.

31. **PARTIAL INVALIDITY**

If any provision of this **Agreement** is declared invalid for any reason, the invalidity of that provision shall not affect the validity of any other provision of this **Agreement**, and all other provisions shall remain in full force and effect. It is declared to be the intention of the parties that they would have executed all other provisions of this **Agreement** without including any such part or parts, or portions that may, for any reason, be hereafter declared invalid.

32. **CREDIT REPORT AND OTHER REPORTS**

**Agent** acknowledges and agrees that **USHEALTH Advisors** may at any time and from time to time, either directly or through a credit reporting agency, undertake verification or re-verification of any information contained in Agent's application to **USHEALTH Advisors**, and **Agent** authorizes **USHEALTH Advisors** to request and obtain an investigative credit report including but not limited to information as to **Agent's** character, general reputation, personal characteristics and mode of living. Upon Agent's written request to **USHEALTH Advisors** within a reasonable period of time after the date of this instrument, **USHEALTH Advisors** shall make a complete and accurate disclosure to Agent of the nature and scope of the investigation requested.

33. **ENTIRE AGREEMENT**

THIS **Agreement** REPRESENTS THE ENTIRE **Agreement** BETWEEN THE PARTIES REGARDING THE SALE BY **Agent** ON BEHALF OF **USHEALTH** Advisors OF THE PRODUCTS OF Carriers FROM THE DATE OF THE EXECUTION OF THIS **AGREEMENT** FORWARD UNTIL TERMINATION AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES, AND ANY AMENDMENT OR MODIFICATION HEREOF SHALL BE IN WRITING AND SIGNED BY THE PARTY BOUND THEREBY. PROVIDED FURTHER, HOWEVER, NOTHING CONTAINED HEREIN SHALL CONSTITUTE A RELEASE, DISCHARGE OR MODIFICATION OF THE DUTIES AND OBLIGATIONS OF Agent UNDER OR BY VIRTUE OF ANY PRIOR WRITTEN AGENT AGREEMENT THAT MAY HAVE EXECUTED WITH USHEALTH Advisors OR ANY OTHER USHEATH GROUP, INC. SUBSIDIARY, INCLUDING, BUT NOT LIMITED THE RESPONSIBILITY AND OBLIGATIONS OF Agent TO TIMELY REPAY THE ACCOUNT (AS DEFINED IN EACH SUCH PRIOR AGENT AGREEMENT). ANY PRIOR ORAL AGREEMENTS BETWEEN THE PARTIES ARE SUPERSEDED BY AND MERGED INTO THIS DOCUMENT, AND THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

34. **EFFECTIVE DATE**

This Agreement will become effective upon Agent becoming licensed in Agent's territory for the sale of insurance described herein, or the date of USHEALTH Advisors' execution of this Agreement at its offices in Texas, whichever shall occur last.

Executed as of the 4 day of November, 2013.

**USHEALTH Advisors, L.L.C.**

By: [signature]

Printed Name: Troy McQuagge

Title: CEO

Agent

Signature: Birsen Goksu

Printed Name: Birsen Goksu

Address: 12507 Overstreet Road

Windermere, FL 34786

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WALTER STRATTON BAGG, ESQ and
COOPER LAW P.A., individually
and on behalf of all others similarly situated,

vs. Case No.: 6:15-cv-1666 ORL-37-GJK

Plaintiffs,

USHEALTH GROUP, INC.,
A Delaware corporation, and
US HEALTH ADVISORS, LLC,
a Texas limited liability company,

Defendants.
_______________________________________/

## AFFIDAVIT OF TERRY SHOTTENKIRK

PERSONALLY APPEARED BEFORE ME, the undersigned, Terry Shottenkirk, who first being duly sworn, deposes and states

1. My name is Terry Shottenkirk, and I am over the age of 18, competent to testify, and I have personal knowledge of the matters stated herein.

2. I serve as a Computer Network Engineer for USHEALTH Advisors, LLC ("UHA"). In such capacity, I am responsible for system administration, networking (which includes administration of email accounts for UHA's independently contracted agents), anti-virus, security, software and server updates. I have one colleague who is also responsible for these functions, and together we are the only two staff who perform these functions on behalf of UHA.

3. In my capacity as a Computer Network Engineer for UHA, I am familiar with the email system maintained by UHA for the benefit of its independently contracted agents, including the creation, maintenance, storage and archiving of all such email accounts. In this regard, at the time an agent is newly contracted with UHA, an email account is established for



EXHIBIT
tabbies
7

them under the domain www.USHAdvisors.com to assist the agents in the conduct of their business. While agents are encouraged to use this account, its use is not mandatory, and many agents conduct their business from personal email accounts over which UHA has no authority or right to access.

4. Email accounts established under the www.USHAdvisors.com domain are periodically backed up by UHA on a tape-storage system. Additionally, current email accounts are only maintained for currently contracted agents. We do not maintain current email accounts for any agent whose contract terminated in the past. Instead, accounts of former agents are only retained on backup tape records based on sequential backup tapes created for the entire system. In order to search emails for key words in any account by any former agent, we would first be required to recreate the account.

