Freedom Life Insurance Company of America

# Memo

**To:** All Licensed and Appointed Agents

**From:** Freedom Life Insurance Company of America

**Date:** November 1, 2003

**Re:** National Do-Not-Call List – Background and Frequently Asked Questions

---

**Legislative and Regulatory Background**

As each of you is aware, the so-called National Do-Not-Call List and its enforcement by either the Federal Trade Commission ("FTC") or the Federal Communications Commission ("FCC") have received significant publicity in recent months. Unfortunately, there appears to have been a great deal of misinformation circulating throughout the country as to not only the impact of this new federal law on various segments of our economy, but also the "who, what, when, where and how" questions in connection with compliance issues and this new federal law. Accordingly, the Legal Department of Freedom Life Insurance Company of America ("Company") has prepared this Memorandum in an effort to answer these and other frequently asked questions regarding this new federal law as it relates to insurance sales by an agency force.

However, before addressing these questions, a brief review of what this law is, where it came from, as well as its current status will be helpful in understanding the answers to the following questions. It should be noted that this law is comprised of three different federal statutes, as well as two lengthy sets of regulations promulgated by two different federal agencies under the statutes, both of which have been amended by the applicable agency. The following brief historical summary is provided so that each of you will have a general understanding as to the evolution of this new law and where we find ourselves today.

In 1991, Congress passed and the President signed into law the Telephone Consumer Protection Act ("TCPA") in order to "protect residential telephone subscribers' privacy rights to avoid telephone solicitations to which they object."[1] In

[1] 47 U.S.C. § 227(c)(1).



EXHIBIT
tabbies
C

order to accomplish the stated purposes of the TCPA, the statute directed the FCC to promulgate regulations that restricted the use of automatic telephone dialing systems, and authorized the FCC to establish "a single national database...of telephone numbers of residential subscribers who object to receiving telephone solicitations..."[2]

In 1992, the FCC adopted certain rules pursuant to the TCPA, but did not create or otherwise establish a national "do-not-call" list.[3] Instead, the FCC, at that time, required telemarketers to adopt "company specific" do-not-call lists, whereby a consumer who did not wish to receive telephone solicitations from a particular company could request that the telemarketer remove that consumer's telephone number from the telemarketer's list.

Approximately three years after enactment of the TCPA, Congress passed and the President signed into law the Telemarketing and Consumer Fraud and Abuse Prevention Act ("TCFAP").[4] This new federal legislation directed the FTC to "prescribe rules prohibiting deceptive...and other abusive telemarketing acts or practices" and to also "include in such rules...a definition of deceptive telemarketing acts or practices..."[5] In August of 1995, pursuant to the authority granted to it under the TCFAP, the FTC promulgated the Telemarketing Sales Rule ("TSR") in order to implement the stated purpose of this federal statute, namely prohibiting telemarketers from "undertak[ing] a pattern of unsolicited telephone calls which the reasonable consumer would consider coercive, or abusive of such consumer's right of privacy."[6] The regulations promulgated by the FTC in 1995 also attempted to delineate conduct that constituted an abusive telemarketing act or practice under the TCFAP. On January 3, 2003, the FTC adopted new regulations amending the TSR, which, among other things, established a nationwide do-not-call registry and spelled out additional requirements for the future use of predictive dialers and other telemarketing activities.[7]

Also in 2003, Congress passed the Do-Not-Call Implementation Act that authorized the establishment of a national do-not-call registry, and directed the FCC to issue final regulations in connection with the TCPA that maximized consistency with the regulations previously adopted by the FTC.[8]

The FCC adopted a Report and entered an Order on June 26, 2003 that is over 160 pages in length.[9] This Order amended the regulations previously adopted by the

[2] *Id.* at § 227(c)(3).
[3] In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (October 16, 1992) at 9, ¶ 14.
[4] 15 U.S.C. § 6101, *et seq.*
[5] *Id.* at § 6102(a)(1) through (a)(2).
[6] *Id.* at § 6102(a)(3)(A).
[7] 68 Fed. Reg. 4580.
[8] Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557 (2003), *to be codified at* 15 U.S.C. § 6101 (*Do-Not-Call Act*).
[9] Report and Order of the Federal Communications Commission, CG Docket No. 02-278, Adopted June 26, 2003 and Released July 3, 2003.

