Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WALTER STRATTON BAGG, ESQUIRE, and COOPER LAW, P.A., individually and on behalf of all others similarly situated,
Plaintiffs,

vs. Case No.: 6:15-cv-1666-Orl-37-GJK

U.S.HEALTH GROUP, INC., a Delaware corporation, and U.S.HEALTH ADVISORS, L.L.C., a Texas limited liability company,

Defendants.
______________________________/

| | |
|---|---|
| DEPOSITION OF: | BIRSEN GOKSU-SAVLUK |
| TAKEN: | Pursuant to Notice Instance of Plaintiffs |
| DATE: | February 16, 2016 |
| TIME: | 9:54 a.m. to 12:04 p.m. |
| PLACE: | Esquire Deposition Solutions 200 East Robinson Street, #725 Orlando, Florida 32801 |
| BEFORE: | TRINA SEMINO, RPR Stenographic Court Reporter and Notary Public State of Florida at Large |

Page 2

APPEARANCES

RICHARD BENNETT, Esquire
Bennett & Bennett
Executive Office Center
1200 Anastasia Avenue
Suite 360
Coral Gables, Florida 33134-6340
305-444-5925
Attorney for Plaintiffs

PETER S. BAUMBERGER, Esquire
Kubicki, Draper, P.A.
25 West Flagler Street
Penthouse
Miami, Florida 33130
305-374-1212

Attorney for Defendant

Page 3

INDEX


| | PAGE |
|---|---|
| Direct Examination by Mr. Bennett | 4 |
| Cross-Examination by Mr. Baumberger | 68 |
| Continued Cross-Examination by Mr. Baumberger | 90 |
| Redirect Examination by Mr. Bennett | 91 |
| Stipulations | 94 |
| Errata Sheet | 95 |
| Certificate of Oath | 98 |
| Court Reporter's Certification Page | 99 |
| Read and Sign Instructions | 100 |


EXHIBITS


| | |
|---|---|
| Plaintiff's Exhibit Number 1 (Subpoena) | 4 |
| Plaintiff's Exhibit Number 2 (11-25-15 Document) | 7 |
| Plaintiff's Exhibit Number 3 (Fairwinds Statement) | 7 |
| Plaintiff's Exhibit Number 4 (Agent Agreement) | 17 |
| Plaintiff's Exhibit Number 5 (12-12-15 Document) | 28 |
| Plaintiff's Exhibit Number 6 (8-3-15 Document) | 29 |
| Plaintiff's Exhibit Number 7 (1-27-15 Document) | 30 |
| Plaintiff's Exhibit Number 8 (Affidavit) | 56 |
| Plaintiff's Exhibit Number 9 (2-25-15 E-mail) | 58 |
| Plaintiff's Exhibit Number 10 (11-25-15 E-mail) | 63 |
| Plaintiff's Exhibit Number 11 (2-4-16 E-mail) | 65 |
| Plaintiff's Exhibit Number 12 (2-12-16 Document) | 65 |


Page 4

WHEREUPON,
BIRSEN GOKSU-SAVLUK,
having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. BENNETT:
Q State your name for the record, please.
A Birsen Goksu-Savluk.
Q May I call you Birsen?
A Yes.
(Whereupon, Plaintiff's Exhibit Number 1 was marked for identification by the Court Reporter).
BY MR. BENNETT:
Q Birsen, I'm going to hand you a copy of a Subpoena.
Did you receive that from me --
A I did.
Q -- by e-mail?
And do you notice I requested that you bring documents --
A Yes.
Q -- here today?
Did you bring any documents responsive to the request?
A I brought bank statements. That's the only



EXHIBIT
tabbies
F

Page 5

thing I could find about anything in this case.
Q Okay. Could I take a look at what you brought?
A Sure. I do have e-mails, as well. I think it was correspondence with Jim Jackson.
MR. BAUMBERGER: The only question I have with this is, I wonder if -- this is your personal banking statement. I don't know if we should redact -- we can maybe address that later.
MR. BENNETT: Let's not mark it. Let me ask her what it is.
MR. BAUMBERGER: Okay.
MR. BENNETT: If it's not useful, we won't use it.
BY MR. BENNETT:
Q So, Birsen, you brought with you this morning, in response to the Subpoena, a copy of some e-mails, the letter that I sent you with a check, and a copy of the Subpoena, a bank statement from Fairwinds Credit Union, a checking account ledger -- is that what you would describe it?
A It's the same account.
Q Oh, it's the same account?
A Yeah.
Q Oh.
A Just three months, total.

Page 6

Q Okay. So, the Fairwinds Credit Union is from January 1, 2015, through March 31, 2015?
A Correct.
Q And you sent a copy of an unsigned Affidavit?
A Yes.
Q So, is that all the documents you had, that were responsive to the request, that you could find?
A Yes.
Q Okay. Could you tell me what the bank statements are in response to?
A Well, just to show the amount of time that I was a member with the fax company, the online company that I signed up with.
Q Okay.
A And I can tell you exact dates of when they withdrew.
Q Okay. Could you show me what you're referring to?
A Sure.
Can I mark on it?
Q Okay, sure.
A This right here, on January 27.
Q You've marked a, "January 27, withdraw debit" --
A Yes.
Q -- "www.Fax87.com"?

Page 7

A Correct.
Q With a telephone number, "866-698-4068"?
A That's what it has on there.
Q Is that a telephone number?
A I'm assuming so, yes.
Q It says, "in the U.S."?
A Yes.
Q Do you know what that means?
A I have no idea.
Q Okay.
A And, then, the second charge was on February 27.
MR. BENNETT: Okay. So, why don't we just mark these two as an exhibit, if nothing else here is --
THE WITNESS: No.
MR. BENNETT: -- that you brought that's relevant.
And we'll just -- before it's attached, I guess, we can redact it, but I would like to note that account number.
MR. BAUMBERGER: Okay, sure.
MR. BENNETT: Okay. So, could you mark this as --
THE COURT REPORTER: Number 3.
(Whereupon, Plaintiff's Exhibits Numbered 2 and 3, respectively, were marked for identification by

Page 8

the Court Reporter).
BY MR. BENNETT:
Q There is a portion of the bank statements relating to Fax87 debits.
Can you give me -- I'm going to be asking you questions today in connection with a case that the Plaintiffs filed against USHEALTH Group and USHEALTH Advisors --
A Okay.
Q -- relating to a fax advertisement.
A (Indicating affirmatively).
Q Do you know Mr. Baumberger?
A Yes.
Q You do know him?
A I met him yesterday.
Q Where did you meet him?
A I don't know if it was his office, but at a address provided to me.
Q What was the purpose of the meeting?
A I guess, just to go over everything about, you know, what's going to be asked to me by them.
Q Is he your attorney?
A No, he's not.
Q And why did you want to meet with him?
A They sent me -- is it a disposition -- to sign?

Page 9

Something I didn't sign.
Q Uh-huh.
A I didn't sign it. And I got a call from Mike, I think --
Q Mike Suarez?
A Yes.
Q Uh-huh.
A And he asked if I was willing to meet, and I said sure, and I did.
Q But, do you remember when I first called you and asked you if you would talk to me about USHEALTH?
A I do remember.
Q And do you remember what your response to me was at that time?
A Out of respect for them, I wouldn't talk to you.
Q Right. And you -- you thought it would be more appropriate if the defense lawyers were present for any questions that I had to ask you?
A Of course, yes.
Q Right.
Did you think it was necessary for me to be present when you met with the defense lawyers to discuss the case?
A I didn't think about that, no.
Q Did your position change from what your attitude

Page 10

was with me, to answer my questions, and what your attitude was with the defense lawyers to talk about the case?
MR. BAUMBERGER: Object to form.
You can answer.
THE WITNESS: I mean, I feel that they do represent the company that I have respect for. So, I don't understand why there's an issue why I shouldn't talk to them.
BY MR. BENNETT:
Q Well, what did you discuss?
A Just everything that you have, basically. And they questioned me, I guess, the same way you're going to question me.
Q I see.
So, "everything that I have," meaning what?
A The e-mails, and the disposition, and --
Q By "the disposition," do you mean the Complaint that was filed by the Plaintiffs.
A I mean, it was just general talk about what happened, basically. That's it.
BY MR BENNETT:
Q And who else was present at this meeting?
A Jim Jackson.
Q And how do you know Jim Jackson?

Page 11

A Jim Jackson is the first lawyer that called me. I know that he works off of a Texas office. And I think he works for USHEALTH Advisors, as a lawyer, I'm not sure, but I know he was calling on behalf of them.
Q Had you known him before this call?
A No, I did not.
Q Approximately when was the call made by Mr. Jackson?
A Probably late last year, like, November, December, maybe a little bit more, I don't know. But, just late last year.
Q And what was the purpose of this call to him?
A He said that there was a lawsuit against the fax, and he just wanted to get some information.
Q Did you provide the information?
A I did. As much as I could, yes.
Q Okay. Was anyone else present at this meeting that you had yesterday afternoon?
A No.
Q Okay. How long did the meeting take?
A Maybe an hour or less, I don't remember.
Q Could you tell me something about your background; where you were born, your education?
A Sure. I was born in Turkey. I moved to U.S. when I was ten. I grew up in Atlanta, Georgia. That's

Page 12

where I got my education. I moved to Orlando.
Q What education did you get in Atlanta?
A Well, you know, high school, college. Marketing sales in college, Kennesaw State, which is located in Georgia.
Q Was that your major?
A Yes.
Q And did you get a degree from Kennesaw State?
A I did not complete it, no.
Q Okay.
A No.
Q Well, what was your major course of study?
A Marketing sales.
Q All right. And what year did you spend -- what years did you spend at Kennesaw State?
A 2000 and 2006.
Q Okay. You were there for six years?
A On and off, yes; not the whole entire time.
Q And what did you do after you left Kennesaw State?
A I got married and moved here, to Orlando.
Q Okay. And what's the name of your husband?
A Erkan Savluk.
Q Have you been employed since you've been in Orlando?

Page 13

A Yes.
Q Do you hold any licenses?
A I do.
Q What licenses?
A I have a real estate license and I have health and life insurance license.
Q So, you're a real estate sales associate?
A Yes.
Q And do you work for a company?
A Not at this time, no.
Q Who have you worked for?
A I worked for Century 21, it's a real estate office. I worked for Only Way Realty. Then I got into timeshare, which is a different section of, like, you know, where I can use my license.
Q What company --
A Westgate.
Q -- did you work for?
A Westgate.
Q Westgate? Where is that located?
A They have several, but I worked in Kissimmee and their Orlando offices.
Q Do you work for any of those organizations presently?
A Not until the 13th of this month.

Page 14

Q You quit your job on the 13th of this month?
A I did.
Q For which company?
A Westgate.
Q So, do you still work for Century 21?
A No. That was in the past.
Q So, why did you quit Westgate?
A Personal reasons.
Q Have you held any other employment since you've moved to Orlando from Atlanta?
A Yes. I worked for USHEALTH Advisors.
Q Where did you first hear of USHEALTH Advisors?
A My close friend started with them, maybe, seven or eight years ago.
Q What's the name of your friend?
A Mara Brockman.
Q Does she live in Orlando?
A She does.
Q And does she still work for USHEALTH Advisors?
A She does.
Q Okay. She recommended the company to you?
A She recruited me, yes.
Q Okay. And what did they recruit you to do?
A To be in sales.
Q Okay.

Page 15

A To be a health insurance adviser.
Q So, take me through it.
From her recommendation, how did you end up working with USHEALTH Advisors?
A Well, she's been in the company for a while, she was very successful and she thought I would be a good fit. So, I gave it a try. You know, I went to school, went to the class, went to -- took the state test, got my license, got recruited by her, started with her.
She had her own office at the time, and then she merged with another office that's also a part of USHEALTH Advisors. And I've been with them for two years, exactly two years.
Q Okay. What do you mean when you say "she recruited you."
What did she do?
A Well, we're self-employed. Like, we're subcontracted, I guess you can say. So, you know, she just recruited me.
Q Okay. Well, who did you -- did she introduce you to anyone at USHEALTH Advisors?
A The thing is, the group of friends that I am with her and her group was -- basically works for USHEALTH Advisors. So, I kind of knew most of the people years before some of them even got involved with

Page 16

USHEALTH Advisors.
Q And you knew them in Orlando?
A Yeah.
Q How long have you lived in Orlando?
A Since 2007.
Q So, these are just personal friends --
A Friends.
Q -- of yours that you did not have any business relationship with before?
A No.
Q And they just all happened to be working for USHEALTH Advisors?
A Eventually, yeah.
Q So, did you meet with anyone at the company to be interviewed and offered that?
A I mean, again, Mara was -- she was a manager, at that time. I think she was a division manager or something. I don't know what her title was.
But, again, she had -- she was running her own office, so she was the one that I interviewed with.
Q All right. So, is she the one that offered you a position with the company?
A Exactly.
Q Did you sign a contract with the company?
A I did.

Page 17

(Whereupon, Plaintiff's Exhibit Number 4 was marked for identification by the Court Reporter).

MR. BENNETT: Let me hand you a document marked Exhibit 4.

BY MR. BENNETT:

Q Can you identify what this document is? And take a look at the last page with the signatures.
A Yeah, I remember this.
Q Okay.
A It's a contract.
Q What is it?
A Agent Agreement.
Q Okay. Do you know what the Agreement was about? Do you have a general familiarity with what --
A Honestly, I don't remember. I do know that I was signing up for two years. So, this contract was for two years, from what I recall. And I was representing USHEALTH Advisors and I could not work for another insurance company while I was working for them.
Q Okay.
A And it was only commission based, so...
Q Okay. And who are the signatures on the last page?
A Can I look at it again?
Q Yeah, sure.