5. UHA utilizes an LT02 tape library for backups and archiving purposes, which backups are performed on an incremental, daily basis, and a full backup is prepared approximately every three (3) months. The LT02 technology is approximately twelve (12) years old, and is not the most efficient. However, it is from this tape backup system that I would be required to recreate email of any former agent.

6. By way of illustration, in connection with this litigation, I was asked to search the email account maintained by Birsen Goksu for certain key terms related to faxes. At the time the request was made, Ms. Goksu was not a currently contracted agent, and UHA therefore did not maintain a current email account for her on the www.USHAdvisors.com domain. As a result, before performing the keyword search, I was first required to recreate Ms. Goksu's email account from the LT02 backup system.

7. In this regard, when recreating an email account such as Ms. Goksu's, the first required step is to determine time period in question, which involved checking with the Agency Department to ascertain when the agent in question was contracted and terminated so that I can

obtain an accurate assessment of when the mailbox was last on our system. This process took approximately ten (10) minutes in connection with Ms. Goksu's account, and based on my knowledge and experience, it is my estimation it would take approximately the same ten (10) minute process for any other agent email account I might be asked to recreate.

8. The next step in the process is to browse our record of tapes sent to the offsite archive to determine how many and which tapes I would need to order from archives in order to recreate the email account. In the case of Ms. Goksu, I identified two (2) tapes by month that were required to recreate an index of her account. Thereafter, I had to order these tapes from our offsite warehouse so that I could load them onto our system to recreate the mailbox index. This process took me ten (10) minutes in connection with Ms. Goksu's account, and based on my knowledge and experience, it is my estimation it would take approximately the same ten (10) minute process for any other agent email account I might be asked to recreate.

9. After I received the two tapes from our offsite storage location, the next step was to browse the data to commence the account restoration process, and restoration of the index for the email account from the two (2) storage tapes was the first step in the process. This process took approximately thirty (30) minutes, and based on my knowledge and experience, it is my estimation it would take approximately the same thirty (30) minute process for any other agent email account I might be asked to recreate.

10. After the email account index was recreated from these two tapes, I had to identify and obtain additional backup tapes that contained the underlying data for the email account. In the case of Ms. Goksu's account, I was required to order and load fifteen (15) different backup tapes in order to recreate the email account. After the tapes were received, they were loaded into the system library to restore. This process took twenty-five (25) minutes, and based on my knowledge and experience, it is my estimation it would take approximately the

same twenty-five (25) minute process for any other agent email account I might be asked to recreate.

11. Thereafter, I started the restoration process on our email system. This process involves not only my personal attention, but also system resources (which are limited in our case, and we are required to allocate system resources between competing business requirements; we do not have a system that is exclusively dedicated to email restoration). This process took approximately one (1) hour and twenty (20) minutes, and based on my knowledge and experience, it is my estimation it would take approximately the same one (1) hour and (20) minute process for any other agent email account I might be asked to recreate.

12. After the email box was fully recreated and restored, I was able to perform a keyword search. Searching for key words on a fully restored system only requires a few minutes.

13. In sum, I expended two (2) hours and thirty-five (35) minutes restoring and recreating Ms. Goksu's email account from archived backup tape records. Based on my knowledge and experience, it is my estimation it would take approximately the two (2) hours and thirty-five (35) minutes per account for any other agent email account I might be asked to recreate, which process could be lengthened depending on the length of time the agent was contracted with UHA, and the fact that UHA maintains over 1,500 tapes stored in its offsite archives, most of which would likely be required in order to recreate and restore all email accounts from 2011 to the present.

14. I am advised that there were 9,128 independently contracted agents with UHA for the period of time from September 2011 to the present. Based on my knowledge and experience with our system, the email restoration process, and my experience recreating Ms. Goksu's email account to perform a keyword search, it would take approximately 23,580 hours (9,128 accounts * 2 hours, 35 minutes per account) of personnel and system time to recreate all such email

accounts for the purpose of conducting a keyword search. Stated differently, assuming a standard work year of 2,000 hours, it would take almost twelve (12) full-time, experienced IT professionals a full year to completely restore all of these accounts, with each such professional working exclusively on the project, and with unlimited system resources, for the entire year.

15. As indicated above, UHA is a small company with limited personnel and system resources. UHA does not have twelve (12) full time staff to devote to this project exclusively for an entire year. Rather, we have only two (2) such personnel who are qualified to conduct this work (myself and my colleague referenced above), and we do not have the ability to devote full-time efforts to this due to competing business demands. Moreover, we do not maintain dedicated systems to conduct this restoration process, meaning that all such restorations would have to be scheduled into limited system time.

16. Based on the foregoing, as well as my personal knowledge and familiarity UHA's email system and capacity, it is my informed belief that recreating over 9,000 email accounts for the purposes of conducting a keyword search would place an undue burden, hardship and expense on UHA, as it would require in excess of 23,000 hours to perform.

**FURTHER AFFIANT SAYETH NAUGHT.**

**TERRY SHOTTENKIRK**

SWORN TO AND SUBSCRIBED before me, the undersigned authority, Terry Shottenkirk, who is personally known to me, and after being duly sworn stated that he has executed the foregoing Affidavit, and that it true and correct.

**WITNESS** my hand and official seal on this, the 30th day of June 2016.

LISA B. SILVIA
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
September 30, 2017

Notary Public