FCC in 1992 under the TCPA in many important respects, including "adoption" of the national do-not-call list established by the FTC with an effective date for the list of October 1, 2003. The regulations promulgated by the FCC contain significant restrictions on both telephone and fax solicitations.

## Litigation Background

Two separate suits were filed on January 29, 2003 by separate telemarketing companies in different federal courts against the FTC challenging, on different grounds, the national do-not-call registry and its enforcement by the FTC.[10]

On September 23, 2003, the federal judge in the Oklahoma case ruled that the FTC exceeded its statutory authority under the TCFAP, and that it had no authority under the TCPA to either create or enforce the national do-not-call registry. The Court's opinion and Order makes clear that in the opinion of this federal judge, only the FCC had statutory authority to create and enforce a national do-not-call registry. In this regard, Congress, as of the date of this Order, had not provided any funding to the FCC to enforce the national do-not-call registry. However, within days after this Order was handed down in Oklahoma, Congress responded and the President signed into law appropriations for the FCC to timely enforce and otherwise regulate the national do-not-call registry. This subsequent action by Congress arguably rendered moot the Order of the federal judge in Oklahoma.

Shortly after the Oklahoma federal judge handed down his decision, the federal judge in Colorado rendered a decision that the national do-not-call registry created by the FTC and its enforcement by the FTC was unconstitutional. The federal judge in Colorado also entered a permanent injunction against the FTC. Pursuant to this injunction, the FTC was ordered to not enforce the do-not-call list and not disseminate the extensive do-not-call list it had already compiled to others, including the FCC. In response to this injunction, the FTC removed the list from its website, and third parties were not able to obtain the list from the FTC.

The FTC immediately appealed the injunction and ruling of the federal district court in Colorado to the United States Court of Appeals –for the Tenth Circuit. In the appeal, the FTC requested reversal of the district court on the merits, and an emergency stay of the injunction pending a determination by the Tenth Circuit on the merits of the appeal. On October 7, 2003, the Tenth Circuit entered an Order staying the injunction pending a final decision on the merits. It should be noted that in granting the FTC's request for stay, the Tenth Circuit stated that it was satisfied that the FTC had demonstrated that there was a "substantial likelihood of success on the merits" of the appeal by the FTC.[11] It appears, therefore, that the FTC will ultimately prevail on the merits in its appeal. In any event, the October 7, 2003 dissolution of the

---

[10] *Mainstream Marketing Service, Inc. v. FTC*, No. 03-N-0184 (D. Colo.) and *U.S. Security v. FTC*, Civ. No. 03-122-W (W.D. Okla.).

[11] *FTC v. Mainstream Marketing Services, Inc.*, No. 03-1429 (United States Court of Appeals -Tenth Circuit), Order Filed October 7, 2003 (page 23).

permanent injunction cleared the way for immediate enforcement of the do-not-call regulations.

## Interim Enforcement Pending Appeal

Interim enforcement of the do-not-call list by the FTC and/or the FCC followed the stay ruling of the Tenth Circuit pending resolution of the merits of the appeal. Thus, the Company has taken steps to insure its compliance with all federal "Do-Not-Call" rules, regulations and legislation (collectively "DNC"), including purchasing the list from the FTC website. All agents of the Company are required to conduct their business in strict compliance with the DNC, as well as any state do-not-call rules, regulations or statutes in their particular state. The DNC rules are expansive and compliance may require modification of the manner in which certain agents have conducted business in the past. However, compliance with the DNC rules should save an agent time and money by eliminating telephone calls by the agent to individuals who have taken the time to register their residential phone or cell phone number on the national do-not-call list. More likely than not, the placement of such a call could be a waste of time because the call will probably irritate the consumer who will not respond in a positive manner to the agent attempting to set an appointment.