Page 18

A Troy McCoy [sic].
Q McQuagge?
A McQuagge.
Q Do you know who that is?
A I do know who that is.
Q Who is Troy McQuagge?
A I know he's located in Texas. I don't know -- I don't remember his exact position, but I know he's of the higher-ups, I guess.
Q Uh-huh. And have you met him personally?
A I have met him personally.
Q Where did you meet him?
A He came to Orlando to one of our meetings.
Q Whose meeting?
A Our office meetings, weekly. We have office meetings every Friday, and he came to one of those.
Q I see.
Does it identify, on this signature page, the title of Mr. McQuagge?
A CEO.
Q Do you know what that means?
A I know what that means, but I'm not sure if I know him as a CEO. I just know he was just, you know, one of the upper management or somebody like that.
Q And what was the purpose of the meeting that --

Page 19

A Just congratulating us on our -- you know, our sales, and our team, and our office. Our success, I guess.
Q Okay. Is that the only time you met him?
A Yes.
Q Did you have a conversation with him then?
A I did.
Q What did you talk about?
A I guess, just general things. Just, you know, glad to meet him.
I do remember the week that he was there, I was a top -- one of the top 20 reps that had a good sales, and he congratulated me and things like that.
Q Top 20 out of how many reps?
A I think it was 65 at that time.
Q In Orlando?
A In our office, yes.
Q And your office was located where?
A In Orlando, downtown Orlando.
Q Do you know the address?
A I'm going to -- I think it was 804 Magnolia Avenue.
Q That's the USHEALTH Advisor office that your friend who recruited you was the manager of?
A No, no. Because, again, she merged after I

Page 20

started. So, her office was originally located on Kirkman Road. And when she merged with the downtown office, that's the one that I'm referring to.
Q I see.
So, when you referred to your team at USHA, who is your team?
A The entire USHA team.
Q In Orlando?
A Yes.
Q Or, in Florida?
A I guess you could say Florida, because we did have satellites that were located in other locations.
Q Okay. But there were 65 representatives in 2014 --
A That I was aware of.
Q -- that was part of your team in Orlando?
A I guess it would be safe to say, in Florida.
Q Sixty-five in all of Florida?
A Yes.
Q Okay. And how do you arrive at that number?
A Um, being mentioned in the meetings --
Q Okay.
A -- you know, by our superiors, our team managers.
Q Was there a list of the agents that -- in

Page 21

rankings, according to sales?
A Not, like, a -- it's not like there's a list. But we did receive weekly e-mails about who sold what, you know, where we were. And there is a list of the people that -- who actually sold, would be on that list.
Q And who sent this e-mail to you?
A It was one of the managers in the office, Jim Hmielewski.
Q Could you spell his name for the court reporter?
A I can spell his first name, but I know I can't spell his last name.
Q Okay.
A It's Jim Hmielewski.
Q And what was his position?
A So, when they merged, I think he was the -- like, a division manager now.
And I know that Mara had stepped down to a satellite, so he was, like, I guess, the top manager, and then it was everybody else.
Q Manager for Florida?
A For our Orlando office.
Q And what is the satellite office that Mara --
A I don't -- there's different divisions. I know -- from what I know, there is divisions, satellites. Then there's, like, team leader, then there's sales

Page 22

agents, writing agents. There's just, like, a ladder.
Q But was this division in another city, or she stayed in Orlando?
A She stayed in Orlando.
Q Okay. So, did you undergo any training from --
A Of course.
Q -- anyone?
Describe the training to me.
A Um, well, there was weekly trainings. Sometimes a couple times a week we would meet in the office and go over materials and, you know, the process. And we would also --
Q Let me stop you there.
So, there are many different categories of people who work at USHEALTH.
What was your category?
A I was a writing agent. I was just an agent.
Q And what does writing agent mean?
A Writing agent is just -- just writing business. That was my role, was writing business.
Q And what is the business?
A It's selling health insurance to prospects.
Q What companies did you write insurance for?
A USHEALTH Advisors.
Q Was there an underwriter involved?

Page 23

A Yes.
Q Which underwriters were those?
A Freedom Life.
Q Is that the only underwriter?
A As far as I'm aware, yes.
Q Did you sell any other insurance product that was not --
A Yes. There are --
Q -- underwritten by Freedom Life?
A Most -- I don't know if they're underwritten by a different company, but I do know that we did sell products in addition to the health insurance, like critical illness, or, you know, accident coverage, or association, things like that.
Q Okay. So, was this all through USHEALTH?
A As far as I know, yes.
Q So, when you -- did you have an initial training session that explained to you what your duties would be as an agent for USHEALTH?
A Yes.
Q What were you told, just generally?
A I mean, it's just -- basically, just the concept: What we do and the products, just the facts about our products, I guess.
Q Were you trained at all in how to market your

Page 24

services?
A Yes.
Q Was it helpful that you had studied marketing at Kennesaw?
A Not really.
Q No?
A Not really, not at all.
Q So, how were you trained to sell the USHEALTH products?
A Well, like, what exactly do you want to know? Like, there's several ways that you can do things.
Q Well, what were you -- I just want to know what the training was to prepare you to sell the insurance products at USHEALTH.
What did they suggest that you do?
A Besides the product knowledge --
Q Uh-huh --
A -- and the --
Q Marketing knowledge is what I'm looking for.
A Marketing knowledge is you buy leads, you call leads and things like that.
Q You buy a list of leads?
A Yes.
Q Where did you obtain these leads?
A Lead companies.

Q Give me an example of a lead company.
A Like, I think it's called -- NetQuote is one. ProspectZone is another. Any lead companies that you can search and Google, basically, like, insurance leads.
Q Were these leads provided by USHEALTH Advisors?
A Some were given to me by USHEALTH Advisors, some I purchased myself.
Q What leads were given to you by USHEALTH Advisors?
A The -- they're, I guess, the leads that I had; old leads or, you know, purchased leads that they shared with their agents to get us started.
Q So, your friend provided you with lists of individuals or businesses that had previously purchased insurance from USHEALTH?
A I don't know if they previously purchased, but I know that they were just leads that she gave me.
Q And what did you do with the leads? What were you trained to do --
A I called.
Q -- with the leads?
A I would call. I called.
Q And when you called them, what did you -- what was your sales pitch?
A Whoever is on that lead, you know, that specific


person or business, I would, you know, request to talk to them. And then when I did, I just let them know that they had inquired about health insurance and I was just, you know, following up to see if they're still in the market. And if they were, we would just talk and then we'll go from there.
Q If they wanted information from you about a particular product, did you provide it to them?
A Not over the phone. I had to make an appointment and let them know that I have to see them.
Q So, was it against company policy for you to mail them information?
A I don't know. But I never mailed personally, so...
Q And when you purchased leads, did you follow the same procedure that you did with company leads?
A Yes.
Q Okay. Did you ever fax materials to any of the leads?
A No, not the leads that I purchased or that was given to me.
Q Okay. So, how long did you work for USHEALTH Advisors?
A November, 2013, till November, 2015; two years.
Q And why did you leave?


A Um, couple of reasons. But one of them was I wanted to try Obamacare and different options in health insurance.
Q What were the other reasons?
A What?
Q What were the other reasons?
A I also wanted to -- I needed to get a stable income, because this is a commission base. So, I did go back to Westgate so that I could have, you know, stable income that wasn't just 100-percent-commission based.
Q So, did you resign from the company?
A I did.
Q Okay. Did you send a resignation letter to them?
A I did not. I just told my friend Mara that I was going to -- you know, what I want to do. And then she said she'll take care of it, and she did.
Q Okay. Did you have a web page at USHEALTH Advisors?
A (Indicating affirmatively).
Q Yes?
A Yes.
Q Okay. And how did you obtain a web page?
A The company provided me with one.
Q Okay. Did you have to pay a fee to have a web


page?
A Not that I remember, no.
Q Okay. Did you get inquiries from people who looked at USHEALTH Group or USHEALTH Advisors?
A Not a lot. But, yeah, I did, from my website, yes.
(Whereupon, Plaintiff's Exhibit Number 5 was marked for identification by the Court Reporter).
MR. BENNETT: Let me show you what's been marked as Exhibit 5.
BY MR. BENNETT:
Q Can you identify what that page is?
A Probably an ad I created. I don't know.
Q Okay. Well, I downloaded that from the USHEALTH --
A My website?
Q -- Advisor website for you. And that's one of your pages.
A Okay.
Q Did you have any input into the information that was contained on your website?
A Probably my personal information: My name, my phone number.
Q Did you supply the photograph?
A And my photograph, you're right.

Page 29

Q So, is everything else, all the data that's on the web page, with your photo, provided by USHEALTH Advisors?
A Yes.
Q Okay. Did you ever use the USHEALTH Advisor website to create any advertising?
A Yes. The verbiage, I think -- if I remember correctly, yes, I did.
Q How did you use it?
A How did I use it?
Q Yeah.
A I mean, like the verbiage on here, I just used it on my advertisement.
Q What advertisement are you referring to?
A I'm not sure. I don't know if it was in my e-mail. I don't know if it was, like, for the actual fax that I would use, but -- for things like that. My e-mail and the fax, but I don't remember for which.
MR. BENNETT: Can you mark this, please?
(Whereupon, Plaintiff's Exhibit Number 6 was marked for identification by the Court Reporter).
MR. BENNETT: Let me show you this page.
BY MR. BENNETT:
Q Can you identify what this page is?
A My Linkedin page?

Page 30

Q Yes.
A Uh-huh.
Q Did you create that page?
A I did.
Q Is that the same photograph that you used?
A It is.
Q Did you create this page before USHEALTH Group or --
MR. BAUMBERGER: Object to form.
BY MR. BENNETT:
Q -- the website?
A The website, I think it started when I started with USHEALTH.
Q And was this part of your marketing strategy, to have a Linkedin page?
A Yes. I wasn't very active. I know I created it, but I wasn't very active in it. I'm more active now than I was then.
MR. BENNETT: Okay.
(Whereupon, Plaintiff's Exhibit Number 7 was marked for identification by the Court Reporter).
BY MR. BENNETT:
Q Can you identify what's been marked as Exhibit 7?
A Yes.

Page 31

Q Okay. What is that?
A That's a flier that I created.
Q Okay. Have you created many fliers during your time working for USHEALTH Advisors?
A No. Actually, this is the first one.
Q When was this created?
A I don't know the exact date, but this was created for the faxes that I was planning on sending out.
Q Okay. And how did you arrive at the decision to create a flier?
A When we call leads, sometimes they request -- sometimes they don't have time to talk to you, so sometimes they request: Can you fax over information, a brochure or something, and -- which I never did. You know, I never did that. But that was one of the ideas.
I mean, when you're working as self-employed and you're trying to reach out to prospects, you just kind of come up with ideas. And with my experience, after a year of being with USHEALTH, that was one of the ideas I came up with, is to fax something to businesses like this, and hopefully get prospects.
Q Did anyone else at -- in your team create fliers?
A No.
Q You had never seen anyone that thought of this

Page 32

idea?
A No.
Q Did you discuss your idea with anyone --
A I did.
Q -- at your team?
Who did you discuss it with?
A With Jim Hmielewski.
Q And what was the conversation about?
A Um, I know I wanted to meet with him about, you know, what I'd been doing, how things have been going for me in the business, and the idea that I wanted to fax out something like this.
Q Did you explain to him how the flier would be created?
A Honestly, I don't remember the details of what I was going to do. I think I created the flier after I talked to him, so I don't remember the details of what we discussed.
Q Okay. And tell me:
What process did you go through to create a flier?
A Obviously, copy/paste a lot. My picture, the USHEALTH Advisors' logo.
Q Where did you find the USHEALTH Advisors' logo?
A I mean, I think, some things that if you Google,

Page 33

Google has it, the websites have it.
Q Which websites?
A My -- like, agent website. And we also have an agent account with USHEALTH Advisors where you have, you know, access to applications, and brochures, and things like that. So, maybe, pictures from there. I might have copy/pasted them. But I know Google alone would pull out, you know, the logo.
Q So, do you remember exactly the day where you selected the logo and decided to put it at the top of the page?
A I don't remember the exact date.
Q Okay. Do you remember copying your picture to --
A I mean, the --
Q -- the flier?
A -- entire brochure was probably created the same day; so, yes.
Q And where did you find the picture that you used?
A Which one, my picture or the logo?
Q Your picture.
A My picture is my picture. I mean, I had that taken -- actually, for real estate. It's in my business cards, so I used the same one.

Page 34

Q Okay.
A And I still use the same one. It's eight years old.
Q And where did you find the content for the flier?
A I don't know, I just created it myself. Everything, I just put it together, copy/paste, copy/paste, you know.
Q So, you copied, say, the first paragraph?
A That is probably copied through my own personal website with USHEALTH Advisors.
Q Okay. So, you believe that information was on the USHEALTH Advisor page for you, as an agent?
A Yes.
Q Okay. And where did you get the information for the three-year lock rate and those bullet points down?
A Um, this is on our brochure. I think it's on the face -- first page.
Q Which is, the three-year lock rate?
A Yes. They're on our product brochure. This is just a fact. I mean --
Q This is the second bullet point --
A Yes.
Q -- you're pointing at?
A Again, customized plans; we are customized. I

Page 35

mean, that's what we did. These are all just facts about what we do.
Q And you wrote the facts or you copied it from the website?
A These, I -- I've probably handwritten them myself.
Q Okay. So, there's a typographical error there in the -- under the fifth one, the pre-existing?
A This one (indicating).
Q Yes, the second one, Accepting Pre-existing Conditions.
A Uh-huh.
Q Is that something you wrote or something you copied?
A Yeah, I wrote that.
Q You wrote that?
A Uh-huh.
Q So, did you write all of them?
A Yes.
Q Okay. And what does the seal at the right side of the three-year --
A What do you mean, what is that?
Q What?
A This (indicating)?
Q Yes.

Page 36

A It's a picture that I copy/paste.
Q And what does it say?
A It says, "three-year rate guarantee."
Q Okay. And what is that referring to?
A That your premiums are locked, your price that was given -- like, let's say I give you a price today, that's locked in for three years.
Q And at the bottom, there are various logos. Where did you get those?
A That was in my e-mails, bottom of my e-mail page. When I copied -- so, I copied -- actually, it was mine, but it was -- originally, I copied it from Jim Hmielewski's e-mail.
Q So, Jim had those BBB's and Stevies?
A I don't know about the BBB'S, but he did -- all the Stevies are in his e-mails --
Q Okay.
A -- or were.
Q What is a Stevie?
A Those are Stevie Awards for showing, you know, things; the accomplishments, I guess.
Q In the sales of insurance, health insurance?
A I think -- no, that's just in general in business. I think it's, like, a, you know -- it's not within the company. It's outside of the company, the

Page 37

awards that you receive.
Q So, did anyone ever ask you what those awards were about?
A (Indicating negatively).
Q No?
A Nobody did.
Q Okay. Well, at the top of the page, you see a date here?
A I do.
Q Okay. Do you know what that date refers to?
A Probably a date when I faxed somebody this --
Q Okay.
A -- flier.
Q Do you see it says, "1/27/2015, 12:41 a.m." --
A Uh-huh.
Q -- "from 407-930-9234"?
A Yes.
Q Do you know what that refers to?
A I do. This phone number is the phone number that was provided to me by the company that I signed up with, which was Fax87.com.
Q Do you have a fax machine?
A I do not.
Q Okay. So, tell me about how you determined who to send this fax to.

Page 38

You see the next line says "To," and there's a number?
A Okay. How do I determine it?
Q Yes.
A Okay. There's a website called Manta.com where you can locate businesses.
Q Right.
A So, that's how I did my search. I did local business search. And any businesses that has a website, I would log -- you know, go to the website and look for their information. So, if they have a fax number, I would just copy the fax number, copy it back to this account and then send it.
Q So, you -- do you know who that fax number is for?
A I have no idea.
Q Okay. So, you went to Manta, and you weren't looking for any particular person?
A Not at all.
Q You were just looking for website information that had fax numbers?
A I was looking for small businesses --
Q Okay.
A -- with that information.
Q So, how did you do the search on Manta? What

Page 39

did you input?
A Sometimes I just put Orlando, and then it will list all different types of businesses. Sometimes I was specific: I would put dentists, I would put lawyers, I would put anything that I know would be self-employed or small businesses.
Q Okay. And you copied it to a document?
A It's a website that you log into. And there's a section where you just put phone numbers, and that's where I copied it to.
Q Okay. So, what is this company that you were copying the numbers to?
A Fax87.
Q Okay.
A That allows me to fax to those numbers that I was putting in, so...
Q Okay. How did you discover Fax87?
A I Google searched it. And --
Q What were you Googling for?
A Since I didn't have a fax machine, I wanted to find out how else I can do it online. And, so, when I Googled it, there were several options.
And I think I talked to a couple of different companies before I decided on one particular. So, that's how I did it.