It is sincerely hoped that each agent will review and study the following "Frequently Asked Questions and the Company's Answers" in order to gain a better understanding of the Company's position in this matter, and insure compliance by all of its agents.

## Frequently Asked Questions and the Company's Answers

1. *What is the federal do-not call rule and how does the DNC affect Freedom Life Insurance Company of America?*

   **Answer:** While the FTC stated in the TSR that it did not have jurisdiction to enforce the DNC with respect to insurance companies and insurance marketing, the FCC specifically held and found in its June 26, 2003 Report and Order that the FCC has jurisdiction to enforce the DNC which is "significantly broader than the FTC's," including jurisdiction to enforce the DNC upon insurance companies and their agents. The FCC will enforce the DNC against insurance companies and their agents.[12] Accordingly, each Agent of the Company must comply with the DNC, until and unless there is some future change in the law or an appellate court decision somehow invalidates the DNC, neither of which is anticipated.

2. *What governmental agencies or departments are responsible for the regulation and enforcement of state and federal Do Not Call lists? What are their roles?*

[12] *See* Report and Order of the Federal Communications Commission, CG Docket No. 02-278, Adopted June 26, 2003 and Released July 3, 2003, at pages 20-21 and 33-34.

**Answer:** Both the FTC and the FCC share enforcement responsibilities of the federal DNC. In addition, where applicable, each state has responsibility for the enforcement and administration of any state specific do-not-call rules, regulations or statutes that have been adopted in such state.

Once again, the FCC has stated that it will enforce the DNC against insurance companies and their agents. It should be remembered, however, that both the FTC and the FCC have stated in the TSR and the June 26, 2003 Report and Order, respectively, that the federal DNC preempts or "trumps" all do-not-call rules, regulations or legislation adopted by any state or local statute, regulation or rule that is less restrictive than the federal DNC. Thus, the federal DNC constitutes a regulatory "floor", although states are free to pass more restrictive, but not less restrictive, rules and regulations.[13]

The Company complies with all federal and state specific do-not-call rules that might be applicable to it. Each agent of the Company must comply with not only the federal DNC, but also with their particular state do-not-call rules, regulations and statutes.

3. *I have heard that insurance companies and their agents are exempt from or not governed by the requirements of the federal DNC. Is this true?*

   **Answer:** No, this is not true. See "Answer" to question 1.

4. *Isn't it correct that the DNC rules apply only to sales over the telephone and not to phone calls that are made to simply set an appointment to meet in person?*

   **Answer:** No, this statement is not correct. The DNC rules apply to telephone calls to a number registered on the national do-not-call list even if the purpose of the call is only to set an appointment. The FCC specifically refused to create an exception to the DNC for calls made to set face-to-face appointments. In refusing to carve appointment calls out of DNC enforcement, the FCC stated:

> "We conclude that such calls are made for the purpose of encouraging the purchase of goods and services and therefore within the statutory definition of telephone solicitation. We find no reason to conclude that such calls are somehow less intrusive to consumers than other commercial telephone solicitations."[14]

In reviewing this issue, the FTC reached the same conclusion.[15] Therefore, agents should not call a phone number that is registered on the national do-not-call list unless the call falls within one of the three limited exceptions to the DNC discussed below.

---

[13] *Id.* at pages 46-50.
[14] *Id.* at page 32.
[15] *FTC Order*, 68 Fed. Reg. 4655-56.

5. *I know consumer residential phone numbers can be added to the national do-not-call registry, but aren't I safe if I call a cell phone number?*

   **Answer:** No. The FCC specifically ruled that cell phone numbers may be registered in the same fashion, and with the same protection, as residential landline phone numbers.[16] For purposes of enforcement, the FCC considers cell phone numbers to be "residential" numbers within the meaning of the statute. Therefore, you cannot call a cell phone number that has been registered on the national do-not-call list unless the call to such cell phone number falls within one of the three limited exceptions to the DNC that are discussed below.