Page 40

Q Do you remember the other companies that you contacted?
A Not at all.
Q And what were you looking for, a price?
A Yes, definitely. That's always a factor.
Q Was Fax87 the least expensive?
A I think it was the least expensive.
Q Did you ever talk to anyone at Fax87?
A I did.
Q Who did you talk to?
A Whatever --I think it was a 1-800 number that they had on the search that I did on Google. And a representative just answered, and I -- you know, I wanted -- I told them what I wanted to do, so they walked me through the process.
Q How did they help you?
A They just gave me information, and price, and that's it.
Q Information about how the system worked?
A A little bit. I mean, I don't remember it, honestly, the whole conversation, but it wasn't like they trained me on it. They just, you know, told me what I could do.
Q And what was the prices you recorded?
A All I remember, that it was 9.99 a month. There

Page 41

would be additional charges if I exceeded a certain amount.
Q A certain amount of faxes -- certain amount of faxes that were sent?
A Yes.
Q Do you remember what type of service that you signed up for? How many faxes were you able to send for 9.99?
A If I remember correctly, it was 30 a month for 9.99. And, then, anything additional would be an extra charge, but I don't know the extra charge, how much it was.
Q Okay. Thirty a month, that's about 33 cents per fax?
A I didn't calculate it that way, I don't know.
Q Okay. But compared to the other companies that were offering to fax your flier, you believed this was a -- the least expensive option that you had?
A Um, honestly, I don't remember exactly why I felt this was a better option. But as far as price, yeah, most definitely it was, you know, something that I thought was very, you know, affordable for me.
Q Okay. That to send 30 faxes of the flier for $10, you thought was a reasonable price and better than the competition?

Page 42

A I guess. I guess, from the information that I received or the search I did. I don't remember the competition.
Q Well, I looked up Fax87 and I saw they were advertising -- and when did you do this, back in 2015, January, 2015?
A Uh-huh.
Q I saw that they were advertising a thousand faxes for 6.99.
A Actually, I looked last night, and they were advising 50 for 4.99. And, then, like, they had different prices all the way up to, like, 40 something.
Q Right. And a thousand was 5.99; is that what you saw?
A No. I saw 4.99 for 50. And they had -- from then on, I don't remember the specifics. But I know that -- obviously they changed the pricing a little bit.
Q So, you think it was less expensive now --
A It seems --
Q -- than when you were looking at it?
A Yes.
Q So, after you developed the flier, did you go back to Jim and show him that -- the flier that you had developed and proposed to send?
MR. BAUMBERGER: Object to form.

Page 43

THE WITNESS: Um, no, not that I remember.
BY MR. BENNETT:
Q So, the only conversation with the division manager you had to discuss your idea to fax fliers was before you actually developed the flier?
A Exactly.
Q Okay. And you never showed him this fax before you sent it out?
A No.
Q Is that correct?
A As far as I remember, no.
Q Okay. So, you believe that you -- your plan provided for up to 30 faxes, and that you didn't send more than 30; is that correct?
A Honestly, I don't know the exact number; I don't. I mean, I don't remember a whole lot of things, now, what happened then, but that's what I remember.
Q Okay. And did you hear from USHEALTH about your faxing the fliers?
A I did.
Q Who did you hear from?
A The first person that talked to me was Jim Hmielewski.
Q And when did that occur?
A Maybe, like, within two weeks or three weeks

Page 44

after I signed up with the Fax87.
Q So, this would have been in February of 2015?
A Yes.
Q Okay. And what was the conversation with him?
A He told me that there was a complaint about a fax that I sent and that I needed to stop immediately.
Q And who was the complaint from?
A I don't remember if he mentioned that, honestly.
Q You mean, one of the recipients of --
A Yes.
Q -- your fax had made a complaint shortly after you sent it?
A Yes.
Q And they had made a complaint to him?
A No. I guess, they complained to the company. I don't know. I mean, we weren't -- I didn't ask.
Q Did anyone complain to you about --
A I don't remember.
Q -- the fax being received?
A Nobody responded to the faxes that I sent.
Q No one did?
A No one did.
Q But one of the recipients called the company in Orlando?
A I don't know who, but I know it wasn't me that

Page 45

they called. So, I know that Jim told me to stop what I was doing.
Q And what was the problem that they were complaining about?
A I didn't know that it was actually illegal to send out faxes. I did not know that, and that they -- I guess they were suing or something in that regards.
Q Who was suing?
A I don't remember. You guys? I don't remember.
Q Or someone else?
A Someone else. I don't know the name -- or, I don't even remember if he told me the name.
Q Okay. So, what was your response?
A I mean, I was worried. I apologized, and I said, what's going to happen, you know. And he told me that there could be a fine that the company might pay, which is $500 per complaint, or fax, or whatever, and that was it.
And I asked him, you know -- you know, how would it affect me. And he said he doesn't know, but I just need to stop what I was doing.
Q And did you?
A Of course, immediately.
Q Okay. Were there any warnings to you that you would have to pay the --

Page 46

A No.
Q -- penalties?
A No.
Q Did you have insurance while you were working for USHEALTH Advisors?
A Yes.
Q What type of insurance was it?
A Well, um, you have to have insurance to cover, like, I guess, you know, anything that could -- I don't know, but I know you have to have insurance. I don't know how to explain it to you.
Q Did you have insurance?
A I did. I know that -- I personally didn't sign up for it -- or, I don't know how that goes about, but I know the company had it, under my name.
Q Did you have to pay any premium amount?
A I think we paid, like, $10 for every paycheck that they cut off --
Q So, it was --
A -- or $50, I don't remember; but there is an amount that they cut off every paycheck.
Q They deducted from your commissions --
A Yes.
Q -- or other --
A Yes.

Page 47

Q -- fees?
A Yes.
Q Okay. Did you get a copy of the policy?
A I don't remember. Possibly, I don't remember.
Q All right. Did you -- when you heard that there might be a penalty to pay, did you inquire of the insurer whether this might be covered under the insurance?
A Not at all, no. I didn't think about that.
Q Did you receive any training about faxing marketing materials to customers?
A No.
Q Was that ever discussed in any meetings --
A No.
Q -- with anyone?
A No.
Q Did you talk to your friend, Marta [sic], when you got the call --
A Mara.
Q I'm sorry, Mara.
-- when you got the call about the complaint that had been received from the fax?
A No. I really never talked to Mara about the entire situation. I think, Jim is the only one in the office that I talked to. That was it.
Q You didn't discuss your idea, to fax people,

Page 48

with any of the other team members?
A Nope, nobody but Jim.
Q And you never have heard of any team member using fax marketing to --
A No.
Q -- targets, or prospects, or leads?
A No.
Q Have you tried to contact Fax87 to see if they had any transmission letters?
A I did.
Q When did you do that?
A I think, after Jim Jackson contacted me. You know, he asked me if I had anything in regards to, you know, like, records. And the first thing I looked was the bank statements or to call Fax87. And I did, I called them.
Q You called the 800 number?
A I did.
Q Okay. And what happened?
A They told me that, unfortunately, they had no record of tracking my account since I canceled it, and the phone number that was given to me was probably already assigned to somebody else.
Q All right. So, the company, Fax87, said they could not give you copies of the transmission records?

Page 49

A Yes. And they said they probably did not have a record of it, or something like that, in that sense.
Q When you sent the faxes out, did you get a receipt from Fax87?
A Not a receipt, but e-mail notification. Whether it went through or it didn't go through, I would get e-mail notification.
Q So, you would get a list of the numbers --
A Yes.
Q -- that they had successfully transmitted --
A Or that didn't go through.
Q And a list of the numbers that didn't --
A Yes.
Q And do you remember what the success rate was?
A I don't remember.
And I did treat those notifications as, like, trash, basically. I just deleted them as I received them.
Q So, you weren't interested in finding out that the $10 you were spending were reaching the people that you copied their fax number?
A I mean, all I know is that some of them didn't go through, so I would just keep trying other companies.
So -- but it wasn't important to me whether it reached everybody that I was trying to reach out to. I was just trying to reach out to as many people, you know,

Page 50

trying to get prospects.
Q So, how many days did you spend looking for faxes and faxing this letter?
MR. BAUMBERGER: Object to form.
THE WITNESS: I don't remember, to be honest. I have no idea.
BY MR. BENNETT:
Q So, was it just one day you did it, or was it every day for a couple of weeks?
A I don't remember. I know it wasn't every day for a couple of weeks. It could have been more than one day, but I don't remember the exact hours, or days, or specific days. I don't remember.
Q Okay. So, you use a Gmail account, correct?
A I do.
Q Have you tried, through Gmail, to recover your deleted --
A I did.
Q You did?
A Not recover, but I tried to find anything in regards to this case that I could find. And there was nothing that I could find.
Q Okay. You know that Gmail offers a program to find your deleted e-mails that you've put in the trash?
A I did not know that. That's new to me.

Page 51

Q So, what efforts did you make with Gmail to find out if you could recover --
A I never reached Gmail personally. I just looked at my account. And I tried to go back to, you know, e-mails that are on, actually, my account currently, to see if there was anything that -- maybe some of the notifications I forgot to delete or anything. I mean, anything that I could get my hands on, but I could not.
Q Okay. Would you be willing to look at your Gmail account, and see if you could recover deleted files so that we could get the transmission lists, and find out who you were successfully faxing the ad to?
A I don't see why I shouldn't, yeah.
Q Because you tried Fax87, and they said they don't have the records?
A Yes.
Q So, Gmail could possibly -- if they were sending notifications to you at Gmail, they could possibly be recovered, and you would turn them over if you could find them?
A Yes.
Q Okay. What type of a computer do you have?
A I don't even know.
Q Is it a laptop?
A It's a desktop.

Page 52

Q It's a desktop?
A Uh-huh.
Q Is it an Apple?
A It's not Apple.
Maybe, HP. I think it's HP.
Q Do you remember when you first bought it?
A No. My husband handles things like that. So, you know, maybe a year ago, two. I don't know.
Q Is it your husband's computer?
A No, it's our computer.
Q So, you both use it for business?
A Personal, business, whatever, yeah.
Q But it's fairly new.
Do you know if you use Windows?
A Yes.
Q You do?
A Yes.
Q Okay. So, it's a Microsoft program that you use?
A Yes.
Q Okay. So, if we sent you an interrogatory asking for the identification of your computer, would you be able to provide that to us: The model number, serial number?
A What will you do with that information?

Page 53

Q What we would do, we would try to recover information about the faxes that you sent and who you sent them to.
A Okay.
Q If it would be possible to do that.
A I see.
I don't know, because -- I mean, I don't know what else you have access to, if I let you do that. I don't know.
Q Well, if they could be protected, if you could see what it was on the computer, that we would just be looking for information about who you faxed to --
A Yeah.
Q -- would you be willing to cooperate with that?
A I mean, I guess, yeah.
Q If you had a confidentiality agreement that nobody would look at it -- you'd get to look at it first and see. But if we could find some tech person to -- with the assignment to find out if fax transmission data was in your computer, and if it was, if it could be located, would you be willing to do that?
MR. BAUMBERGER: All right, let me just stop here and object to the question. And I think the witness would have a right to consult with an attorney before anybody is retained to go through her

Page 54

personal e-mail account.
MR. BENNETT: Absolutely.
MR. BAUMBERGER: So, I just want to make sure the witness is aware of her rights.
THE WITNESS: Okay. I don't know my rights, so --
MR. BENNETT: Okay.
THE WITNESS: -- I guess I would go through an attorney, sure.
MR. BENNETT: Okay.
THE WITNESS: And whatever, you know.
MR. BENNETT: All right.
THE WITNESS: Can we take a short break?
MR, BENNETT: Sure.
(Whereupon, a break was taken at 11:01 a.m., after which the proceedings continued at 11:08 a.m.)
MR. BENNETT: Let me show you what was marked as Exhibit 2, which are e-mails that you brought with you to your deposition today.
THE WITNESS: Okay.
BY MR. BENNETT:
Q How did you search your Gmail to find these e-mails?
A Again, anything that's currently on there, I just -- you know, there's a search area where you can put

Page 55

names or words to search for specific things.
Q Search your e-mails, you mean? In the Gmail list, you're searching for names?
A Like, Fax87.
Also, since I know, exactly, the timeframe that I did what I did, I looked up the dates, and there was nothing on there on those dates.
Q Okay. So, this is everything that you found, you just printed out the e-mails?
A Yes. I don't have anything regarding the process with Fax87.
Q Okay. And were there other e-mails related to this litigation or your fax that you didn't print?
A Not in my personal, no.
Q And what is your personal e-mail?
A It's my first name, BirsenGoksu@Gmail.com.
Q And did you have another e-mail at USHEALTH Advisors?
A I did.
Q And did you search those, as well?
A I didn't even think about searching those, no.
Q Okay.
A And now I don't have access to them, since I left, so...
Q Okay. You're saying you no longer have access

Page 56

to any e-mails you sent or received at USHEALTH Advisors?
A No.
Q But your website is still up.
A Is it?
Q Your page is still up. Recently, I looked at it.
A Oh, okay. Well, I don't have an account with them. I can't personally log into the account.
Q I see.
And you can't log into Fax87 --
A Either, no.
Q -- now?
But you're still using your Gmail account --
A I am, yes.
Q -- that is advertised on the --
A Yes.
Q -- fax we were discussing?
MR. BENNETT: Can we mark this?
(Whereupon, Plaintiff's Exhibit Number 8 was marked for identification by the Court Reporter).
BY MR. BENNETT:
Q Can you identify what this document is?
A It's an Affidavit that Mike Suarez sent me.
Q Okay. And how did this document come to be sent to you? Did you request that he prepare an Affidavit for

Page 57

you?
A No.
Q Did you sign an Affidavit?
A No.
Q What was the purpose of this Affidavit being sent to you?
A I have no idea.
Q Okay. It was not explained to you?
A I guess this is just explanation of what I told them, you know, and they just wrote it down, and they wanted me to sign my statements of what I said.
Q Okay. And is it accurate, what they wrote down?
A It's very accurate.
Q Okay. But why did you decide that you didn't want to sign it?
A There were two things that I wanted that I thought it should be on there: One was, there were two $9.99 charges, not one, that I noticed on my bank statements. And the fact that I talked to Jim Hmielewski, as well.
Q And did they -- why isn't that information in this?
A Well, I was sick the last ten days. I was literally, like, in bed resting. And Mike tried to call me when I didn't sign this, and I didn't pick up. I mean,

Page 58

I was sleeping most of the days.
And, then, when he did call me, I think, which was yesterday, and I called him back -- no, I'm sorry. I called him back, for the first time, yesterday. That's when we decided to meet.
Q Okay. But not --
A But I also e-mailed him regarding those two things.
Q Okay. So, you decided to meet with Peter, not Mike, up here?
A I mean, they said that -- you know, he told me are you willing to meet? I said sure. And it was Peter, not Mike.
MR. BENNETT: The Defendants produced some e-mails to me.
(Whereupon, Plaintiff's Exhibit Number 9 was marked for identification by the Court Reporter).
BY MR. BENNETT:
Q Can you take a look at this and tell me if you've seen it before?
A Yes.
Q Okay. Could you read the date on this e-mail?
A February 25, 2015.
Q Okay. And it says it's from Debra Silva.
Do you know who she is?