6. *I understand that a consumer can register his/her residential landline and/or cell phone number on the national do-not-call list, but what about Business phones?*

   **Answer:** The federal statutes, rules and regulations discussed above (DNC) are applicable only to so-called "B to C" or business-to-consumer calls. If an individual or company has listed a telephone number in the public domain as a business listing (e.g. yellow pages, white pages, other advertisements or public communications), then such number is beyond the scope of the federal DNC. So-called "B to B" or business-to-business telephone calls and numbers are not regulated by the federal DNC. Therefore, an agent's telephone call to a business number is not a violation of the DNC.

7. *In connection with insurance sales and setting appointments by an agent, what are the exceptions, if any, to the National DNC rules with respect to people who have registered their residential landline or cell phone numbers on the national do-not-call list?*

   **Answer:** If a person has registered their residential or cell phone number on the national do-not-call list, there are only three very narrow and limited exceptions that would permit an agent to contact an individual who has registered their phone number on the national do-not-call list. These are the so-called "business relationship" exemption, the "prior express permission" exemption, and the "personal relationship" exemption.

8. *What is the "business relationship" exemption to the DNC that would permit a phone call to a residential or cell phone number registered on national do-not-call list?*

   **Answer:** The "business relationship" exemption is very narrow. In the context of an insurance agent, the FCC, in pertinent part, defines "business relationship" as follows:

   > "a prior or existing relationship formed by a voluntary two-way communication between [an agent] and a residential subscriber [to

[16] *See* Report and Order of the Federal Communications Commission, CG Docket No. 02-278, Adopted June 26, 2003 and Released July 3, 2003, at page 24.

the national do-not-call list] with or without an exchange of consideration, [i] on the basis of the [residential] subscriber's [prior] purchase or transaction with the [agent] within eighteen (18) months immediately preceding the date of the telephone call or [ii] on the basis of the [residential] subscriber's inquiry or application regarding the products or services offered by the [agent] within three (3) months immediately preceding the date of the call."[17]

It should be noted that if a residential subscriber to the national do-not-call list has terminated a "business relationship" with an agent prior to the call by the agent, then it is a violation of the DNC for the agent to subsequently place a solicitation call to the subscriber's registered number. In addition, if the residential subscriber makes a do-not-call request to the agent, it is a violation of the DNC for the agent to place a solicitation call to the registered number, even if the residential subscriber continues to do business with the agent.

So-called "bootstrapping" of "business relationships" is not permitted under the DNC. More specifically, a residential subscriber who has registered his phone number on the national do-not-call list who has a prior or existing "business relationship with a particular business entity does not extend to affiliated entities unless the subscriber would reasonably expect them to be included given the nature and type of goods or services offered by the affiliate and the identity of the affiliate."[18]

9. *How does the "business relationship" exemption to the DNC affect an agent calling the phone number listed on a new sales lead produced by PDS in order to set an appointment?*

**Answer:** Calling the phone number listed on a PDS lead for the purposes of setting an appointment generally should not violate the DNC for the following reasons:

First, in generating the lead, PDS removes residential and cell phone numbers that are registered on the national do-not-call list. Therefore, at the time the PDS lead was generated, the phone number called by PDS was not on the national do-not-call list purchased by the Company from the FTC and furnished to PDS.

Secondly, if the potential applicant while speaking to the PDS operator from a non-registered phone number provides PDS with a registered residential or cell phone number for the applicant to be contacted by the agent, then the second part of the "business relationship" test is satisfied, as long as the agent makes the appointment call within three (3) months of the date that the PDS lead was generated. In other words, this situation would be an example of "a prior or existing relationship formed by a voluntary two-way communication between [an agent] and a residential subscriber [to the national do-not-call list] with or without an exchange of consideration.... on the

[17] *Id.* at page 134.
[18] *Id.*

basis of the [residential] subscriber's inquiry or application regarding the products or services offered by the [agent] within three (3) months immediately preceding the date of the call" within the definition of "business relationship" discussed above. Accordingly, for any PDS generated lead that is contacted three (3) or more months after the lead card was generated, the agent is required to verify that the potential applicant's number is not registered in the federal do-not-call database.