Page 59

A No.
Q Okay. And it was to Lisa Silvia.
Do you know either one of them?
A (Indicating negatively).
Q Well, the main body of the e-mail is to -- from you to Jim Hmielewski.
A Uh-huh.
Q And the copy -- did you write this cc? Was this copied to you?
A That, I did not. I don't remember.
Q Who is Bill Shelton?
A He is one of the managers in our Orlando office -- or, was, when I was there.
Q All right. And Mara Brockman?
A Is my friend who --
Q Does she still work for USHEALTH Advisors?
A She does.
Q And what is her position today?
A I don't know.
Q And Taraina McCants?
A McCants.
Q Who is that?
A She is the regional manager, as far as I know.
Q The region being Florida?
A No. Region being, like, south region of the

Page 60

United States.
Q Okay. And is she based in Orlando?
A No. She's in Atlanta, Georgia.
Q And, then, you see Debra Silva is listed again?
A Debra Silva -- I mean, if Bill Shelton's on there, maybe -- I'm guessing -- she's another manager that I'm not really -- I wasn't very familiar with. I don't know.
Q And Travis Yoder?
A You know what, I think Travis Yoder is someone that I'm confusing with Troy McCoy [sic].
I think it was Travis that we were talking about earlier, not Troy. I don't know. I don't know which one is which.
Q Okay. Well, McQuagge signed the contract with you --
A Okay.
Q -- and it said he was a CEO, correct?
A So, I think Travis is the one I mentioned about who came to Orlando. I think that's who -- that's who he is.
Q From Fort Worth?
A Uh-huh.
Q Okay. All right. Well, what is this fax with these questions and these answers?

Page 61

A These were questions that wanted -- they wanted me to answer --
Q Who --
A -- and I didn't.
Q Who wanted you to answer?
A I guess, Jim originally sent me this e-mail. To be honest, I don't remember this. And I don't have this on my e-mail records.
Q So, in blue, there are numbered questions.
A Right.
Q And you think Jim Hmielewski was the one asking you these questions?
A No. I think he's the one who sent me the original e-mail.
Q Okay. So, you cut and pasted the answers.
And this e-mail is from you to Jim, giving him the answers he wanted?
A All I did is answer the questions.
Q Right, right.
But this e-mail is from you to Jim, with copies to the other people?
A Right. So, probably, what I'm guessing is, if Jim is the one who sent me the original questions that had these people, I just probably respond to all.
Q Okay. In answer to Number 3, you say that

Page 62

you -- you "talked to Fax87, and they offered me a product that would be a good fit."
What do you mean by "a product"?
A That actually would do what I wanted to do, is be able to fax things out.
Q Okay. Just to upload fax numbers with a flier --
A Brochure or flier.
Q -- and they would send it for you.
So, they were recommending a price and a number to you --
A Yeah. I mean, they were --
Q -- that you could --
A -- basically could accomplish the idea that I had.
Q And in answer to Number 5, you said that you copied the -- "copied and paste the information from our website, as you probably have noticed."
Is that correct?
A Yes.
Q That's all the information you gave.
And you still stand by those answers? You wouldn't correct anything?
A The only thing I -- again, I did not mention on here -- yes, nobody approved it, nobody saw it. That's --

Page 63

I mean, that was -- is Number 4.
It was my idea completely. And I didn't know it was illegal or anything. But I did tell Jim Hmielewski what I was doing, like, as far as the idea.
MR. BAUMBERGER: For clarification, you did or did not know it was illegal?
THE WITNESS: I did not know it was illegal.
(Whereupon, Plaintiff's Exhibit Number 10 was marked for identification by the Court Reporter).
BY MR. BENNETT:
Q Let me hand you Exhibit 10, which is an e-mail from Jim Jackson to Peter Baumberger and Michael Suarez dated November 25, 2015.
Do you remember this e-mail?
A Yes.
Q There's no message here.
Was there a message that you were responding to?
A That, I don't know, to be honest. I don't remember.
Q Well, you say, at the bottom, here, it says from you to Jim Jackson.
A Uh-huh.
Q Okay. Did you send that?
A I did, yes.
Q Okay. And could you read it over and tell me if

Page 64

that -- you believe that's still accurate information?
A I just chatted with them and found that I used my fax number, 407-930-9234: "Since the account has been canceled back in February, I no longer can log back into that account, no longer exists, so I have no record of who I sent the fax to. I had signed up back in January 28, and it was canceled on February 28. I checked my bank account, and they charged 9.99, and there's no additional charge. That tells me that I did not go over 30, since it was 30 for 9.99, and plus additional fees for more."
Q Okay. When you say you "chatted with them," they have an online chat where you do it on your keyboard?
Is that --
A No.
Q -- what you mean by chatted, or do you mean you had a telephone conversation?
A I had a telephone conversation.
Q Okay. And, then, there's another message on November 25, where you advised that Fax87 gave you the fax number that's on the fax.
Is that --
A I checked all my e-mails, but I have no other -- (witness mumbling) -- yes.
Q That's correct, Fax87 gave you the number that appears on the fax, and you uploaded them --

Page 65

A When I called them?
Q Yes.
A I don't remember how I got that information, to be honest. Most likely they did, I don't know.
(Whereupon, Plaintiff's Exhibit Number 11 was marked for identification by the Court Reporter).
BY MR. BENNETT:
Q This is Exhibit~11, which is an e-mail from you to Mike Suarez dated February 4.
A Uh-huh.
Q Okay. Is that information correct that you sent to Mike?
A Yeah. This is an e-mail that I sent to Mike, yes.
Q And is the content -- you wouldn't change anything? That's still your testimony today?
A Yes.
MR. BENNETT: If you'll give me one second.
MR. BAUMBERGER: Sure. I can start looking at the exhibits, because I'm going to have some questions.
(Whereupon, Plaintiff's Exhibit Number 12 was marked for identification by the Court Reporter).
MR. BENNETT: Exhibit 12 was produced by the Defendants.

Page 66

BY MR. BENNETT:
Q Have you ever seen this document before, from Freedom Life Insurance Company of America?
A Not like this, but I do have a letter or a little package from them saying this.
Q Saying what?
A The termination date.
Q So, were you terminated by Freedom Life Insurance Company?
A I don't know, to be honest. I didn't even look at the --
Q Did you ever work for Freedom Life Insurance Company?
A Not that I'm aware of, no.
Q So, were you terminated by USHEALTH Advisors?
A I should be, because that's who I worked for.
Q Well, your testimony was you resigned because you wanted to have a fixed income rather than a --
A Right.
Q -- commission income; is that right?
A Yes.
Q You were not fired by USHEALTH --
A I was not fired.
Q -- is that correct?
No one at the company said: As a result of

Page 67

these faxes, we are going to --
A No.
Q -- discontinue your employment?
A No.
Q This was totally your idea?
A It was completely my idea.
Q And it wasn't related to any complaints about your fax?
A Not at all, no.
Q And is this the date, 11/21/2015, that you resigned?
A I guess, when -- no. I told my friend, on September 19, at a dinner, that I wanted to resign, that I didn't want to work with her or the company.
Q Who is your friend?
A Mara Brockman.
Q Was this a company-sponsored dinner?
A No. It was -- we were just celebrating my husband's birthday.
Q So, you said September 19 --
A (Indicating affirmatively).
Q -- you told her you wanted -- and it was just -- took awhile for the --
A Um, yeah, it did. I mean, I was still actively working. I still had clients and, you know, things like that.

Page 68

MR. BENNETT: I have no further questions for you.
MR. BAUMBERGER: I've got a few questions.
I apologize if I go over some of the same stuff, but I just want to try and put everything in order here.

CROSS-EXAMINATION

BY MR. BAUMBERGER:
Q My understanding is that your agency relationship with USHEALTH Advisors was approximately two years; is that right?
A Yes.
Q And I believe we've already marked it: Exhibit 4 is a copy of the contract which contained the terms and conditions of your agency relationship with USHEALTH Advisors; is that right?
A Yes.
Q And was your agency contract with USHEALTH Advisors or with USHEALTH Group?
A Advisors.
Q All right. Did you ever have any contracts or agreements specifically with USHEALTH Group?
A Not that I'm aware of, no.
Q And do you specifically know who or what

Page 69

USHEALTH Group is, specifically or legally?
A No.
Q I believe that you testified that you left on your own volition and you were not fired --
A Yes.
Q -- is that correct?
A Correct.
Q All right. And when you did have the agency relationship with USHEALTH Group, did you understand that you were an independent contractor for -- strike that.
When you did have your agency relationship with USHEALTH Advisors, did you understand that you were working as an independent contractor with that company?
A Yes.
Q And I believe you were asked some questions about leads, and generating applications and enrollments.
A Yes.
Q And my question is:
Did you generally use your own judgment in generating or soliciting applications or enrollments?
A What does that mean?
Q I mean, is that work that you performed on your own, for the most part, in seeking out leads and trying to enroll new applicants?
A I mean, yeah, you're self-employed, so that's

Page 70

what you do.
Q And I believe you testified that you worked off commissions?
A I did.
Q And let's talk, again, about the -- this fax ad. I'm going to hand you Exhibit 7.
Exhibit 7 is the fax that's the basis of the lawsuit, that's why we're here --
A Okay.
Q -- is that correct?
A Yes; as far as I know, yes.
Q All right. And I believe you testified that you're not aware of anybody who's associated with USHEALTH Advisors that ever recommended to you or gave you the idea of sending out faxes; is that --
A No.
Q Okay. The idea to send out this particular fax, which is marked as Exhibit 7, whose idea was that?
A Mine.
Q And the information that's contained on that particular advertising page on Exhibit 7, is that a page that you created on your own?
A Yes.
Q And I believe that you testified that you did not show that to anybody before you sent the fax out; is

Page 71

that correct?
A Yes. As far as I remember, yes.
Q And I just want to ask you a few more questions about how the process worked with the faxing.
I believe you testified that you located a company, called Fax87, online?
A Uh-huh, yes.
Q Was that through, purely, internet research?
A Yes, Googled.
Q That you did on your own?
A Yes.
Q And the way you described the process, am I correct in understanding that you had to actually input fax numbers onto the website that were eventually faxed out?
A Yes.
Q And you mentioned that you located these fax numbers on a website?
A Manta.com, yes.
Q Did you keep any notes or did you save any pages that would indicate what fax numbers were used?
A No.
Q Do you have any record whatsoever of where you obtained these fax numbers or any record of -- that identifies the fax numbers?

Page 72

A No.
Q Do you have any identification or records that identify the names of the individuals or businesses that you were attempting to fax this information to?
A No.
Q I'm going to hand you -- you brought with you some e-mails that you were able to locate. And I guess my first question is:
All the e-mails that you were able to locate on your own, have they been marked as Defense Exhibit -- or, Plaintiff's Exhibit 2?
A Yes.
Q Let me take a look at that again real quick.
A (Witness complies).
Q Defense Exhibit 2 are the e-mails that you brought with you here today?
A I think so, yes.
Q And I just want to make sure that I'm understanding the order of e-mails that you have here.
From what I can tell, it looks like the older e-mails are in the back of this exhibit, Exhibit 2, and then the newer ones are moved forward from the last page; is that correct?
A Um, this is separate from all of this (indicating), because I think this is between me and

Page 73

Mr. Jackson here.
Q But taking a look at the last page of Exhibit 2, is that the oldest e-mail?
A Yes, it is.
Q Okay. And that refers to a communication that took place in 2013?
A Yes.
Q And, then, from my review of these records, the next oldest e-mail is the next -- second page from the bottom; is that right?
A I'm sorry, say that again.
Q Sure.
From my review of this exhibit, Exhibit 2, the second oldest e-mail is the second one from the bottom; is that right?
A There's no date on here.
Q If you look at the next page, I think it starts at the bottom.
A November, yes.
Q And what's the date and time of this e-mail?
A November 25, 2015.
Q Okay. And, then, is this an e-mail that you wrote to Jim Jackson?
A Yes.
Q All right. And does it appear that it's in

Page 74

response to any e-mail, or is it just an e-mail that appears that you just wrote?
A I think this is what I wrote to him.
Q Let me take a quick look at that e-mail.
A (Witness complies).
Q And in this e-mail that you sent to Jim Jackson on November 25, 2015, at 1:51 p.m., are you describing your efforts in locating records that relate to the faxing that you were involved in?
A Yes.
Q Okay.
A Yes.
Q And everything that's contained within this e-mail that you wrote Mr. Jackson on November 25, 2015, at 1:51 p.m.; is that correct?
A Yes, it is.
Q Okay. And it looks like the next e-mail that you sent, according to the records that you brought -- well, strike that.
It looks like Mr. Jackson responded to the e-mail that we just discussed, and said: "Thanks for your assistance. Let me know if you happen to run across anything"; is that correct?
A Yes.
Q Then your next e-mail is dated November 25,

Page 75

2015, at 3:14 p.m.
A Yes.
Q And you're now responding to Mr. Jackson's previous e-mail, who's thanking you for your assistance and asking you to let him know if you run across anything; is that right?
A Yes.
Q My question is: Here, you -- this is the e-mail that you've previously been asked about, but it starts off, "I just chatted with them and found out that I used -- my fax number is 407-930-9234."
That's how your e-mail begins?
A I guess, yes.
Q Okay. And my question is:
When you were saying "I just chatted with them," who are you referring to, Fax87?
A Fax87, uh-huh.
Q So, you specifically contacted them to see if they had any records of --
A I did.
Q -- the faxing?
And what did they tell you?
A That, again, since I canceled my account, there was no record that I could go back to.
Q Okay. In looking, again, at Exhibit 2 -- and

Page 76

I'm referring to your e-mail of November 25, 2015, at 3:14 p.m. This one right here (indicating).
A Okay. What about it?
Q Towards the end of that e-mail, you reference the fact that you went back and checked your bank account?
A Yes.
Q And you mentioned a charge for 9.99?
A Yes.
Q And then you say that, "There is no additional charge"; is that right?
A I checked my bank account and they charge- -- yes.
Q But you did find, in your bank records, that there were two charges?
A Of 9.99, yes.
Q Then you have a note here: "That tells me that I did not go over 30, since it was 30 for 9.99, plus additional fee for more."
A Yes.
Q So, based upon your recollection of when these faxes were sent out, was it your understanding that 30 faxes would be sent for the price of 9.99?
A Yes.
Q That was your recollection of what the charges were, back when you performed the faxing?

Page 77

A As far as what I remember, yes.
Q Okay. And do you have a personal recollection of sitting at the computer, back at the time that you inputted the fax numbers, and inputting a humongously [sic] large number of faxes --
A No.
Q -- hundreds or thousands?
A No. That's impossible, I didn't have time for that.
Q So, just based upon -- I know you testified that you don't remember exactly how long this took, but based upon your recollection of, at least, the time that you took inputting numbers, do you think the numbers are closer to 30 or much more?
A Honestly, I don't know. I really don't know.
This is an extra way for me to get prospects. It wasn't -- like, it's just the extra time that I had. My main ways were calling, and other ways, not this. This was just if I had free time, that's when I did it, until I was warned.
Q All right. But do you have a recollection of researching hundreds of fax numbers on Manta, and inputting --
A No.
Q -- hundreds of fax numbers?

Page 78

A No. It can't be hundreds, I know that.
Q All right. And as you sit here today, is there any way for you to confirm the identity of people or businesses that you sent a fax to, or the fax numbers that you sent faxes to, back at the time that you sent Exhibit 7 through the Fax87 website?
A No.
Q In taking a look at Exhibit 9 -- you were asked some questions about Exhibit 9. I believe you testified that Exhibit 9 is an e-mail that you sent on February 25, 2015, at 8:46 a.m. --
A Uh-huh.
Q Is that right?
A I guess, yeah.
Q That was just over a year ago?
A Uh-huh, yes.
Q Okay. And in taking a look at these questions -- just to go through a couple.
In response to Question 1:
Did you indicate that you found an E-fax company online?
A Yes.
Q And, then, in response to Question 3, you identify how you found Fax87?
A Yes.