Thirdly, even if the potential applicant added his residential or cell phone number to the national do-not-call list after providing it to PDS, but before the agent places the appointment call, the second part of the "business relationship" test is satisfied for the same reasons, provided the telephone call occurs within three (3) months of the date the PDS lead card was generated.

Finally, it must be remembered that even if the original call by the agent to a PDS generated lead is within the "business relationship" exception, the consumer has the right to terminate the business relationship over the phone while talking to the agent, and the agent would violate the DNC if the agent refused to honor the consumer's decision, by placing any subsequent call to his registered residential or cell phone number.

10. *Is it possible to satisfy the "business relationship" exemption from a potential applicant's written response to a mail lead sufficient to satisfy the exemption requirements?*

**Answer:** Yes, it is possible, but only if the mail lead piece is properly worded so that it is clear that by returning the mail lead, the individual is making an "inquiry or application regarding the products or services offered by the [agent]" as set forth in the definition of "business relationship" outlined above.

Please remember, however, that no agent is authorized to conduct any written advertisement or mail solicitation that mentions the Company's name or otherwise describes any of its policies, features, service or available coverages, without first obtaining the prior written consent of the Company.

11. *What is the "prior express permission" exemption to the DNC that would permit a phone call to a residential or cell phone number registered on national do-not-call list?*

**Answer:** "[S]ellers may contact consumers registered on a national do-not-call list if they have obtained the prior express permission of those consumers." However, "such express permission must be evidenced only by a signed, written agreement between the consumer [that is registered on the list] and the seller which states that the consumer agrees to be contacted by this seller, including the telephone number to which calls may be placed."[19] Calls may not be placed to any residential or cell phone

[19] *Id.* at page 30.

number registered on the national do-not-call list for the purpose of requesting written permission to later place a "sales" call to the number.

12. *Is it possible to satisfy the "prior express permission" exemption from a potential applicant's written response to a mail lead sufficient to satisfy the exemption requirements?*

**Answer:** Yes, it is possible, but only if the strict requirements of the "prior express permission" exemption are met. In this regard, the potential applicant must have signed the return mail piece, and such return mail piece should either have been signed by the agent in advance of its original mailing, or be promptly signed by the agent upon its return from the individual, and before placing the appointment call to the individual. The return mail piece also must clearly state that the individual consents and agrees to be contacted by the agent at the phone numbers designated on the returned mail piece for the purpose of setting an appointment to discuss the coverage set forth and described in the mail piece.

Once again, please remember, however, that no agent is authorized to conduct any written advertisement or mail solicitation that mentions the Company's name or otherwise describes any of its policies, features, service or available coverages, without first obtaining the prior written consent of the Company.

13. *What is the "personal relationship" exemption to the DNC that would permit a phone call to a residential or cell phone number registered on the national do-not-call list?*

**Answer:** The FCC recognizes a limited exception to the DNC for so-called "personal relationships." However, this exemption is limited to individuals personally known to the caller. The FCC stated that "[w]e believe that calls to family members, friends and acquaintances of the caller will be both expected by the recipient and limited in number." In determining for enforcement purposes whether a caller was a "friend," or "acquaintance" of a consumer, the FCC stated that the test was "whether a reasonable consumer would expect calls from such a person because they have a close, or at least, firsthand relationship."[20]

14. *Is it okay for me to call a residential or cell phone number registered on the national do-not-call list, if the individual was personally referred to me by an existing client, customer, friend or family member?*

**Answer:** No, this would violate the DNC. The FCC has refused to either create a separate exemption or extend the "business relationship" or "personal relationship" exemption to appointment calls made in response to a referral from a source that either knew or had a personal relationship with the consumer.[21] An agent should verify before placing any solicitation call to any individual based upon a referral from

[20] *Id.* at page 31.
[21] *Id.* at page 32.

clients, customers, friends or family members that all residential and cell phone numbers of individuals referred to the agent are not registered on the national do-not-call list.