Page 79

Q And how did you find them? What do you reference?
A Google. I don't know if it's on here.
Q Okay.
A I found -- yes, it is, Google search.
Q Looking at a series of questions which was Number 4, which begins: "Who authorized this agent to do this? We don't -- we obviously do not authorize any fax blasts, so I'm concerned about whether this was a lone wolf or whether this practice is being encouraged in a particular region."
What was your response to that particular question?
A I took full responsibility that it was my idea and I didn't ask anybody.
Q Okay. Then, taking a look at your response to Question 5, Question 5 had a series of questions, which begins: "Where did the form of the ad used come from?"
What was your response to Question 5?
A That I personally created the ad myself. I copy/paste information from our website, and no one approved the flier, from my leaders, they didn't even know I was doing this.
Q So, in looking at your answer to Question 5, which was sent about a year ago, in this response, you

Page 80

specifically stated that nobody approved of the flier and that they didn't know you were doing this, correct?
A Yes.
Q All right. But now you're saying that you did have a conversation with Mr. Jim Hmielewski --
A Yes.
Q -- is that right?
A Yes.
Q But that testimony, you'll agree, is inconsistent with your answer to --
A Yes.
Q -- Number 5?
A I see that.
Q And when you answered Question 5, that was a little bit closer in time to when the faxes actually were sent out; is that correct?
A It is, yes.
Q And the Affidavit that we provided you, which is Exhibit 8 --
A Uh-huh.
Q -- did you get a chance to review this?
A I did.
Q Okay. And is that consistent with the answers that you provided in your e-mail of February 25, 2015, at 8:46 a.m.?

A Yes, yes.
Q Okay. You were asked some questions about the fact that you had a conversation with Jim following a complaint?
A Yes.
Q All right. And I believe you testified that you don't recall the identity of the person who complained?
A No.
Q All right.
A I mean, I don't remember the conversation exactly.
Q Do you know if it was the Plaintiffs who are suing in this case?
A It could be, possibly.
Q Just a couple of questions about Jim Hmielewski.
Do you know what his specific title was with USHEALTH Advisors back when you worked there? Do you recall the specific title he had?
A All I know is, like -- again, there's a ladder. So, he was, like, the division manager.
Q But do you know what his -- I mean, have you had a chance to review his contract or --
A No.
Q -- agreement?
A No.



Q All right. So, do you specifically know what his, you know, legal job title and obligations were with the company?
A No.
Q Just taking a quick look at -- let's go over your contract really quickly. I think it's Exhibit -- you've got it there.
Is that Exhibit --
A It's 4.
Q -- 4. All right. Just to go over a few of the terms of the contract.
This is the contract -- Exhibit 4 is the agreed-upon terms and conditions of your agency relationship with USHEALTH Advisors during the time that you were associated with this company; is that right?
A Yes. I tried to find a copy, but I couldn't, last night. So, I don't know if this is --
Q But does this appear --
A Yes.
Q -- to be the agreement?
A It does.
Q In taking a look at the first paragraph, Section A, does this reference that you were an independent contractor for USHEALTH Advisors?
A Yes.



Q Taking a look at Page 4, if you will, for a second --
A Page 4?
Q Yes.
A Okay.
Q -- of Exhibit 4.
Taking a look at Section 4, which discusses your responsibilities as an agent; is that right?
A Yes.
Q All right. And the very first paragraph here says: "Agent, at all times, shall comply with all of USHEALTH Advisors' rules and regulations, as such may be amended from time to time, and with all laws and regulations of the states in which agent solicits business."
A Okay.
Q Is that what it says?
A Yes.
Q And was that one of the obligations or responsibilities that you had as an agent, per the agreement?
A Yes. I mean -- yeah.
Q Okay. Do you recall receiving -- when you first associated with the company, do you recall receiving any memos or materials that talked about the company policies



and things of that nature?
A Yes.
Q Do you recall all the particulars that were contained in those agreements or memos?
A I usually don't read things like that.
Q Understood, understood.
A No, I don't know.
Q Okay. And, then, taking a look at the last paragraph here of Section 4, which is entitled, "Responsibilities."
Did this also require the agent to comply with all laws and regulations of the states in which agent solicits business?
A That's what it says, yes.
Q And I believe that you testified that at the time that you sent out the faxes, you didn't know that unsolicited faxes were not legal; is that correct?
A I did not know that, yes.
Q Did not know. All right.
And, then, taking a look at Exhibit 5 -- or, Section 5, which is entitled, "Term" --
A Uh-huh, yes.
Q -- taking a look at the first paragraph, does Section 5 contain the list of offenses that could result in the termination of the agreement?

A Can you just give me a minute?
Q Sure.
A Okay.
Q Yes?
A Yes.
Q All right. And taking a look at the list, there's several examples of conduct that could result in the termination of the agreement.
It's listed A through J; is that right?
A Yes.
Q All right. And Section D states the following: "Published, distribute or use any circulars, advertising, sales material or other material -- or, other matter referring to USHEALTH Advisors, or to policies, coverage, products, the benefits or services of carriers, including the name of any applicable insurance carrier, without first securing the written approval of USHEALTH Advisors and each applicable carrier."
Do you see that?
A Yes, I do.
Q So, does this indicate that before you do any advertising, you were required to first secure written approval?
A Yes.
Q Did you do that before you sent out the fax at



issue in this case?
A No, I did not.
Q All right. And taking a look at Exhibit -- or Section 19, which is on Page 11 of the same agreement --
A Okay.
Q -- did you specifically agree, pursuant to Section 19, that you would not use any advertisements referring to USHEALTH Advisors without first securing USHEALTH Advisors' written approval?
A I see that on here, yes.
Q That was one of the agreements that you had, pursuant to this contract?
A Again, I don't -- I didn't read the contract, and I couldn't find the contract, so I don't know.
Q Understood.
But that is contained in your contract?
A Yes.
Q And, again, before you sent out that fax, did you ever receive written approval from USHEALTH Advisors?
A No, I did not.
MR. BAUMBERGER: Just a few other questions.
BY MR. BAUMBERGER:
Q With respect to the faxing that was sent through Fax87, did anybody contact you directly, that you can recall, following that?



A No.
Q Now, I believe that you mentioned that, on occasion, in your practice -- strike that.
During the time that you were associated with USHEALTH Advisors, I believe that you testified that sometimes you had conversations with leads who asked you to fax information to them?
A Yes.
Q And, in those cases, they were inviting you to send faxes?
A Information, yes.
Q With respect to the -- any of the fax numbers that you sent, do you know whether or not any of those fax numbers were associated with companies that had asked you to send them fax information?
A Possibility, but I don't know.
Q So, that's possible, but you don't have any way to verify?
A No, I do not.
Q But are you certain that, from time to time, you were requested by certain companies or individuals to send them fax information?
A Yes.
Q And did you keep track or a note of the identities of those individuals, or companies, or their



fax numbers?
A No, not at that time.
Q When you spoke with Fax87 about this program that they were offering, did they give you any training or guidance?
A No, not over the phone. And I don't know if they had anything available on their website, to be honest.
Q Did they caution you against entering numbers of anybody that you had no relationship with?
A What do you mean?
Q Did they caution you against entering fax numbers on their page, for businesses or individuals that you had no prior established business relationship with?
A No, they did not.
Q And as you sit here today, with respect to any faxes that were sent as a part of this process, do you have any way of knowing which of those faxes went through and which of them did not go through?
A I have no idea.
MR. BAUMBERGER: May I have just a moment?
MR. BENNETT: Sure.
(Whereupon, a break was taken at 11:54 a.m., after which the proceedings continued at 11:59 a.m.)
MR. BAUMBERGER: Let's just take a look again at

Page 89

Exhibit 2. And I'm referring specifically to the e-mail that you sent on -- to Jim Jackson on November 25, 2015.
BY MR. BAUMBERGER:
Q What was -- back at that point in time, which was over a year ago, what was the number of faxes that you estimated that you sent pursuant to this e-mail?
A Thirty or less.
Q Okay. And I know you've testified that you don't know for sure, but best -- to your best recollection, is that the number that you believe were sent or attempted to be sent to the website?
A Yes. I mean, as far as the membership with Fax87, I think that's what I signed up for, 30 or -- for a month, for 9.99.
Q So, you believe that 9.99 bought you 30 faxes?
A Yes.
Q But that didn't confirm that they would actually go through?
A No.
Q All right. And the money that you spent to pay for 9.99 to Fax87, was that something that you paid for personally?
A Yes.
Q Were you reimbursed that by the company?

Page 90

A No.
MR. BAUMBERGER: I have no further questions at this time. Thank you.
MR. BENNETT: No.
MR. BAUMBERGER: Very good.
CONTINUED CROSS-EXAMINATION
BY MR. BAUMBERGER:
Q Is there anything sensitive -- I mean, I don't think anybody's going to be looking at this, but is there anything sensitive on these bank statements?
A No.
Q Is there any account number -- let me see.
I don't even see an account number on here, because I think that would probably be the only thing that would be sensitive.
A Can I take a look, just in case?
(Counsel tenders bank statement to witness).
MR. BENNETT: Oh, I have one more question, I'm sorry.
THE WITNESS: No, that's fine (indicating bank statement).
MR. BAUMBERGER: I had a question about your e-mail address.
THE WITNESS: Okay.
BY MR. BAUMBERGER:

Page 91

Q In taking a look at the fax that you sent --
A Uh-huh.
Q -- I think it's Exhibit 7 or, maybe --
A 7?
Q Yes.
Which e-mail address did you provide on there, your --
A Personal.
Q -- Gmail?
A Yes.
Q Is that the one that you typically used back at the time that you were associated with the company?
A Yeah. For the most part I did, yes.
Q All right. Is that the one that's associated with your Linkedin account?
A Currently, yes.
MR. BAUMBERGER: I've got no further questions.
REDIRECT EXAMINATION
BY MR. BENNETT:
Q For the two charges that were made to Fax87, did you only send what you estimate to be 30 total, or 30 for each month that you were billed 9.99?
A I stopped within the first two to three weeks that I signed up for. So, I don't even know how I got the second charge. I should not have been, because I wasn't a

Page 92

member -- or, I wasn't active that period.
Q And when you went to Manta, did you copy and paste --
A The phone numbers?
Q -- just the fax number and paste it into the online thing?
A As far as I remember, yes.
Q Okay. So, you could do those rather quickly, if you were just going down the list of dentists, copying fax numbers back and forth?
A Well, it doesn't work like that. You don't go to Manta.com and look for businesses. You actually have to go to the website, if they have a website, and then look for their contact information, see if they have a fax provided. So, it is a long process.
MR. BENNETT: Okay, thank you. No further questions for me.
MR. BAUMBERGER: Me either. Okay, all done.
THE WITNESS: Are we good?
MR. BENNETT: Yeah.
MR. BAUMBERGER: You're all done. Oh, and reading and waiving, did you want to talk to her about that?
MR. BENNETT: Well, if you would like to see a copy of the written transcript of this, and read it

for accuracy, you have the right to do that, and change any of your answers if you believe they were inaccurately transcribed or if you remembered something differently than what you testified to.
THE WITNESS: I see.
MR. BENNETT: And you would probably have to come here and you could sign it --
THE WITNESS: At another time?
MR. BENNETT: -- and make any changes. Well, they would notify you, if you wish to, when it was available, and give you a time period to come in before they do that.
THE WITNESS: Sure, that's fine.
MR. BAUMBERGER: You can reserve the right and then make the decision later, I think, too.
MR. BENNETT: Right.
THE WITNESS: Sure.
MR. BENNETT: But they will notify you, if you ask them to, of when it's ready.
THE WITNESS: Okay.
THE COURT REPORTER: Can I have a contact phone number?
THE WITNESS: Sure: 407-450-3499.
THE COURT REPORTER: Thank you.
(Whereupon, the deposition concluded at



12:04 p.m.)

STIPULATION

It is hereby stipulated and agreed, by and between counsel present at this deposition, that the reading and signing of this deposition would be reserved.



DEPOSITION ERRATA SHEET

Our Assignment No. J0323573
Case Caption: Bagg, et al. vs. USHEALTH Advisors

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter, or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of ___________, 20___.

______________________________
BIRSEN GOKSU-SAVLUK



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________

SIGNATURE:_______________________DATE:___________
BIRSEN GOKSU-SAVLUK

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

_________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:______________

_________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:______________

_________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:______________

_________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:______________

_________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:______________

_________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:______________

_________________________________________________

Reason for change:__________________________________

SIGNATURE:_______________________DATE:____________

BIRSEN GOKSU-SAVLUK



CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF SEMINOLE

I, THE UNDERSIGNED AUTHORITY, CERTIFY THAT THE WITNESS NAMED HEREIN PERSONALLY APPEARED BEFORE ME AND WAS DULY SWORN BY ME.

WITNESS my hand and official seal this 25th day of March, 2016.

Trina Semino

NOTARY PUBLIC STATE OF FLORIDA
TRINA SEMINO
MY COMMISSION # EE 844836
EXPIRES: February 18, 2017
Bonded Thru Budget Notary Services

TRINA SEMINO, RPR
Court Reporter and
Notary Public
My Commission Expires:
February 18, 2017
#EE 844836



CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF SEMINOLE

I, TRINA SEMINO, REGISTERED PROFESSIONAL REPORTER, CERTIFY THAT I WAS AUTHORIZED TO AND DID STENOGRAPHICALLY REPORT THE FOREGOING DEPOSITION; AND THAT THE FOREGOING TRANSCRIPT IS A TRUE RECORD OF THE TESTIMONY GIVEN BY THE WITNESS.

I FURTHER CERTIFY THAT I AM NOT A RELATIVE, EMPLOYEE, ATTORNEY, OR COUNSEL OF ANY OF THE PARTIES, NOR AM I A RELATIVE OR EMPLOYEE OF ANY OF THE PARTIES' ATTORNEYS OR COUNSEL CONNECTED WITH THE ACTION, NOR AM I FINANCIALLY INTERESTED IN THE ACTION.

DATED THIS 25TH DAY OF MARCH, 2016, AT SEMINOLE COUNTY, FLORIDA.

Trina Semino

TRINA SEMINO, RPR
Notary Public-State of Florida
Commission Number: EE 844836
Expires: February 18, 2017



NOTICE TO READ AND SIGN DEPOSITION

IN RE: DEPOSITION OF BIRSEN GOKSU-SAVLUK
BIRSEN GOKSU-SAVLUK
C/O PETER S. BAUMBERGER, ESQUIRE
KUBICKI, DRAPER, P.A.
25 WEST FLAGLER STREET, PENTHOUSE
MIAMI, FLORIDA 33130

WALTER BAGG/COOPER LAW, ET AL., VS. USHEALTH ADVISORS, LLC

Enclosed, please find a notice of reading & signing of the above-referenced deposition in which you and/or your attorney have indicated that you wish to read. It is imperative that you read and sign your transcript immediately so that any necessary corrections can be supplied to all requesting parties. Please contact this office within 14 days of receipt of this letter to set up a convenient time for you to come to my office and read your deposition. After 30 days, you will forfeit your right to read.

Please note, if your case settles, you MUST still complete reading and signing of transcript. We thank you in advance for your assistance and cooperation in this important matter.