15. *How can an agent acquire a list of registered numbers for their own purposes? What is the expense?*

**Answer:** The national do-not-call list is maintained by telephone area code. Anyone can obtain the do-not-call listings for up to five (5) area codes at no cost from the FTC website, www.telemarketing.donotcall.gov. If do-not-call lists for more than five (5) area codes are desired, the cost is $25.00 per additional area code.[22]

16. *What should the agent do if he/she receives a Do-Not-Call request from an individual who is **not** registered on either the national do-not-call list or the do-not-call list of any state?*

**Answer:** This request must be honored. If you are asked during a call not to call the number again, pursuant to the DNC you must log the person's name and telephone number and refrain from calling the number again, regardless of whether the person has registered their number on any do-not-call list. This information should then be sent to both the Home Office of the Company, c/o Agency Department, and the principal office of the agency under which the agent is writing. This will enable the Company and the agency to add the person's name and telephone number to a separate do-not-call list. The agent should also maintain his/her own do-not-call list. Although it is anticipated that an individual agent's personally maintained do-not-call list will be relatively small in size, it should nevertheless be checked prior to any residential or cell phone solicitation call initiated by the agent, in addition to the national do-not-call list. If a do-not-call request is received from a new sales lead produced by PDS, it should be also reported through the agency management hierarchy so that the agency management can likewise promptly advise PDS.

17. *What about faxes?*

**Answer:** Faxes of unsolicited advertisements, solicitations and invitations to inquire are prohibited. The FCC Report and Order specifically provides that "[n]o person or entity may...[u]se of a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone fax machine."[23] This prohibition is not limited to the faxes sent to the residential or cell phone numbers registered on the national do-not-call list, but instead prohibits sending an unsolicited fax advertisement, solicitation, or invitation to inquire to any telephone number.

---

[22] *Id.* at page 35.
[23] *Id.* at page 131.

*18. What about automated dialers with pre-recorded messages and no live operators?*

**Answer:** Dialers with pre-recorded messages and no live operators are prohibited unless the caller can establish a "prior express permission" or a "business relationship" exemption. This prohibition applies to all residential telephone numbers, regardless of whether they are registered in the national do-not-call registry. The FCC Report and Order specifically provides that "[n]o person or entity may...[i]nitiate any telephone call to **any** residential line using an artificial or prerecorded voice to deliver a message **without the prior consent of the called party, unless the call** (i) is made for emergency purposes, (ii) is not made for commercial purposes, (iii) is made for commercial purposes but does not include or introduce an unsolicited advertisement or constitute a telephone solicitation, (iv) **is made to any person with whom the caller has an established business relationship at the time the call is made**, or (v) is made by or on behalf of a tax-exempt nonprofit organization." [Emphasis added]. In the context of an agent selling insurance policies, setting appointments for such sales, or prospecting for leads, it is difficult to imagine any possible exception to this prohibition except the "prior express permission" and the "business relationship" exemptions discussed above in the context of the national do-not-call list. However, every agent should understand that the prohibition is not limited to residential phone lines registered on the national do-not-call list, but instead literally prohibits calls to **any** residential phone line unless one of the exceptions set forth above is present.

*19. What are the Penalties for non-compliance with the DNC?*

**Answer:** Penalties include $500 for each violation or actual loss, whichever is greater, an action to enjoin the violation, or both. If found to be willful and knowing, the court may increase the award to three times the preceding amount. Additionally, violation of the federal DNC rules, or any state or local do-not-call rule or regulation, is grounds for immediate termination of the agent's appointment with the Company.

## Conclusion

The Company requires all agents to fully comply with the federal DNC provisions, as well as any state specific do-not-call rules, regulations or statutes that may have been passed or promulgated in their particular state. The Company recognizes that this has been an evolving issue, and may well be subject to future change by the judiciary, legislature or regulators, and we will make every reasonable effort to keep our agents informed of new developments.