Sincerely,

Production Department of:
Esquire Deposition Solutions
200 East Robinson Street, Suite 725
Orlando, Florida 32801
(407) 426-7676

cc: Richard Bennett, Esquire

## $

**$10** 41:24 46:17 49:19
**$50** 46:20
**$500** 45:17
**$9.99** 57:18

## -

**--I** 40:11

## 1

**1** 4:11 6:2 78:19
**1-800** 40:11
**1/27/2015** 37:14
**10** 63:8,11
**100-percent-commission** 27:10
**11** 65:5 86:4
**11/21/2015** 67:10
**11:01** 54:15
**11:08** 54:16
**11:54** 88:23
**11:59** 88:24
**12** 65:22,24
**12:41** 37:14
**13th** 13:25 14:1
**19** 67:13,20 86:4,7
**1:51** 74:7,15

## 2

**2** 7:24 54:18 72:11,15, 21 73:2, 13 75:25 89:1
**20** 19:12,14
**2000** 12:16
**2006** 12:16
**2007** 16:5
**2013** 26:24 73:6
**2014** 20:14
**2015** 6:2 26:24 42:5,6 44:2 58:23 63:13 73:21 74:7,14 75:1 76:1 78:11 80:24 89:3
**21** 13:12 14:5
**25** 58:23 63:13 64:19 73:21 74:7,14, 25 76:1 78:10 80:24 89:3
**27** 6:22,23 7:11
**28** 64:6,7

## 3

**3** 7:23,25 61:25 78:23
**30** 41:9,23 43:13,14 64:9,10 76:17,21 77:14 89:14,16 91:21
**31** 6:2
**33** 41:13
**3:14** 75:1 76:2

## 4

**4** 17:1,4 63:1 65:9 68:15 79:7 82:9,10, 12 83:1, 3,6,7 84:9
**4.99** 42:11,15
**40** 42:12
**407-450-3499** 93:23
**407-930-9234** 37:16 64:3 75:11

## 5

**5** 28:7,10 62:16 79:17,19, 24 80:12, 14 84:20, 21,24
**5.99** 42:13
**50** 42:11,15

## 6

**6** 29:20
**6.99** 42:9
**65** 19:15 20:13

## 7

**7** 30:20,24 70:6,7, 18,21 78:6 91:3,4

## 8

**8** 56:19 80:19
**800** 48:17
**804** 19:21
**866-698-4068** 7:2
**8:46** 78:11 80:25

**9**

**9**
58:16
78:8,9,10

**9.99**
40:25
41:8,10
64:8,10
76:7,15,
17,22
89:15,16,
22 91:22

**A**

**a.m.**
37:14
54:15,16
78:11
80:25
88:23,24

**Absolutely**
54:2

**Accepting**
35:10

**access**
33:5 53:8
55:23,25

**accident**
23:13

**accomplish**
62:14

**accomplishm ents**
36:21

**account**
5:19,21,
22 7:19
33:4
38:12
48:21
50:14
51:4,5,10
54:1
56:7,8,13
64:3,5,8
75:23
76:5,11
90:12,13
91:15

**accuracy**
93:1

**accurate**
57:12,13
64:1

**active**
30:16,17
92:1

**actively**
67:24

**actual**
29:16

**ad**
28:13
51:12
70:5
79:18,20

**addition**
23:12

**additional**
41:1,10
64:8,10
76:9,18

**address**
5:8 8:18
19:20
90:23
91:6

**advertised**
56:15

**advertiseme nt**
8:10
29:13,14

**advertiseme nts**
86:7

**advertising**
29:6
42:5,8
70:21
85:12,22

**advised**
64:19

**adviser**
15:1

**advising**
42:11

**Advisor**
19:23
28:17
29:5
34:13

**Advisors**
8:8 11:3
14:11,12,
19 15:4,
12,21,24
16:1,12
17:18
22:24
25:5,6,9
26:23
27:19
28:4 29:3
31:4 33:4
34:11
46:5
55:18
56:1
59:16
66:15
68:11,17,
20,21
69:12
70:14
81:17
82:14,24
85:14,17
86:8,19
87:5

**Advisors'**
32:23,24
83:12
86:9

**affect**
45:20

**Affidavit**
6:4
56:23,25
57:3,5
80:18

**affirmative ly**
8:11
27:20
67:21

**affordable**
41:22

**afternoon**
11:18

**agency**
68:10,16,
19 69:8,
11 82:13

**agent**
17:12
22:17,18,
19 23:19
33:3,4
34:13
79:7
83:8,11,
14,20
84:11,12

**agents**
20:25
22:1
25:12

**agree**
80:9 86:6

**agreed-upon**
82:13

**agreement**
17:12,13
53:16
81:24
82:20
83:21
84:25
85:8 86:4

**agreements**
68:23
84:4
86:11

**amended**
83:13

**America**
66:3

**amount**
6:11
41:2,3
46:16,21

**answers**
60:25
61:15,17
62:22
80:23
93:2

**anybody's**
90:9

**apologize**
68:5

**apologized**
45:14

**appears**
64:25
74:2

**Apple**
52:3,4

**applicable**
85:16,18

**applicants**
69:24

**applications**
33:5
69:16,20

**appointment**
26:10

**approval**
85:17,23
86:9,19

**approved**
62:25
79:22
80:1

**approximately**
11:7
68:11

**area**
54:25

**arrive**
20:20
31:9

**assigned**
48:23

**assignment**
53:19

**assistance**
74:22
75:4

**associate**
13:7

**association**
23:14

**assuming**
7:5

**Atlanta**
11:25
12:2
14:10
60:3

**attached**
7:17

**attempted**
89:12

**attempting**
72:4

**attitude**
9:25 10:2

**attorney**
8:22
53:25
54:9

**authorize**
79:8

**authorized**
79:7

**Avenue**
19:22

**awards**
36:20
37:1,2

**aware**
20:15
23:5 54:4
66:14
68:24
70:13

**awhile**
67:23

**B**

**back**
27:9
38:12
42:5,23
51:4
58:3,4
64:4,6
72:21
75:24
76:5,25
77:3 78:5
81:17
89:5
91:11
92:10

**background**
11:23

**bank**
4:25 5:18
6:9 8:3
48:15
57:18
64:7
76:5,11,
13 90:10,
17,20

**banking**
5:6

**base**
27:8

**based**
17:21
27:10
60:2
76:20
77:10,11

**basically**
10:12,21
15:23
23:22
25:4
49:17
62:14

**basis**
70:7

**Baumberger**
5:5,11
7:20 8:12
10:4 30:9
42:25
50:4
53:22
54:3
63:5,12
65:19
68:4,9
86:21,22
88:21,25
89:4
90:2,5,7,
22,25
91:17
92:18,21
93:14

**BBB'S**
36:14,15

**bed**
57:24

**begins**
75:12
79:7,18

**behalf**
11:4

**believed**
41:17

**benefits**
85:15

**BENNETT**
4:6,13
5:9,12,14
7:12,15,
21 8:2
10:10,22
17:3,5
28:9,11
29:19,22,
23 30:10,
19,22
43:2 50:7
54:2,7,
10,12,14,
17,21
56:18,21
58:14,18
63:10
65:7,18,
24 66:1
68:2
88:22
90:4,18
91:19
92:16,20,
24 93:6,
9,16,18

**Bill**
59:11
60:5

**billed**
91:22

**Birsen**
4:2,8,9,
14 5:15

**Birsengoksu@gmail.com.**
55:16

**birthday**
67:19

**bit**
11:10
40:20
42:17
80:15

**blasts**
79:9

**blue**
61:9

**body**
59:5

**born**
11:23,24

**bottom**
36:8,10
63:20
73:10,14,

18

**bought**
52:6
89:16

**break**
54:13,15
88:23

**bring**
4:19,23

**brochure**
31:14
33:17
34:17,20
62:8

**brochures**
33:5

**Brockman**
14:16
59:14
67:16

**brought**
4:25 5:2,
15 7:15
54:18
72:6,16
74:18

**bullet**
34:16,22

**business**
16:8
22:19,20,
21 26:1
32:11
33:24
36:24
38:9
52:11,12
83:15
84:13
88:14

**businesses**
25:14

31:20
38:6,9,22
39:3,6
72:3 78:4
88:13
92:12

**buy**
24:20,22

C

**calculate**
41:15

**call**
4:9 9:3
11:5,7,12
24:20
25:22
31:11
47:17,20
48:15
57:24
58:2

**called**
9:10 11:1
25:2,20,
22,23
38:5
44:23
45:1
48:15,17
58:3,4
65:1 71:6

**calling**
11:4
77:18

**canceled**
48:21
64:4,7
75:23

**cards**
33:25

**care**
27:17

**carrier**
85:16,18

**carriers**
85:15

**case**
5:1 8:6
9:23 10:3
50:21
81:13
86:1
90:16

**cases**
87:9

**categories**
22:14

**category**
22:16

**caution**
88:9,12

**celebrating**
67:18

**cents**
41:13

**Century**
13:12
14:5

**CEO**
18:20,23
60:18

**chance**
80:21
81:22

**change**
9:25
65:15
93:2

**changed**
42:17

**charge**
7:11
41:11
64:9
76:7,10
91:25

**charge-**
76:11

**charged**
64:8

**charges**
41:1
57:18
76:14,24
91:20

**chat**
64:12

**chatted**
64:2,11,
15 75:10,
15

**check**
5:17

**checked**
64:7,22
76:5,11

**checking**
5:19

**circulars**
85:12

**city**
22:2

**clarificati on**
63:5

**class**
15:8

**clients**
67:25

**close**
14:13

**closer**
77:14
80:15

**college**
12:3,4

**commission**
17:21
27:8
66:20

**commissions**
46:22
70:3

**communicati on**
73:5

**companies**
22:23
24:25
25:3
39:24
40:1
41:16
49:22
87:14,21,
25

**company**
6:12 10:7
13:9,16
14:3,21
15:5
16:14,22,
24 17:19
23:11
25:1
26:11,16
27:11,24
36:25
37:20
39:11
44:15,23
45:16
46:15
48:24

66:3,9, 13,25 67:14 69:13 71:6 78:20 82:3,15 83:24,25 89:25 91:12

**company-sponsored** 67:17

**compared** 41:16

**competition** 41:25 42:3

**complain** 44:17

**complained** 44:15 81:7

**complaining** 45:4

**complaint** 10:18 44:5,7, 11,14 45:17 47:20 81:4

**complaints** 67:7

**complete** 12:9

**completely** 63:2 67:6

**complies** 72:14 74:5

**comply** 83:11 84:11

**computer** 51:22 52:9,10, 22 53:11, 20 77:3

**concept** 23:23

**concerned** 79:9

**concluded** 93:25

**conditions** 35:11 68:16 82:13

**conduct** 85:7

**confidentiality** 53:16

**confirm** 78:3 89:18

**confusing** 60:11

**congratulated** 19:13

**congratulating** 19:1

**connection** 8:6

**consistent** 80:23

**consult** 53:24

**contact** 48:8 86:24 92:14 93:21

**contacted** 40:2 48:12 75:18

**contained** 28:21 68:15 70:20 74:13 84:4 86:16

**content** 34:4 65:15

**continued** 54:16 88:24 90:6

**contract** 16:24 17:10,16 60:15 68:15,19 81:22 82:6,11, 12 86:12, 13,14,16

**contractor** 69:10,13 82:24

**contracts** 68:22

**conversation** 19:6 32:8 40:21 43:3 44:4 64:16,17 80:5 81:3,10

**conversations** 87:6

**cooperate** 53:14

**copied** 34:9,10 35:3,14 36:11,12 39:7,10 49:20 59:9 62:17

**copies** 48:25 61:20

**copy** 4:14 5:16,17 6:4 38:12 47:3 59:8 68:15 82:16 92:2,25

**copy/paste** 32:22 34:7,8 36:1 79:21

**copy/pasted** 33:7

**copying** 33:13 39:12 92:9

**correct** 6:3 7:1 43:10,14 50:14 60:18 62:19,23 64:24 65:11 66:24 69:6,7 70:10 71:1,13 72:23 74:15,23 80:2,16 84:17

**correctly** 29:8 41:9

**correspondence** 5:4

**counsel** 90:17

**couple** 22:10 27:1 39:23 50:9,11 78:18 81:15

**court** 4:12 7:23 8:1 17:2 21:9 28:8 29:21 30:21 56:20 58:17 63:9 65:6,23 93:21,24

**cover** 46:8

**coverage** 23:13 85:14

**covered** 47:7

**create**
29:6
30:3,7
31:10,22
32:20

**created**
28:13
30:16
31:2,3,6,8 32:14,16 33:17
34:6
70:22
79:20

**Credit**
5:18 6:1

**critical**
23:13

**CROSS-EXAMINATION**
68:8 90:6

**customers**
47:10

**customized**
34:25

**cut**
46:18,21
61:15

D

**data**
29:1
53:19

**date**
31:7
33:12
37:8,10,11 58:22
66:7
67:10
73:16,20

**dated**
63:13
65:9
74:25

**dates**
6:15
55:6,7

**day**
33:9,18
50:8,9,10,12

**days**
50:2,12,13 57:23
58:1

**debit**
6:23

**debits**
8:4

**Debra**
58:24
60:4,5

**December**
11:10

**decide**
57:14

**decided**
33:10
39:24
58:5,9

**decision**
31:9
93:15

**deducted**
46:22

**Defendants**
58:14
65:25

**defense**
9:17,22
10:2
72:10,15

**degree**
12:8

**delete**
51:7

**deleted**
49:17
50:17,24
51:10

**dentists**
39:4 92:9

**deposition**
54:19
93:25

**describe**
5:19 22:8

**describing**
74:7

**desktop**
51:25
52:1

**details**
32:15,17

**determine**
38:3

**determined**
37:24

**developed**
42:22,24
43:5

**differently**
93:4

**dinner**
67:13,17

**DIRECT**
4:5

**directly**
86:24

**discontinue**
67:3

**discover**
39:17

**discuss**
9:22
10:11
32:3,6
43:4
47:25

**discussed**
32:18
47:12
74:21

**discusses**
83:7

**discussing**
56:17

**disposition**
8:25
10:17,18

**distribute**
85:12

**division**
16:17
21:16
22:2 43:3
81:20

**divisions**
21:23,24

**document**
17:3,6
39:7
56:22,24
66:2

**documents**
4:20,23
6:6

**downloaded**
28:14

**downtown**
19:19
20:2

**duly**
4:3

**duties**
23:18

E

**E-fax**
78:20

**e-mail**
4:18 21:6
29:16,17
36:10,13
49:5,7
54:1
55:15,17
58:22
59:5
61:6,8,14,16,20
63:11,14
65:8,13
73:3,9,14,20,22
74:1,4,6,14,17,21,25 75:4,8,12
76:1,4
78:10
80:24
89:2,7
90:23
91:6

**e-mailed**
58:7

**e-mails**
5:3,16
10:17
21:3
36:10,16
50:24
51:5

54:18,23 55:2,9,12 56:1 58:15 64:22 72:7,9, 15,19,21

**earlier** 60:13

**education** 11:23 12:1,2

**efforts** 51:1 74:8

**employed** 12:24

**employment** 14:9 67:3

**encouraged** 79:10

**end** 15:3 76:4

**enroll** 69:24

**enrollments** 69:16,20

**entering** 88:9,12

**entire** 12:18 20:7 33:17 47:23

**entitled** 84:9,21

**Erkan** 12:23

**error** 35:7

**established** 88:14

**estate** 13:5,7,12 33:24

**estimate** 91:21

**estimated** 89:7

**eventually** 16:13 71:14

**exact** 6:15 18:8 31:7 33:12 43:15 50:12

**EXAMINATION** 4:5 91:18

**examples** 85:7

**exceeded** 41:1

**exhibit** 4:11 7:13 17:1,4 28:7,10 29:20 30:20,24 54:18 56:19 58:16 63:8,11 65:5,22, 24 68:15 70:6,7, 18,21 72:10,11, 15,21 73:2,13 75:25 78:6,8,9, 10 80:19 82:6,8,12 83:6 84:20 86:3 89:1 91:3

**exhibits** 7:24 65:20

**Exhibit~11** 65:8

**exists** 64:5

**expensive** 40:6,7 41:18 42:18

**experience** 31:18

**explain** 32:13 46:11

**explained** 23:18 57:8

**explanation** 57:9

**extra** 41:10,11 77:16,17

**F**

**face** 34:18

**fact** 34:21 57:19 76:5 81:3

**factor** 40:5

**facts** 23:23 35:1,3

**fairly** 52:13

**Fairwinds** 5:18 6:1

**familiar** 60:7

**familiarity** 17:14

**fax** 6:12 8:10 11:14 26:18 29:16,18 31:13,20 32:11 37:22,25 38:11,12, 14,21 39:15,20 41:14,17 43:4,7 44:6,11, 19 45:17 47:21,25 48:4 49:20 53:19 55:13 56:17 60:24 62:5,6 64:3,6, 19,20,25 67:8 70:5,7, 17,25 71:14,17, 21,24,25 72:4 75:11 77:4,22, 25 78:4 79:8 85:25 86:18 87:7,12, 13,15,22 88:1,12 91:1 92:5,9,14

**Fax87** 8:4 39:13,17 40:6,8 42:4 44:1 48:8,15, 24 49:4 51:14 55:4,11 56:10 62:1 64:19,24 71:6 75:16,17 78:6,24 86:24 88:3 89:14,22 91:20

**Fax87.com.** 37:21

**faxed** 37:11 53:12 71:14

**faxes** 31:8 41:3,4,7, 23 42:9 43:13 44:20 45:6 49:3 50:3 53:2 67:1 70:15 76:21,22

77:5 78:5 80:15 84:16,17 87:10 88:17,18 89:6,16

**faxing** 43:19 47:9 50:3 51:12 71:4 74:8 75:21 76:25 86:23

**February** 7:11 44:2 58:23 64:4,7 65:9 78:10 80:24

**fee** 27:25 76:18

**feel** 10:6

**fees** 47:1 64:10

**felt** 41:20

**filed** 8:7 10:19

**files** 51:10

**find** 5:1 6:7 32:24 33:19 34:4 39:21 50:20,21, 22,24 51:1,11, 19 53:18, 19 54:22 76:13 79:1 82:16 86:14

**finding** 49:18

**fine** 45:16 90:20 93:13

**fired** 66:22,23 69:4

**fit** 15:6 62:2

**fixed** 66:18

**flier** 31:2,10 32:13,16, 21 33:16 34:5 37:13 41:17,23 42:22,23 43:5 62:7,8 79:22 80:1

**fliers** 31:3,23 43:4,19

**Florida** 20:10,11, 17,18 21:20 59:24

**follow** 26:15

**forgot** 51:7

**form** 10:4 30:9 42:25 50:4 79:18

**Fort** 60:22

**forward** 72:22

**found** 55:8 64:2 75:10 78:20,24 79:5

**free** 77:19

**Freedom** 23:3,9 66:3,8,12

**Friday** 18:16

**friend** 14:13,15 19:24 25:13 27:15 47:16 59:15 67:12,15

**friends** 15:22 16:6,7

**full** 79:14

G

**gave** 15:7 25:17 40:17 62:21 64:19,24 70:14

**general** 10:20 17:14 19:9 36:23

**generally** 23:21 69:19

**generating** 69:16,20

**Georgia** 11:25 12:5 60:3

**give** 8:5 25:1 36:6 48:25 65:18 85:1 88:4 93:11

**giving** 61:16

**glad** 19:10

**Gmail** 50:14,16, 23 51:1, 3,10,17, 18 54:22 55:2 56:13 91:9

**Goksu-savluk** 4:2,8

**good** 15:6 19:12 62:2 90:5 92:19

**Google** 25:4 32:25 33:1,7 39:18 40:12 79:3,5

**Googled** 39:22 71:9

**Googling** 39:19

**grew** 11:25

**group** 8:7 15:22,23 28:4 30:7 68:20,23 69:1,9

**guarantee** 36:3

**guess** 7:17 8:20 10:13 15:18 18:9 19:3,9 20:11,17 21:18 23:24 25:10 36:21 42:1 44:15 45:7 46:9 53:15 54:8 57:9 61:6 67:12 72:7

75:13
78:14

**guessing**
60:6
61:22

**guidance**
88:5

**guys**
45:9

**H**

**hand**
4:14 17:3
63:11
70:6 72:6

**handles**
52:7

**hands**
51:8

**handwritten**
35:5

**happen**
45:15
74:22

**happened**
10:21
16:11
43:17
48:19

**health**
13:5 15:1
22:22
23:12
26:3 27:2
36:22

**hear**
14:12
43:18,21

**heard**
47:5 48:3

**held**
14:9

**helpful**
24:3

**high**
12:3

**higher-ups**
18:9

**Hmielewski**
21:8,13
32:7
43:23
57:19
59:6
61:11
63:3 80:5
81:15

**Hmielewski's**
36:13

**hold**
13:2

**honest**
50:5 61:7
63:18
65:4
66:10
88:8

**honestly**
17:15
32:15
40:21
41:19
43:15
44:8
77:15

**hour**
11:21

**hours**
50:12

**HP**
52:5

**humongously**
77:4

**hundreds**
77:7,22,
25 78:1

**husband**
12:22
52:7

**husband's**
52:9
67:19

**I**

**idea**
7:9 32:1,
3,11
38:16
43:4
47:25
50:6 57:7
62:14
63:2,4
67:5,6
70:15,17,
18 79:14
88:20

**ideas**
31:15,18,
19

**identification**
4:12 7:25
17:2 28:8
29:21
30:21
52:22
56:20
58:17
63:9
65:6,23
72:2

**identifies**
71:25

**identify**
17:6
18:18
28:12
29:24
30:23
56:22
72:3
78:24

**identities**
87:25

**identity**
78:3 81:7

**illegal**
45:5
63:3,6,7

**illness**
23:13

**immediately**
44:6
45:23

**important**
49:23

**impossible**
77:8

**inaccurately**
93:3

**including**
85:15

**income**
27:8,10
66:18,20

**inconsistent**
80:10

**independent**
69:10,13
82:24

**indicating**
8:11
27:20
35:9,24
37:4 59:4
67:21
72:25
76:2
90:20

**individuals**
25:14
72:3
87:21,25
88:13

**information**
11:14,15
26:7,12
28:20,22
31:13
34:12,15
38:11,20,
24 40:17,
19 42:1
52:25
53:2,12
57:21
62:17,21
64:1
65:3,11
70:20
72:4
79:21
87:7,11,
15,22
92:14

**initial**
23:17

**input**
28:20
39:1
71:13

**inputted**
77:4

**inputting**

77:4,13, 23

**inquire** 47:6

**inquired** 26:3

**inquiries** 28:3

**insurance** 13:6 15:1 17:19 22:22,23 23:6,12 24:13 25:4,15 26:3 27:3 36:22 46:4,7,8, 10,12 47:7 66:3,9,12 85:16

**insurer** 47:6

**interested** 49:18

**internet** 71:8

**interrogatory** 52:21

**interviewed** 16:15,20

**introduce** 15:20

**inviting** 87:9

**involved** 15:25 22:25 74:9

**issue** 10:8 86:1

J

**Jackson** 5:4 10:24,25 11:1,8 48:12 63:12,21 73:1,23 74:6,14, 20 89:2

**Jackson's** 75:3

**January** 6:2,22,23 42:6 64:6

**Jim** 5:4 10:24,25 11:1 21:8,13 32:7 36:13,14 42:23 43:23 45:1 47:23 48:2,12 57:19 59:6 61:6,11, 16,20,23 63:3,12, 21 73:23 74:6 80:5 81:3,15 89:2

**job** 14:1 82:2

**judgment** 69:19

K

**Kennesaw** 12:4,8, 15,20 24:4

**keyboard** 64:12

**kind** 15:24 31:17

**Kirkman** 20:2

**Kissimmee** 13:21

**knew** 15:24 16:2

**knowing** 88:18

**knowledge** 24:16,19, 20

L

**ladder** 22:1 81:19

**laptop** 51:24

**large** 77:5

**late** 11:9,11

**laws** 83:13 84:12

**lawsuit** 11:13 70:8

**lawyer** 11:1,3

**lawyers** 9:17,22 10:2 39:4

**lead** 24:25 25:1,3,25

**leader** 21:25

**leaders** 79:22

**leads** 24:20,21, 22,24 25:4,5,8, 10,11,17, 18,21 26:15,16, 19,20 31:11 48:6 69:16,23 87:6

**leave** 26:25

**ledger** 5:19

**left** 12:19 55:24 69:3

**legal** 82:2 84:17

**legally** 69:1

**letter** 5:17 27:13 50:3 66:4

**letters** 48:9

**license** 13:5,6,15 15:8

**licenses** 13:2,4

**life** 13:6 23:3,9 66:3,8,12

**Linkedin** 29:25 30:15 91:15

**Lisa** 59:2

**list** 20:25 21:2,4,5 24:22 39:3 49:8,12 55:3 84:24 85:6 92:9

**listed** 60:4 85:9

**lists** 25:13 51:11

**literally** 57:24

**litigation** 55:13

**live** 14:17

**lived** 16:4

**local**
38:8

**locate**
38:6
72:7,9

**located**
12:4
13:20
18:7
19:18
20:1,12
53:20
71:5,17

**locating**
74:8

**locations**
20:12

**lock**
34:16,19

**locked**
36:5,7

**log**
38:10
39:8
56:8,10
64:4

**logo**
32:23,24
33:8,10,
21

**logos**
36:8

**lone**
79:9

**long**
11:20
16:4
26:22
77:11
92:15

**longer**
55:25
64:4,5

**looked**
28:4
42:4,10
48:14
51:3 55:6
56:5

**lot**
28:5
32:22
43:16

M

**machine**
37:22
39:20

**made**
11:7
44:11,14
91:20

**Magnolia**
19:22

**mail**
26:12

**mailed**
26:13

**main**
59:5
77:18

**major**
12:6,12

**make**
26:9 51:1
54:3
72:18
93:9,15

**management**
18:24

**manager**
16:16,17
19:24
21:16,18,
20 43:4
59:23
60:6
81:20

**managers**
20:24
21:7
59:12

**Manta**
38:17,25
77:22
92:2

**Manta.com**
38:5
71:19
92:12

**Mara**
14:16
16:16
21:17,22
27:15
47:18,19,
22 59:14
67:16

**March**
6:2

**mark**
5:9 6:20
7:12,21
29:19
56:18

**marked**
4:12 6:23
7:25
17:2,3
28:8,9
29:21
30:21,23
54:17
56:20
58:17
63:9
65:6,23
68:14
70:18
72:10

**market**
23:25
26:4

**marketing**
12:3,13
24:3,19,
20 30:14
47:10
48:4

**married**
12:21

**Marta**
47:16

**material**
85:13

**materials**
22:11
26:18
47:10
83:25

**matter**
85:13

**Mccants**
59:20,21

**Mccoy**
18:1
60:11

**Mcquagge**
18:2,3,6,
19 60:15

**meaning**
10:16

**means**
7:8
18:21,22

**meet**
8:16,24
9:8 16:14
18:12
19:10
22:10
32:9
58:5,9,12

**meeting**
8:19
10:23
11:17,20
18:14,25

**meetings**
18:13,15,
16 20:21
47:12

**member**
6:12 48:3
92:1

**members**
48:1

**membership**
89:13

**memos**
83:25
84:4

**mention**
62:24

**mentioned**
20:21
44:8
60:19
71:17
76:7 87:2

**merged**
15:11
19:25
20:2
21:15

**message**
63:16,17

64:18

**met**
8:15 9:22 18:10,11 19:4

**Michael**
63:12

**Microsoft**
52:18

**Mike**
9:3,5 56:23 57:24 58:10,13 65:9,12, 13

**mine**
36:12 70:19

**minute**
85:1

**model**
52:23

**moment**
88:21

**money**
89:21

**month**
13:25 14:1 40:25 41:9,13 89:15 91:22

**months**
5:25

**morning**
5:15

**moved**
11:24 12:1,21

14:10 72:22

**mumbling**
64:23

**N**

**names**
55:1,3 72:3

**nature**
84:1

**needed**
27:7 44:6

**negatively**
37:4 59:4

**Netquote**
25:2

**newer**
72:22

**night**
42:10 82:17

**note**
7:18 76:16 87:24

**notes**
71:20

**notice**
4:19

**noticed**
57:18 62:18

**notification**
49:5,7

**notifications**
49:16

51:7,18

**notify**
93:10,18

**November**
11:9 26:24 63:13 64:19 73:19,21 74:7,14, 25 76:1 89:3

**number**
4:11 7:2, 4,19,23 17:1 20:20 28:7,23 29:20 30:20 37:19 38:2,11, 12,14 40:11 43:15 48:17,22 49:20 52:23,24 56:19 58:16 61:25 62:10,16 63:1,8 64:3,20, 24 65:5, 22 75:11 77:5 79:7 80:12 89:6,11 90:12,13 92:5 93:22

**numbered**
7:24 61:9

**numbers**
38:21 39:9,12, 15 49:8, 12 62:6 71:14,18, 21,24,25 77:4,13, 22,25 78:4 87:12,14 88:1,9,13 92:4,10

**O**

**Obamacare**
27:2

**object**
10:4 30:9 42:25 50:4 53:23

**obligations**
82:2 83:19

**obtain**
24:24 27:23

**obtained**
71:24

**occasion**
87:3

**occur**
43:24

**offenses**
84:24

**offered**
16:15,21 62:1

**offering**
41:17

88:4

**offers**
50:23

**office**
8:17 11:2 13:13 15:10,11 16:20 18:15 19:2,17, 18,23 20:1,3 21:7,21, 22 22:10 47:24 59:13

**offices**
13:22

**older**
72:20

**oldest**
73:3,9,14

**online**
6:12 39:21 64:12 71:6 78:21 92:6

**option**
41:18,20

**options**
27:2 39:22

**order**
68:6 72:19

**organizations**
13:23

**original**
61:14,23

**originally**
20:1
36:12
61:6

**Orlando**
12:1,21,
25 13:22
14:10,17
16:2,4
18:13
19:16,19
20:8,16
21:21
22:3,4
39:2
44:24
59:12
60:2,20

**P**

**p.m.**
74:7,15
75:1 76:2

**package**
66:5

**pages**
28:18
71:20

**paid**
46:17
89:22

**paragraph**
34:9
82:22
83:10
84:9,23

**part**
15:11
20:16
30:14
69:23
88:17
91:13

**particulars**
84:3

**past**
14:6

**paste**
62:17
92:3,5

**pasted**
61:15

**pay**
27:25
45:16,25
46:16
47:6
89:21

**paycheck**
46:17,21

**penalties**
46:2

**penalty**
47:6

**people**
15:24
21:4
22:15
28:3
47:25
49:19,25
61:21,24
78:3

**performed**
69:22
76:25

**period**
92:1
93:11

**person**
26:1
38:18
43:22
53:18
81:7

**personal**
5:6 14:8
16:6
28:22
34:10
52:12
54:1
55:14,15
77:2 91:8

**personally**
18:10,11
26:13
46:13
51:3 56:8
79:20
89:23

**Peter**
58:9,12
63:12

**phone**
26:9
28:23
37:19
39:9
48:22
88:6 92:4
93:21

**photo**
29:2

**photograph**
28:24,25
30:5

**pick**
57:25

**picture**
32:22
33:13,19,
21,22,23
36:1

**pictures**
33:6

**pitch**
25:24

**place**
73:6

**Plaintiff's**
4:11 7:24
17:1 28:7
29:20
30:20
56:19
58:16
63:8
65:5,22
72:11

**Plaintiffs**
8:7 10:19
81:12

**plan**
43:12

**planning**
31:8

**plans**
34:25

**point**
34:22
89:5

**pointing**
34:24

**points**
34:16

**policies**
83:25
85:14

**policy**
26:11
47:3

**portion**
8:3

**position**
9:25
16:22
18:8
21:14
59:18

**Possibility**
87:16

**possibly**
47:4
51:17,18
81:14

**practice**
79:10
87:3

**pre-existing**
35:8,10

**premium**
46:16

**premiums**
36:5

**prepare**
24:13
56:25

**present**
9:17,22
10:23
11:17

**presently**
13:24

**previous**
75:4

**previously**
25:14,16
75:9

**price**
36:5,6
40:4,17
41:20,24
62:10
76:22

**prices**
40:24

42:12

**pricing**
42:17

**print**
55:13

**printed**
55:9

**prior**
88:14

**problem**
45:3

**procedure**
26:16

**proceedings**
54:16
88:24

**process**
22:11
32:20
40:15
55:11
71:4,12
88:17
92:15

**produced**
58:14
65:24

**product**
23:6
24:16
26:8
34:20
62:1,3

**products**
23:12,23,
24 24:9,
14 85:15

**program**
50:23
52:18
88:3

**proposed**
42:24

**prospects**
22:22
31:17,21
48:6 50:1
77:16

**Prospectzone**
25:3

**protected**
53:10

**provide**
11:15
26:8
52:23
91:6

**provided**
8:18
25:5,13
27:24
29:2
37:20
43:13
80:18,24
92:15

**Published**
85:12

**pull**
33:7

**purchased**
25:7,11,
14,16
26:15,20

**purely**
71:8

**purpose**
8:19
11:12
18:25
57:5

**pursuant**
86:6,12
89:7

**put**
33:10
34:7
39:2,4,5,
9 50:24
54:25
68:6

**putting**
39:16

**Q**

**question**
5:5 10:14
53:23
69:18
72:8
75:8,14
78:19,23
79:13,17,
19,24
80:14
90:18,22

**questioned**
10:13

**questions**
8:6 9:18
10:1
60:25
61:1,9,
12,18,23
65:21
68:2,4
69:15
71:3
78:9,18
79:6,17
81:2,15
86:21
90:2
91:17

92:17

**quick**
72:13
74:4 82:5

**quickly**
82:6 92:8

**quit**
14:1,7

**R**

**rankings**
21:1

**rate**
34:16,19
36:3
49:14

**reach**
31:17
49:24,25

**reached**
49:24
51:3

**reaching**
49:19

**read**
58:22
63:25
84:5
86:13
92:25

**reading**
92:22

**ready**
93:19

**real**
13:5,7,12
33:24
72:13

**Realty**
13:13

**reasonable**
41:24

**reasons**
14:8
27:1,4,6

**recall**
17:17
81:7,18
83:23,24
84:3
86:25

**receipt**
49:4,5

**receive**
4:16 21:3
37:1 47:9
86:19

**received**
42:2
44:19
47:21
49:17
56:1

**receiving**
83:23,24

**Recently**
56:5

**recipients**
44:9,23

**recollection**
76:20,24
77:2,12,
21 89:11

**recommendation**
15:3

**recommended**
14:21
70:14

**recommending**
62:10

**record**
4:7 48:21 49:2 64:5 71:23,24 75:24

**recorded**
40:24

**records**
48:14,25 51:15 61:8 72:2 73:8 74:8,18 75:19 76:13

**recover**
50:16,20 51:2,10 53:1

**recovered**
51:19

**recruit**
14:23

**recruited**
14:22 15:9,15, 19 19:24

**redact**
5:7 7:18

**REDIRECT**
91:18

**reference**
76:4 79:2 82:23

**referred**
20:5

**referring**
6:17 20:3 29:14 36:4 75:16 76:1 85:14 86:8 89:1

**refers**
37:10,18 73:5

**region**
59:24,25 79:11

**regional**
59:23

**regulations**
83:12,14 84:12

**reimbursed**
89:25

**relate**
74:8

**related**
55:12 67:7

**relating**
8:4,10

**relationship**
16:9 68:11,16 69:9,11 82:14 88:10,14

**relevant**
7:16

**remember**
9:10,12, 13 11:21 17:8,15 18:8 19:11 28:2 29:7,18 32:15,17 33:9,12, 13 40:1, 20,25 41:6,9,19 42:2,16 43:1,11, 16,17 44:8,18 45:9,12 46:20 47:4 49:14,15 50:5,10, 12,13 52:6 59:10 61:7 63:14,19 65:3 71:2 77:1,11 81:10 92:7

**remembered**
93:3

**reporter**
4:12 7:23 8:1 17:2 21:9 28:8 29:21 30:21 56:20 58:17 63:9 65:6,23 93:21,24

**represent**
10:7

**representative**
40:13

**representatives**
20:13

**representing**
17:17

**reps**
19:12,14

**request**
4:24 6:7 26:1 31:11,13 56:25

**requested**
4:19 87:21

**require**
84:11

**required**
85:22

**research**
71:8

**researching**
77:22

**reserve**
93:14

**resign**
27:11 67:13

**resignation**
27:13

**resigned**
66:17 67:11

**respect**
9:15 10:7 86:23 87:12 88:16

**respond**
61:24

**responded**
44:20 74:20

**responding**
63:17 75:3

**response**
5:16 6:10 9:13 45:13 74:1 78:19,23 79:12,16, 19,25

**responsibilities**
83:8,20 84:10

**responsibility**
79:14

**responsive**
4:23 6:7

**resting**
57:24

**result**
66:25 84:24 85:7

**retained**
53:25

**review**
73:8,13 80:21 81:22

**rights**
54:4,5

**Road**
20:2

**role**
22:20

**rules**

83:12

**run**
74:22
75:5

**running**
16:19

**S**

**safe**
20:17

**sales**
12:4,13
13:7
14:24
19:2,12
21:1,25
25:24
36:22
85:13

**satellite**
21:18,22

**satellites**
20:12
21:24

**save**
71:20

**Savluk**
12:23

**school**
12:3 15:7

**seal**
35:20

**search**
25:4
38:8,9,25
40:12
42:2
54:22,25
55:1,2,20
79:5

**searched**
39:18

**searching**
55:3,21

**section**
13:14
39:9
82:23
83:7
84:9,21,
24 85:11
86:4,7

**secure**
85:22

**securing**
85:17
86:8

**seeking**
69:23

**selected**
33:10

**self-employed**
15:17
31:16
39:5
69:25

**sell**
23:6,11
24:8,13

**selling**
22:22

**send**
27:13
37:25
38:13
41:7,23
42:24
43:13
45:6 62:9
63:23
70:17

87:10,15,
21 91:21

**sending**
31:8
51:17
70:15

**sense**
49:2

**sensitive**
90:8,10,
15

**separate**
72:24

**September**
67:13,20

**serial**
52:23

**series**
79:6,17

**service**
41:6

**services**
24:1
85:15

**session**
23:18

**shared**
25:11

**she'll**
27:17

**Shelton**
59:11

**Shelton's**
60:5

**short**
54:13

**shortly**
44:11

**show**

6:11,17
28:9
29:22
42:23
54:17
70:25

**showed**
43:7

**showing**
36:20

**sic**
18:1
47:16
60:11
77:5

**sick**
57:23

**side**
35:20

**sign**
8:25 9:1,
3 16:24
46:13
57:3,11,
15,25
93:7

**signature**
18:18

**signatures**
17:7,22

**signed**
6:13
37:20
41:7 44:1
60:15
64:6
89:14
91:24

**signing**
17:16

**Silva**
58:24

60:4,5

**Silvia**
59:2

**sit**
78:2
88:16

**sitting**
77:3

**situation**
47:23

**Sixty-five**
20:18

**sleeping**
58:1

**small**
38:22
39:6

**sold**
21:3,5

**soliciting**
69:20

**solicits**
83:14
84:13

**south**
59:25

**specific**
25:25
39:4
50:13
55:1
81:16,18

**specifically**
68:23,25
69:1
75:18
80:1 82:1
86:6 89:1

**specifics**

42:16

**spell**
21:9,10, 11

**spend**
12:14,15
50:2

**spending**
49:19

**spent**
89:21

**spoke**
88:3

**stable**
27:7,9

**stand**
62:22

**start**
65:19

**started**
14:13
15:9 20:1
25:12
30:12

**starts**
73:17
75:9

**state**
4:7 12:4, 8,15,20
15:8

**stated**
80:1

**statement**
5:7,18
90:17,21

**statements**
4:25 6:10
8:3 48:15
57:11,19

90:10

**states**
60:1
83:14
84:12
85:11

**stayed**
22:3,4

**stepped**
21:17

**Stevie**
36:19,20

**Stevies**
36:14,16

**stop**
22:13
44:6
45:1,21
53:22

**stopped**
91:23

**strategy**
30:14

**strike**
69:10
74:19
87:3

**studied**
24:3

**study**
12:12

**stuff**
68:5

**Suarez**
9:5 56:23
63:12
65:9

**subcontracted**
15:18

**Subpoena**
4:15
5:16,18

**success**
19:2
49:14

**successful**
15:6

**successfully**
49:10
51:12

**suggest**
24:15

**suing**
45:7,8
81:13

**superiors**
20:23

**supply**
28:24

**sworn**
4:3

**system**
40:19

**T**

**taking**
73:2
78:8,17
79:16
82:5,22
83:1,7
84:8,20, 23 85:6
86:3 91:1

**talk**
9:11,15
10:2,9,20
19:8

26:1,5
31:12
40:8,10
47:16
70:5
92:22

**talked**
32:17
39:23
43:22
47:22,24
57:19
62:1
83:25

**talking**
60:12

**Taraina**
59:20

**targets**
48:6

**team**
19:2
20:5,6,7, 16,23
21:25
31:22
32:5
48:1,3

**tech**
53:18

**telephone**
7:2,4
64:16,17

**tells**
64:9
76:16

**ten**
11:25
57:23

**tenders**
90:17

**Term**
84:21

**terminated**
66:8,15

**termination**
66:7
84:25
85:8

**terms**
68:16
82:11,13

**test**
15:8

**testified**
4:4 69:3
70:2,12, 24 71:5
77:10
78:9 81:6
84:15
87:5 89:9
93:4

**testimony**
65:16
66:17
80:9

**Texas**
11:2 18:7

**thanking**
75:4

**thing**
5:1 15:22
48:14
62:24
90:14
92:6

**things**
19:9,13
23:14
24:11,21
29:17
32:10,25

33:5 36:21 43:16 52:7 55:1 57:16 58:8 62:5 67:25 84:1,5

**Thirty**
41:13 89:8

**thought**
9:16 15:6 31:25 41:21,24 57:17

**thousand**
42:8,13

**thousands**
77:7

**three-year**
34:16,19 35:21 36:3

**till**
26:24

**time**
6:11 9:14 12:18 13:10 15:10 16:17 19:4,15 31:4,12 58:4 73:20 77:3,8, 12,17,19 78:5 80:15 82:14 83:13 84:16 87:4,20 88:2 89:5 90:3 91:12 93:8,11

**timeframe**
55:5

**times**
22:10 83:11

**timeshare**
13:14

**title**
16:18 18:19 81:16,18 82:2

**today**
4:22 8:6 36:6 54:19 59:18 65:16 72:16 78:2 88:16

**told**
23:21 27:15 40:14,22 44:5 45:1,12, 15 48:20 57:9 58:11 67:12,22

**top**
19:12,14 21:18 33:10 37:7

**total**
5:25 91:21

**totally**
67:5

**track**
87:24

**tracking**
48:21

**trained**
23:25 24:8 25:19 40:22

**training**
22:5,8 23:17 24:13 47:9 88:4

**trainings**
22:9

**transcribed**
93:3

**transcript**
92:25

**transmission**
48:9,25 51:11 53:19

**transmitted**
49:10

**trash**
49:17 50:24

**Travis**
60:9,10, 12,19

**treat**
49:16

**Troy**
18:1,6 60:11,13

**truth**
4:3,4

**Turkey**
11:24

**turn**
51:19

**type**
41:6 46:7 51:22

**types**
39:3

**typically**
91:11

**typographical**
35:7

**U**

**U.S.**
7:6 11:24

**uh-huh**
9:2,7 18:10 24:17 30:2 35:12,17 37:15 42:7 52:2 59:7 60:23 63:22 65:10 71:7 75:17 78:12,16 80:20 84:22 91:2

**undergo**
22:5

**understand**
10:8 69:9,12

**understanding**
68:10 71:13 72:19 76:21

**understood**
84:6 86:15

**underwriter**
22:25 23:4

**underwriters**
23:2

**underwritten**
23:9,10

**Union**
5:18 6:1

**United**
60:1

**unsigned**
6:4

**unsolicited**
84:17

**upload**
62:6

**uploaded**
64:25

**upper**
18:24

**USHA**
20:5,7

**USHEALTH**
8:7 9:11 11:3

14:11,12, 19 15:4, 12,21,24 16:1,12 17:18 19:23 22:15,24 23:15,19 24:8,14 25:5,6,9, 15 26:23 27:19 28:4,15 29:3,5 30:7,13 31:4,19 32:23,24 33:4 34:11,13 43:18 46:5 55:18 56:1 59:16 66:15,22 68:11,17, 20,23 69:1,9,12 70:14 81:17 82:14,24 83:12 85:14,17 86:8,9,19 87:5

**V**

**verbiage** 29:7,12

**verify** 87:18

**volition** 69:4

**W**

**waiving** 92:22

**walked** 40:14

**wanted** 11:14 26:7 27:2,7 32:9,11 39:20 40:14 57:11,16 61:1,5,17 62:4 66:18 67:13,22

**warned** 77:20

**warnings** 45:24

**ways** 24:11 77:18

**web** 27:18,23, 25 29:2

**website** 28:5,16, 17,21 29:6 30:11,12 33:3 34:11 35:4 38:5,9, 10,20 39:8 56:3 62:18 71:14,18 78:6 79:21 88:7 89:12 92:13

**websites** 33:1,2

**week** 19:11 22:10

**weekly** 18:15 21:3 22:9

**weeks** 43:25 50:9,11 91:23

**Westgate** 13:17,19, 20 14:4,7 27:9

**whatsoever** 71:23

**Windows** 52:14

**withdraw** 6:23

**withdrew** 6:16

**wolf** 79:10

**words** 55:1

**work** 13:9,18, 23 14:5, 19 17:18 22:15 26:22 59:16 66:12 67:14 69:22 92:11

**worked** 13:11,12, 13,21 14:11 40:19 66:16 70:2 71:4 81:17

**working** 15:4 16:11 17:19 31:4,16 46:4 67:25 69:13

**works** 11:2,3 15:23

**worried** 45:14

**Worth** 60:22

**write** 22:23 35:18 59:8

**writing** 22:1,17, 18,19,20

**written** 85:17,22 86:9,19 92:25

**wrote** 35:3,13, 15,16 57:10,12 73:23 74:2,3,14

**www.fax87.com** 6:25

**Y**

**year** 11:9,11 12:14 31:18 52:8 78:15 79:25 89:6

**years** 12:15,17 14:14 15:12,13, 25 17:16, 17 26:24 34:2 36:7 68:12

**yesterday** 8:15 11:18 58:3,4

**Yoder** 60:9,10